IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JUSTIN NOVICK, ET AL | § | CASE NO. 4:16-CV-0730 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | JUNE 27, 2018 |
| SHIPCOM WIRELESS, INC., ET AL | § | 8:04 A.M. TO 5:35 P.M. |

JURY TRIAL DAY TWO

BEFORE THE HONORABLE CHRISTINA A. BRYAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

COURTROOM CLERK:                          CINDY JANTOWSKI

ELECTRONIC RECORDING OFFICER:      SAMANTHA WARDA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For the Plaintiffs,                     SHELLIST LAZARZ SLOBIN, LLP
Justin Novick, et al:                   Michael Todd Slobin, Esq.
                                        Daryl Sinkule, Esq.
                                        11 Greenway Plaza, Ste. 1515
                                        Houston, Texas  77046
                                        713-621-2277



For the Defendant,                      LITTLER MENDELSON, PC
Shipcom Wireless, Inc.:                 Kerry E. Notestine, Esq.
                                        Luke C. MacDowall, Esq.
                                        1301 McKinney, Ste. 1900
                                        Houston, Texas  77010
                                        713-652-4743

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CHARLES BETHAS | | | | |
| By Mr. Slobin | 6 | . | 67 | |
| By Mr. MacDowall | | 29 | | |
| | | | | |
| JUSTIN ERIC NOVICK | | | | |
| By Mr. Slobin | 165 | . | 219,334 | . |
| By Mr. MacDowall | . | 190 | . | 222 |
| | | | | |
| ZAHID ISLAM | | | | |
| By Mr. Sinkule | 227 | . | 295 | . |
| By Mr. Notestine | . | 261 | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| (Pre-admitted.) | | | |

1          <u>HOUSTON, TEXAS; WEDNESDAY, JUNE 27, 2018, 8:04 A.M.</u>

2          (Outside the presence of the jury.)

3               THE COURT:  Is there anything that we need to take

4     up before the jury comes in?

5               MR. NOTESTINE:  Why not, Your Honor?

6               THE COURT:  Okay.  With respect to the charge

7     conference, will you-all be ready to do that this evening

8     after Court?

9               MR. NOTESTINE:  Yes, Your Honor.

10              MR. SLOBIN:  Yes, Your Honor.

11              COURTROOM MARSHAL:  They're here.

12              THE COURT:  Okay.  The jury is all here.

13              MR. SLOBIN:  Your Honor, should I put the witness in

14    the box now?

15              THE COURT:  Sure.

16         (Pause in the proceedings.)

17              MR. SLOBIN:  Your Honor, I think I'd like it on the

18    Record that I was the second person here among the attorneys

19    and the witnesses today.

20              THE COURT:  The question is:  Did everyone have

21    their coffee this morning?

22              MR. SLOBIN:  Yes, but I think I needed a second cup.

23    You'll see a little lag in energy this morning, and I

24    apologize for that in advance.  Luke beat me.

25              MR. MACDOWALL:  Without any coffee, I should add.

1          MR. SLOBIN:  What?

2          MR. MACDOWALL:  Yeah.

3          MR. SLOBIN:  Do you have kids yet?

4          MR. MACDOWALL:  No.

5          MR. SLOBIN:  That'll change.  I started drinking

6     coffee the week my second child was born.

7          You comfortable with that mic setup today?

8          WITNESS BETHAS:  As long as you are.

9          THE COURT:  Can you-all hear him back there?

10         MR. SLOBIN:  I was having trouble hearing in the

11    beginning, Your Honor.

12         THE COURT:  I don't know if you can make it come

13    forward a little bit or --

14         WITNESS BETHAS:  That's about as far as we can go.

15       (Talking off the Record.)

16         WITNESS BETHAS:  How we doing now?

17         THE COURT:  That's better.  I think I can pick up

18    now.

19       (Talking off the Record.)

20         THE COURT:  We're ready.

21         COURTROOM MARSHAL:  You're ready?

22         THE COURT:  Yes, thank you so much.

23         COURTROOM MARSHAL:  All rise for the jury.

24       (Jury enters courtroom at 8:09 a.m.)

25         THE COURT:  Be seated, please.

6

1          Good morning, ladies and gentlemen of the jury.  We

2     are ready to proceed.

3          We need to swear the witness again.

4        (Witness sworn.)

5          THE COURT:  Please proceed.

6                DIRECT EXAMINATION OF CHARLES BETHAS

7     BY MR. SLOBIN:

8     Q    Good morning, Mr. Bethas.  How are you doing today?

9     A    I'm great, thank you.

10    Q    Great.  Okay.  Let's just dive right into this.

11         If you'll turn to Exhibit No. 9 in that Plaintiffs'

12    exhibit book in front of you.

13        (Talking off the Record.)

14    BY MR. SLOBIN:

15    Q    Or if you can see it on the monitor in front of you, too.

16    That work?

17    A    That's fine.

18    Q    What is this document?

19    A    This appears to be possibly the agreement that --

20    Q    I'm going to help you out because I'm going to --

21    A    Yes.  It's the offer they made me prior to my employment

22    at Shipcom.

23    Q    Okay.  Great.  And you'll kind of some duties and

24    responsibilities that are listed in this document.  See that?

25    A    Yes, I do.

CHARLES BETHAS - DIRECT BY MR. SLOBIN                          7

1    Q     Thank you.  All right.  It indicates that your position

2    will be a senior trainer.  Was that your title while you were

3    employed at Shipcom?

4    A     It was.

5    Q     Okay.  And do you know if there's any difference between

6    a senior trainer and any other trainer?

7    A     Well, I was the oldest one there.  That might have had

8    something to do with it.  But actually I have more years of

9    experience at previous positions being a trainer.

10   Q     Okay.  Let me ask you this.  But do you know if the

11   duties that you had as a trainer were the same as other

12   trainers?

13   A     They were.

14   Q     Okay.  Do you know if there's any differences between

15   your duties and other duties of other trainers, based on your

16   own personal experience?

17   A     No, we actually were able to do the same things and

18   interchange personnel as needed, which happened quite often.

19   Q     Okay.  If you'll look down to -- let me point this to

20   you.  It says duties shall be as follows but not limited to.

21   It states preparation of training material.  What does that

22   mean to you?

23   A     The preparation was involved either getting the handouts,

24   the quick reference guides, all the reference materials

25   printed here in Houston.  And then drop-ship to the end site.

1    Eventually we changed over to taking them on a thumb drive,

2    presenting them to a local printer and having them print there

3    onsite to help save shipping costs.  The PowerPoints, those

4    were also delivered to me by email.  I would copy those to a

5    thumb drive so that I would have those when I arrived on site

6    and we'd have the latest versions that were approved.

7    Q    Okay.  Did you at all -- were you at all involved in

8    actually drafting the training material, the content of those

9    materials?

10   A    No, that was done for us.  And those were approved

11   between management of Shipcom and the VA.  And I believe that

12   there was a furious transition back and forth until those were

13   perfected.  Once that happened, then the final drafts were

14   presented to me so that I could transport those to the site.

15   Q    Okay.  And again, and I apologize if I asked this

16   yesterday.  Again, you were not involved in any of that

17   process of what's going to go in the training material and

18   then out to the VA personnel?

19   A    No.  No, I wasn't.

20   Q    Okay.  And it has your compensation listed on this; is

21   that right?

22   A    That's correct.

23   Q    And how were you to be compensated?

24   A    Well, I discovered after I was employed there that we

25   were paid monthly.  So, the $90,000 was divided into 12

1    monthly compensations with the appropriate tax and so forth

2    taken out.

3    Q    Okay.  And was that $90,000 for all hours, even for all

4    the hours you worked regardless of the amount?

5    A    Yes.

6    Q    Okay.  All right.  And did you work a lot of hours?

7    A    I slept very little.

8    Q    Okay.

9    A    Most days were a minimum of 14-hour days.

10   Q    Okay.  And during those 14-hour days, again tell me

11   exactly what you were doing.  Just kind of give me a summary

12   of that.

13   A    We would arrive very early onsite to meet with logistics

14   people there onsite.  Mostly with the site lead getting us

15   into the rooms.  Just getting access into the rooms was

16   sometimes a challenge.  Finding a room sometimes we needed to

17   be guided to that.  We would set up for the classes and make

18   sure all the visuals were in place, all the materials were

19   passed out, and that we were ready for the class to begin.

20   Q    And then you would -- I assume you'd teach the class?

21   A    We would teach the class in whatever fashion needed to be

22   -- to accommodate the staffing.  And then there would be

23   questions afterwards, occasionally.  We would go ahead and do

24   end-of-day reports for the rosters to our management.  Answer

25   emails.  Plan for the next training, if there was any

1    materials that needed to be reprinted because they had been

2    revised during our training session.  And we did that often.

3    So things changed moment to moment and we had to be ready.

4    Q    And then if there were questions and you provided

5    responses, where is the source material for you to give the

6    response?

7    A    Those were generally parking lot items.

8    Q    And what does that mean?

9    A    Well, what that means is like during the presentation if

10   it deviates outside what we're addressing through the

11   PowerPoint presentations, we would make a list of whatever

12   questions needed to be answered because we weren't really in a

13   position to be able to say how they worked, how their process

14   flowed.  And most of the time that was our first time onsite.

15   So we would parking lot those items and pass those up to my

16   managers so that they could disseminate them to theirs and a

17   decision and answer could be given.  And most often those

18   answers would be reported back to us, as well.

19   Q    Okay.  All right.  But did you have the ability to answer

20   questions that were outside of the materials given to you by

21   Shipcom?

22   A    No.  Any questions were generally We do this here, what's

23   the equivalent of that with your software.

24   Q    All right.  I'm going to put up Plaintiffs' Exhibit

25   No. 10.  You see this?

CHARLES BETHAS - DIRECT BY MR. SLOBIN

1    A    Yes.

2    Q    And what is this?

3    A    Well, it looks like a job description for a trainer.

4    Q    Okay.  And I'll let the jury kind of go through all this.

5    But it says here, and I think this is important, enhancing

6    training materials.  What does that mean to you?

7    A    I really can't tell you.  Enhancing it.  The training

8    materials were presented to us.  We weren't to deviate.

9    Possibly printing them in color versus black and white.

10   Q    Okay.  But you didn't alter?

11   A    No, we weren't allowed to alter content.

12   Q    All right.  Great.  All right.  Here comes a laundry list

13   of questions.  I need to go through all of these.  It's

14   important to your case.

15   A    Okay.

16   Q    All right.  Did you do any work related to tax?

17   A    No.

18   Q    Okay.  And I think I'm going to use Mr. Sinkule's

19   approach.  Did you do any work related to finance, accounting

20   or budgeting?

21   A    No, I didn't.

22   Q    Okay.  Did you do any work related to auditing?

23   A    No.

24   Q    Did you do any work related to insurance, quality control

25   or purchasing?

1    A    No, they had departments for that and there was no need.

2    Q    I asked you this earlier, but did you do any work

3    relating to procurement?

4    A    No.

5    Q    All right.  Did you do any work relating to advertising,

6    marketing, research or anything related to safety and health?

7    A    No.

8    Q    All right.  Did you do any work related to personnel

9    management or human resources?

10    A    No, I didn't.

11    Q    What about employee benefits, labor relations or public

12    relations?

13    A    No.

14    Q    What about government relations or computer network?

15    A    No, that was outside my job --

16    Q    Okay.  What about any work related to Internet and data

17    base administration?

18    A    No.

19    Q    Any work related to legal and regulatory compliance?

20    A    No.

21    Q    Any -- Let me ask you this.  Were you engaged in actually

22    running Shipcom?

23    A    No, not in any way.

24    Q    Okay.  You weren't on management at Shipcom, were you?

25    A    No.

1    Q    All right.  Were you at all responsible for determining

2    Shipcom's overall course or policies?

3    A    No, I was not.

4    Q    Did you design any of the CATAMARAN software?

5    A    No.  No.

6    Q    Were you a part of the team that designed any of the

7    CATAMARAN software?

8    A    No, that was done by Development.

9    Q    Okay.  And again, I believe you testified your job was

10    literally just training that material; is that right?

11    A    Yes.  I presented the material.

12    Q    Okay.  Did you advise the VA hospitals on about how to

13    configure or modify the CATAMARAN software to run their

14    business?

15    A    No.

16    Q    Okay.  All right.  Did you have the authority to

17    formulate Shipcom's management policies?

18    A    No, I didn't.

19    Q    Did you have the authority to effect Shipcom's management

20    policies?

21    A    No, I didn't.

22    Q    Did you have the authority to interpret Shipcom's

23    management policies?

24    A    No, sir.

25    Q    What about implement Shipcom's management policies?

CHARLES BETHAS - DIRECT BY MR. SLOBIN

1    A    Absolutely not.

2    Q    What about formulating their operating procedures?

3    A    No.  Those were dictated to us.  No.

4    Q    Affecting their operating procedures?

5    A    No, those were parked or in place.

6    Q    Okay.  Interpreting their operating procedures?

7    A    No.

8    Q    Implementing their operating procedures?

9    A    No.

10   Q    Were you able to commit Shipcom in matters that have a

11   significant financial impact?

12   A    No.  I was just a teacher and presenter.

13   Q    All right.  Still got a couple more here.  Sorry.

14   A    Okay.

15   Q    Did you have authority to waive or deviate from

16   established policies and procedures without prior approval?

17   A    Absolutely not.

18   Q    And can you get a little closer to that mic again?

19   A    Absolutely not.

20   Q    Did you have authority to negotiate and bind Shipcom on

21   matters of significant -- on significant matters?

22   A    No.

23   Q    Did you provide consultation or expert advice to Shipcom

24   management?

25   A    No.

15

1   Q    Were you involved in planning long- or short-term

2   business objectives for Shipcom?

3   A    No.  Those were decided for us.

4   Q    Did you investigate and resolve matters of significance

5   on behalf of Shipcom's management?

6   A    No.

7   Q    All right.  Did you represent the company in handling

8   employment complaints?

9   A    No.

10  Q    Or any complaints?

11  A    No.

12  Q    Did you represent the company in arbitrating disputes?

13  A    No, not amongst the employees or the VA, either one.

14  Q    Okay.  Did you represent the company in resolving

15  grievances?

16  A    No.

17  Q    Did you ever negotiate a contract with the VA?

18  A    No, I didn't.

19  Q    Did you negotiate any pricing terms with the VA?

20  A    No.

21  Q    Did you participate in any management meetings at Shipcom

22  regarding the direction of the company?

23  A    No, I didn't.

24  Q    Did you have any input into which hospitals you trained

25  at?

16

1   A    No, I didn't.

2   Q    Did you discipline employees?

3   A    Absolutely not.

4   Q    Did you manage employees?

5   A    No.

6   Q    Did you devise any marketing plans for Shipcom?

7   A    No.

8   Q    Did you decide whether or how to recruit potential hires?

9   A    No.

10   Q    So you indicated that you were primarily teaching.  How

11   much time, how much of your job was teaching?

12   A    Basically the entire time I was onsite.

13   Q    Okay.  And was that your primary duty?

14   A    That was really my only duty, yes.

15   Q    Okay.  Let's look at Plaintiffs' Exhibit No. 11.  And you

16   may want to pull this out of the book or look at it in the

17   book.  Let me ask you -- I'm not going to go through all of

18   these, but I want to go through a couple of them.

19        Whose handwriting is this?

20   A    The handwriting would be mine.

21   Q    Okay.  And what is this document that we're looking at?

22   A    It's an annual performance review for myself.

23   Q    Says year one, so that's the first year you were there?

24   A    It was sometime after my anniversary, approximately three

25   months, but yes.

CHARLES BETHAS - DIRECT BY MR. SLOBIN

1    Q    Okay.  All right.  Let's talk about number 5.  I can't

2    read your handwriting.  What does that -- First of all, what's

3    the question and what's your response?

4    A    The question reads, number 5, proficiency at improving

5    work methods and procedures as a means towards greater

6    efficiency.  My handwriting shows two items, one being

7    developed and accomplished data interface virtual training.

8    Q    Okay.  And that's consistent with what you did; is that

9    right?

10   A    Yes.  The development staff had a playground, a sandbox,

11   a test environment where I could practice setting up rooms,

12   setting up racks, basically just getting to know the software

13   and be able to talk to it in an intelligent way.

14   Q    Okay.  And again, you're following the processes that are

15   given to you; is that right?  Is that fair?

16   A    Yes, I needed to know how to do this.  Yes.  And was

17   instructed to learn the software.

18   Q    Okay.  Why don't you turn to the next page.  Let's talk

19   about number 7, the ability to work independently.  What did

20   you write?

21   A    I wrote that the DC site go-live support solo for

22   approximately eight weeks.  Basically that means that everyone

23   in the company left except for me.  I was there by myself.

24   Q    Okay.  And again, this whole time you're following the

25   guidelines from Shipcom; is that right?

CHARLES BETHAS - DIRECT BY MR. SLOBIN

18

1    A    That's correct.

2    Q    What about number 11?  Move that out.  What is that

3    question and response?

4    A    Adeptness to analyzing facts, problem solving, decision-

5    making, and demonstrating good judgment, has determined site

6    lead -- has demonstrated site lead skills and worked as public

7    relations during crisis management.  And I notated DC and

8    Durham.

9    Q    Okay.  What happened there?

10   A    Chaos.  There was poor execution and poor assessment of

11   the site's needs.  There were difficulty in the learning curve

12   in the staffing at both sites.  So I was asked to stay behind

13   and basically handle these people through additional training,

14   day in, day out until they got it.

15   Q    Okay.  And do you know why you were asked to kind of

16   hand-hold at the site?

17   A    Because I'm empathetic and nice.

18   Q    Okay.  Patient?

19   A    Very.

20   Q    Okay.  And again, the whole time while you're hanging

21   back dealing with that crisis situation are you still

22   following Shipcom's management or guidelines?

23   A    Every day.

24        MR. MACDOWALL:  Objection, Your Honor.  Please ask

25   Counsel not to lead the witness -- stick to questions.  Object

1    to form.

2              THE COURT:  Your objection is leading?

3              MR. MACDOWALL:  Yes, Your Honor.

4              THE COURT:  Sustained.

5              MR. SLOBIN:  All right.  I'll move on.

6    BY MR. SLOBIN:

7    Q    Let's look at number 15.  Tell me what this question --

8    please explain what 15 states.

9    A    Fifteen states "delegates responsibility where

10   appropriate based on the employee's ability and potential."

11   Q    Can you read your response?

12   A    I'll do my best.  "Operates within company hierarchy for

13   issues, resolutions" -- I'm not sure what the next word says.

14   Q    Looks like help desk.

15   A    Help desk.  Thank you.  "Expense department, travel" --

16   and I'm not sure what the next word is.  I apologize.

17   Q    Okay.  Were you dedicating response -- I'm sorry --

18   delegating responsibilities?

19   A    No, I was reporting within the ranks in the

20   organizational chart of the company.

21   Q    Okay.  All right.  Then let's look at the top on the next

22   page.  I think I'm going to get you to read number one out to

23   everybody.

24   A    Okay.  Number 1, "list all aspects of employee's

25   performance that contribute to his or her effectiveness."

1    "Has developed to continually improve upbeat attitude."  And I

2    can't quite read, if you could scoot that over.

3    Q    Sorry.

4    A    "In and under diverse conditions -- adverse conditions,

5    has great ability to be able to work with any site or Shipcom

6    employee, willingness to travel or change work locations."

7    Q    Okay.  And do you agree with that?

8    A    Yes.

9         (Pause in the proceedings.)

10   Q    Show you Plaintiffs' Exhibit No. 13.  Have you seen this

11   before?

12   A    Yes, I have.

13   Q    Okay.  When did you first see this?

14   A    Would have been sometime after July.  I'm going to say it

15   was in possibly in August of 2015.

16   Q    Okay.  And what was your understanding of this document?

17   A    Well, my understanding was that they would accumulate or

18   ascertain what my overtime hours were from Deltec (phonetic)

19   and pay me some rate that they determined was considered

20   overtime.  Which that process began in September, the 1st of

21   September of 2015.  But I'm not really sure whatever happened

22   to August.

23   Q    Okay.  And what do you mean by that?

24   A    Well, they paid us through July 31st of 2015, and they

25   picked up paying us with overtime in September.

1   Q    Okay.  Did you work overtime in August?

2            MR. MACDOWALL:  Objection, Your Honor.  This entire

3   line of questioning is irrelevant.  There's no issue of

4   damages before the jury, so I'm not sure where counsel is

5   going with this, but it's certainly not something for the jury

6   to consider.

7            MR. SLOBIN:  Your Honor, Mr. Notestine opened the

8   door yesterday on damages.  I'm not going any further than

9   that question.

10           THE COURT:  All right.  Let's wrap it up quickly.

11           Overruled.  The objection is overruled.

12  BY MR. SLOBIN:

13  Q    Okay.  And so, how did things change though regarding

14  your compensation after September of 2015?

15  A    In regards to our working conditions they changed

16  greatly.  We went from working well into the night to being

17  required to clock out at a specific time every day so that we

18  would not incur overtime.

19  Q    Okay.  Great.  Just a few more questions.  And again, I

20  apologize if I asked this before.  But did you have any

21  involvement in improving Shipcom's training materials?

22           MR. MACDOWALL:  Objection, Your Honor, asked and

23  answered.

24           THE COURT:  Overruled.

25  BY MR. SLOBIN:

1   Q    So you can answer.

2   A    We absolutely could not.

3   Q    Okay.  Did you ever offer up any suggestions to improve

4   Shipcom's materials or training process?

5   A    Initially, in my first few months at Shipcom, but then I

6   realized it was futile.

7   Q    Okay.  And what do you mean by that?  Did they do

8   anything in response to your --

9   A    It just went into space.  Any suggestions I made were

10  ignored and not responded to.

11  Q    Okay.  Who knew what you were doing the most?  Who knew

12  your duties the most?

13         MR. MACDOWALL:  Objection, Your Honor.  Calls for

14  speculation.

15         THE COURT:  Sustained.

16         WITNESS BETHAS:  Well, that would be my --

17         MR. SLOBIN:  You got to stop.

18         WITNESS BETHAS:  I'm sorry.

19  BY MR. SLOBIN:

20  Q    I'll ask a better question or another question.

21         Was anyone with you on a day-to-day basis when you

22  were doing training?

23  A    Generally there would be one other trainer.  Not always,

24  but I'd say at least half the time.

25  Q    Okay.  Was Mr. Goenka ever with you when you were doing

CHARLES BETHAS - DIRECT BY MR. SLOBIN

1    training?

2    A    No.

3    Q    Okay.  There's also another individual, I cannot

4    pronounce his last name, Reddy.

5    A    Reddy was never in one of my classes.  I did see him

6    onsite at about four different sites just visiting, but that

7    was it.

8    Q    Were you ever offered stock options?

9    A    No.

10   Q    Did you ever receive an employment handbook or a manual?

11   A    If I recall correctly, I was out onsite on the East

12   Coast.  I believe that there was a communique that we were

13   supposed to respond back to that there was one published.  So

14   there was one that existed, possibly even a year into my

15   employment.

16   Q    All right.  Do you recall at all when you received that

17   communique regarding the employment handbook?

18   A    I can't specifically tell you what date that was.

19   Q    Will you turn in that big binder to Exhibit No. 68?

20   Yeah, this one.  This one right here.  Do you see that?

21   A    I do.

22   Q    Is that the handbook you were referencing?

23   A    I believe it is.

24   Q    Okay.  Do you recall approximately when you received

25   this?

1   A    I don't.  It was long after I'd started and I was out

2   onsite.

3   Q    If we look at -- I think it's the third page, the top,

4   there are some dates here.  You see those?

5   A    Yes.

6   Q    Does this refresh your recollection as to when you may

7   have received this handbook?

8   A    This parallels my recollection.  I had been with Shipcom

9   just over a year then.

10  Q    Okay.  And so, you think you received it when?

11  A    The summer or early Fall of 2015.

12  Q    Okay.

13          MR. SLOBIN:  Your Honor, I'll pass the witness.

14          THE COURT:  All right.  Mr. MacDowall.

15          MR. MACDOWALL:  Your Honor, before I begin my cross

16  may I set up our laptop to work with the overhead projector?

17          THE COURT:  Yes.

18          MR. SLOBIN:  Oh.  Your Honor, I forgot a host of

19  questions.  I apologize.  Can I continue on?  I don't think

20  I've ever done that.

21          Do you have any objection?

22          I can do it on the back end.  I'm sorry, Your Honor.

23          MR. MACDOWALL:  No, Your Honor, I understand.  I

24  think it's better this way.

25          THE COURT:  All right.  So finish.

1          Can you -- are you able to set up while he's

2     finishing his questioning?

3               MR. MACDOWALL:  I think I can, yes, Your Honor.

4               THE COURT:  All right.

5               MR. SLOBIN:  I don't think I've ever done that, Your

6     Honor.

7               DIRECT EXAMINATION OF CHARLES BETHAS (RESUMED)

8     BY MR. SLOBIN:

9     Q    Charles, will you turn to Exhibit No. 65 in that book?

10         (Pause in the proceedings.)

11    Q    Are you there?

12    A    Yes, I am.

13    Q    All right.  What is -- do you know what this document is?

14    A    Well, it looks like it's a printout of my LinkedIn

15    profile.

16    Q    Okay.  And there's a date up here on the top, December

17    2015 -- I'm sorry, December 15, 2017.  Does that accurately

18    reflect this document at that time?

19    A    That's correct.

20    Q    Okay.  Or is that -- or do you know if that's the print

21    date?

22    A    I'm pretty sure it was -- that was in effect and it

23    probably still is.  I haven't updated my LinkedIn page for a

24    long time.

25    Q    Well, if you look down here it says Shipcom; you see

1     that?

2     A    Yes.

3     Q    All right.  Please read me what you wrote there.  And I

4     assume you wrote this?

5     A    Yes.  Uh -- hmm.  It says on July 2014 I will be working

6     to implement a new automated inventory system for the VA

7     hospitals nationwide.  So it appears to be a post prior to my

8     employment with Shipcom, possibly when I was interviewing with

9     them.

10    Q    Okay.  So you hadn't started working?

11    A    No.

12    Q    Okay.  All right.  Let's look at just one more document.

13    Turn to Plaintiffs' Exhibit No. 16.

14         (Pause in the proceedings.)

15    Q    Are you there?

16    A    I am.

17    Q    What is this?

18    A    It appears to be a resume, possibly a resume since my

19    employment with my current employer now.

20    Q    Okay.  And then you've got some information listed about

21    Shipcom; is that fair?

22    A    Yes.

23    Q    Okay.  And did you prepare this document?

24    A    Yes, I did.

25    Q    It states here under your senior trainer and

1    implementation project manager, was that your title?

2    A     Senior trainer was.

3    Q     What about implementation project manager?

4    A     That actually was responsibilities from previous jobs

5    that I brought forward.

6    Q     Okay.  Why did you do that?

7    A     Well, we were suddenly let go.  I was out of work for

8    approximately half a year.  I needed a job to save my

9    lifestyle.

10   Q     So is this accurate?

11   A     From a sales standpoint, yes.

12   Q     It's a stretch though?

13   A     Yes.

14          MR. MACDOWALL:  Objection, Your Honor, leading.

15          MR. SLOBIN:  Okay.

16          THE COURT:  Sustained.

17   BY MR. SLOBIN:

18   Q     It states under here "managed implementation and training

19   of logistical inventory, hardware and software systems in 200

20   Veteran Administration medical centers facilities."  Is that

21   accurate?

22   A     No, it's not.  We weren't ever able to get out to 200

23   Veteran sites, but that was our objective to begin with.  And

24   my sole responsibility was training.  I wasn't able to

25   exercise to manage implementation of training.

CHARLES BETHAS - DIRECT BY MR. SLOBIN

1    Q    Okay.  And again, is this --

2    A    Hardware.

3    Q    Is this an accurate description of your duties?

4    A    Not for what I ended up doing, no.

5    Q    All right.  And again, why did you write that?

6    A    I wanted to be able to present --

7    Q    I get it.

8    A    I wanted to be able to present all of my skill sets being

9    represented in all my positions.

10   Q    Is that what you did at Shipcom?

11   A    No.

12   Q    The next paragraph it states you're a key role player

13   between VISN management and company VPs.  What's VISN

14   management?

15   A    VISN management would be the legacy system that the VA

16   used to accomplish their logistics in purchasing.  Company

17   VIPs would be Shipcom management.  And so, this basically says

18   that I communicated with both, often was a relay for

19   information between the VA and our management.

20   Q    Okay.  And is that a accurate statement?

21   A    Yes.

22   Q    Okay.  And then it states further down in that paragraph

23   project manager.  You write that?

24   A    Yes, I did.

25   Q    Were you a project manager?

1     A     I was a project manager from my education previously to

2     Shipcom.  However, I was not able to my PMO skills there.

3     Q     This is really important though.  Were you a project

4     manager for Shipcom?

5     A     No.

6     Q     Did you manage employees at Shipcom?

7     A     No, I had no input as to the scope, to the milestones or

8     to the key role players that a project manager would do.

9     Q     Did you supervise anyone at Shipcom?

10    A     No, I did not.

11    Q     Did you hire anyone at Shipcom?

12    A     No.

13    Q     Did you fire anyone at Shipcom?

14    A     No.

15    Q     All right.  So this isn't accurate?

16    A     No.

17          MR. SLOBIN:  Your Honor, I'll pass the witness now

18    officially.

19          THE COURT:  All right.

20          Mr. MACDOWALL, when you're ready.

21          MR. MACDOWALL:  Your Honor, thank you.

22          CROSS-EXAMINATION OF CHARLES BETHAS

23    BY MR. MACDOWALL:

24    Q     Good morning, Mr. Bethas.

25    A     Good morning.

1    Q    You attended Wichita State University; is that right?

2    A    I did.

3    Q    And you graduated there with a bachelor of science degree

4    in business administration; is that accurate?

5    A    Yes, sir.

6    Q    Am I right that following your college graduation you

7    began working for a company called Professional Data Services;

8    is that right?

9    A    After I graduated from college I was employed by Farmarco

10   (phonetic).

11   Q    And after that you were employed by Professional Data

12   Services; is that accurate?

13   A    That's correct.

14   Q    You began working there in 1983; is that true?

15   A    Yes.

16   Q    And Professional Data Services is a medical software

17   company, is it not?

18   A    It is for practice management.

19   Q    And you worked for that company as a trainer; is that

20   right?

21   A    Correct.

22   Q    And you would agree with me that your job entailed

23   loading software on a mainframe and training personnel how to

24   use that software; is that right?

25   A    That's correct.

1    Q    And you worked for that company for 14 years through

2    1997; is that accurate?

3    A    Yes.

4    Q    And the entire time you held that same job for

5    Professional Data Services; is that true?

6    A    Yes.

7    Q    Performing those same duties all 14 years; is that

8    accurate?

9    A    Yes.

10   Q    And then in 1998 you went to work for a company called

11   Harris Enterprises; is that true?

12   A    That's correct.

13   Q    And Harris Enterprises was a publication company; is that

14   right?

15   A    That's true.

16   Q    You worked for Harris Enterprises as a software analyst;

17   do I have that right?

18   A    Correct.

19   Q    Am I correct that your job as a software analyst was to

20   test and implement changes to software which were provided by

21   the company's software vendors?

22   A    Yes.

23   Q    And is it accurate that you worked for Harris Enterprises

24   through 2005?

25   A    Yes.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q    So approximately eight years there?  Seven years.  Excuse
2    me.
3    A    Yes.
4    Q    And then you went back to work for Professional Data
5    Services in 2005; is that right?
6    A    I did.
7    Q    And that was the company we just got finished talking
8    about that you were with from 1983 to 1997, true?
9    A    Correct.
10   Q    And your job title this time around was business/clinical
11   analyst; is that correct?
12   A    Correct.
13   Q    And your job as a business/clinical analyst was to
14   implement software on electronic medical records; is that
15   right?
16   A    Actually it was training clinicians, doctors, nurses how
17   to use electronic medical records software.
18   Q    Okay.  So your job in that regard was training people how
19   to use medical-related software; is that right?
20   A    That's correct.
21   Q    And you would do hands-on training with some of these
22   folks; is that right?
23   A    Correct.
24   Q    In fact you would do hands-on training in a sort of test
25   setting before the software was actually live with the client;

1    is that accurate?

2    A    Correct.

3    Q    And you were doing that in a setting before the client

4    was migrating over to a live version of the software; is that

5    accurate?

6    A    We started out that way, yes.

7    Q    And in this role you trained administrative personnel,

8    right?

9    A    Yes.

10   Q    And you trained clinical personnel; is that accurate?

11   A    Yes.

12   Q    And you worked in this position until August of 2013.  Do

13   I have that right?

14   A    Correct.

15   Q    You then went to work as a project manager for a global

16   medical supply company; is that accurate?

17   A    Yes.

18   Q    And I believe you alluded to that earlier.  That's

19   something that you put in your resume, that project management

20   experience that you have.

21   A    Yes.

22   Q    And at the time this company was busy building oncology

23   hospitals; is that accurate?

24   A    That's correct.

25   Q    And your job in this project management role was to

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    arrange all the necessary logistics for building those

2    oncology hospitals; isn't that right?

3    A    Correct.

4    Q    You then applied for employment with Shipcom; is that

5    true?

6    A    Yes.

7    Q    And Shipcom made you an offer of employment, right?

8    A    Correct.

9         MR. MACDOWALL:  Apologize, Your Honor.  Just a few

10    seconds if I may.

11        (Pause in the proceedings)

12    BY MR. MACDOWALL:

13    Q    Mr. Bethas, this is a copy of the document you saw

14    earlier on direct examination, right?

15    A    Yes.

16    Q    This is a copy of your offer letter from Shipcom --

17    A    Yes.

18    Q    -- dated July 25th of 2014; is that accurate?

19    A    Yes.

20    Q    And in this document at the bottom there of that part

21    that I've highlighted or pulled out there it says your

22    position will be senior trainer with effect from August 7th of

23    2014; is that right?

24    A    Yes.

25    Q    And you testified on direct examination that you accepted

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    this offer of employment from Shipcom; is that true?

2    A    That's correct.

3    Q    And you were actually as a senior trainer throughout your

4    employment with Shipcom; is that accurate?

5    A    That's correct.

6         THE COURT:  Counsel, that was which exhibit?  Is

7    that DX?

8         MR. MACDOWALL:  Apologize, Your Honor.  It's

9    Defendant's Exhibit No. 15.

10        THE COURT:  Thank you.

11   BY MR. MACDOWALL:

12   Q    I'm pulling out another section of this for you to see a

13   little bit better, Mr. Bethas.  It's paragraph number 2.  Do

14   you see that, compensation?

15   A    I do.

16   Q    And this indicates that you would be compensated by the

17   company at the rate of $90,000 annually; is that right?

18   A    That's correct.

19   Q    And you were in fact compensated by the company with an

20   annual salary of $90,000; is that true?

21   A    True.

22   Q    Now before receiving the offer from Shipcom you had

23   assumed that you would be paid on a salary basis by the

24   company; isn't that true?

25   A    Yes.

1    Q    And you assumed that because you had been paid on a

2    salary basis in all the other jobs that --

3              MR. SLOBIN:  Objection, relevance, Your Honor.  I'm

4    sorry, I didn't mean to --

5              THE COURT:  Overruled.

6    BY MR. MACDOWALL:

7    Q    Mr. Bethas, you assumed that you were going to be paid on

8    a salary basis by Shipcom because in all of the other jobs

9    that we've talked about today you were paid on a salary basis,

10   too; isn't that right?

11             MR. SLOBIN:  Objection again, Your Honor.  May I

12   approach?

13             THE COURT:  Yes.

14        (Bench conference begins at 8:54 a.m.)

15        (Bench conference indiscernible.)

16        (Bench conference ends at 8:55 a.m.)

17   BY MR. MACDOWALL:

18   Q    Mr. Bethas, I'm going to ask the question again just to

19   be clear.  You assumed when you received the offer from

20   Shipcom that you would be paid on a salary basis for that

21   company because you had been paid on a salary basis with all

22   the other employers that we've talked about today; isn't that

23   true?

24   A    No.  I was paid salary plus commission and bonuses at

25   other positions.  My understanding was exactly what this

1    states.

2    Q    But you were paid on a salary basis with all those other

3    companies; isn't that right?

4    A    There was salary involved, yes.

5    Q    So you weren't surprised when Shipcom offered you a

6    salary, an annual salary as your compensation; isn't that

7    right?

8    A    I was not shocked, no.

9    Q    Isn't it also true that in none of those other jobs you

10   had never been paid overtime?  Isn't that true?

11   A    I was paid bonuses for going over and above, so consider

12   that overtime or not.

13   Q    Well, you weren't paid for working an extra number of

14   hours; is that right?

15   A    That's correct.

16   Q    Now, we've heard testimony that you were reclassified as

17   non-exempt by Shipcom in 2015; is that right?

18   A    That's correct.

19   Q    And you were paid back pay for amount of overtime hours

20   that you had worked for the company up until the point of

21   reclassification; isn't that true?

22   A    True.

23   Q    And that sum that you were paid was $7,384.09; is that

24   accurate?

25   A    That's correct.

CHARLES BETHAS - CROSS BY MR. MACDOWALL                    38

1    Q    You were then paid overtime by Shipcom through the rest

2    of your employment; isn't that true?

3    A    That's true.

4    Q    And you never made any complaint to Shipcom about being

5    classified as an exempt employee; isn't that right?

6    A    Actually I was irritated that it wasn't done up front.

7    So, yes, I complained to my manager.

8    Q    When did you complain to your manager?

9    A    Constantly after this was implied and before it was

10   introduced.

11   Q    Do you recall giving a deposition in this case,

12   Mr. Bethas?

13   A    Yes.

14   Q    And that deposition took place at your attorney's office;

15   isn't that true?

16   A    Yes.

17   Q    And your attorney was there, wasn't he?

18   A    Yes, he was.

19   Q    And I was there and I asked you certain questions, didn't

20   I?

21   A    Yes.

22   Q    And there was a court reporter taking down what you said;

23   isn't that true?

24   A    Correct.

25   Q    And you were sworn in to tell the truth at that

1   deposition, weren't you?

2   A    Yes.

3         MR. MACDOWALL:  Your Honor, may I approach the

4   witness?

5         THE COURT:  Yes.

6   BY MR. MACDOWALL:

7   Q    Mr. Bethas, I'm handing you what is a sealed copy of your

8   transcript we received from the court reporter.  If you would,

9   please open that.  Do you see that, Mr. Bethas?

10  A    Yes.

11  Q    If you could, turn to page 165.  If you'd look at line

12  number 9, I'm going to read aloud and you read along with me

13  silently.

14        It says Question:  "Before you were reclassified I

15  believe you testified you didn't have any complaints about

16  being classified as an exempt employee; is that accurate?"

17  Answer:  "It was how the job was presented and I accepted

18  that."  Question:  "So all of your complaints are with respect

19  to the company's decision to reclassify you?"  Answer:  "And

20  how that was done."

21        Did I read that accurately?

22  A    Yes.

23  Q    So wouldn't you agree with me that you didn't have

24  complaints about being classified as an exempt employee during

25  your employment?

CHARLES BETHAS - CROSS BY MR. MACDOWALL

40

1    A    Just how that was done.

2    Q    Just how the reclassification was done; is that accurate?

3    A    That's correct.

4    Q    Now you worked as a senior trainer up until July 27th of

5    2016; is that accurate?

6    A    Yes, sir.

7    Q    You were traveling to different VA hospitals to perform

8    work on behalf of Shipcom for the VA hospitals; is that true?

9    A    Yes.

10   Q    And as part of your work you were implementing a software

11   system called CATAMARAN.  I believe you testified to that; is

12   that right?

13   A    I was training that system, yes.

14   Q    And you would agree with me that the purpose of CATAMARAN

15   was to monitor the hospital's use of medical and surgical

16   supplies; is that accurate?

17   A    Correct.

18   Q    And the supplies are being used for all sorts of purposes

19   such as surgical supplies, long-term health supplies,

20   etcetera, right?

21   A    Correct.

22   Q    And is it important for the hospitals, would you agree

23   with me, to determine their usage and inventory supplies of

24   these different medical items; isn't that true?

25   A    True.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q    It's important to the hospitals' running of their
2    business, wasn't it?
3    A    Sure.
4    Q    And it was important for the hospitals to be able to
5    monitor those supplies because it would help increase their
6    efficiency; wouldn't you agree with that?
7    A    Yes.
8    Q    And would you agree with me that it was also important
9    for the hospitals -- excuse me, for patient care?
10   A    Absolutely.
11   Q    Ultimately the goal, right, was to save lives through
12   this new system that was being implemented; isn't that right?
13   A    Yes, sir.
14   Q    Now aside from the software component, the CATAMARAN that
15   we've been talking about, there were also the hardware
16   components to leverage that software; isn't that true?
17   A    (No audible response.)
18   Q    They were implementing hardware pieces to leverage the
19   software; is that right?
20   A    The system incorporated hardware and software, yes.
21   Q    And part of your job as a trainer was to train on those
22   hardware pieces; isn't that true?
23   A    There were some hardware pieces, yes, involved that the
24   end users used.
25   Q    So, ultimately what you were training on was the software

1  and the hardware solution that Shipcom was implementing in the
2  hospital.  Would you agree with that?

3  A    Yes.

4  Q    And the solution, when we use that term, what we're
5  talking about, if you would agree with me, is the solution to
6  the tracking and monitoring of the inventory supplies, isn't
7  that right?

8  A    That's the purpose for it, yes.

9  Q    And the purpose was to improve the processes that the VA
10  hospital had in place before hiring Shipcom to do this job;
11  isn't that right?

12  A    Yes.

13  Q    So you were training these hospital personnel on how to
14  do their jobs more efficiently and better; wouldn't you agree
15  with that?

16  A    Yes.

17  Q    And I believe you testified earlier that your primary job
18  was to train the hospital staff; isn't that right?

19  A    Yes, sir.

20  Q    And in training the staff we were talking about training
21  on both the software and hardware components we just talked
22  about, right?

23  A    Yes.

24  Q    You also train on supply chain concepts; isn't that true?

25  A    Yes, that was involved in the material that we presented.

1    Yes.

2    Q    And by supply chain concept we're talking about concepts

3    about how to improve processes of moving items from one place

4    to another; isn't that true?

5    A    Well, how to do it.  Most often it involved an

6    improvement in the process, yes.

7    Q    And you were teaching those concepts to the folks you

8    were training; isn't that right?

9    A    Yes.

10              UNIDENTIFIED SPEAKER:  Can you speak up or get

11   closer to the mic, please?

12   BY MR. MACDOWALL:

13   Q    Mr. Bethas, you would also train on the benefits of the

14   solution; isn't that true?

15   A    That was incorporated in the materials, yes.

16   Q    And one of the reasons that you're teaching on the

17   benefits of the solution is to convince the staff to adopt it;

18   isn't that right?

19   A    True.

20              THE COURT:  Just one moment.  I'm not sure that mic

21   is on.  Can you tap it?

22        (Pause in the proceeding.)

23              THE COURT:  I tell you what, let's -- Mr. Bethas,

24   when you answer can you speak up?  And then on our break we'll

25   see if we can figure out how to get that microphone working.

44

1      WITNESS BETHAS:  Sure, I'll do my best.

2           THE COURT:  Ladies and gentlemen of the jury, are

3    you able to hear the witness?

4        (No audible response.)

5           THE COURT:  All right.  Please let us know if you

6    cannot hear him and we'll try to get that fixed during the

7    break.

8           Sorry, Mr. MacDowall, you may continue.

9           MR. MACDOWALL:  Thank you, Your Honor.

10   BY MR. MACDOWALL:

11   Q    Mr. Bethas, in order to train the hospital personnel on

12   the solution we've been talking about, you would agree with me

13   that you would have to develop a deep understanding of that

14   solution that was being implemented; isn't that right?

15   A    Yes.

16   Q    And in order to develop that deep understanding of the

17   solution you would put together test scenarios to figure out

18   how the software worked; isn't that right?

19   A    They had a test environment for us to use.  It was called

20   Playground, and that's what I used to familiarize myself with

21   the software.  Yes.

22   Q    To give the jury an idea here, when we're talking about

23   this testing environment it's an environment that you're using

24   that you can access from your computer; is that right?

25   A    Correct.  Just Shipcom employees.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q    And as a Shipcom employee you would get on there and test

2    the software to see if you could, for example, add different

3    events and different supply rooms; is that right?

4    A    True.

5    Q    And you would test work flows to see how certain items

6    would go from place to place within the hospital; is that

7    right?

8    A    Yes.

9    Q    And you did that so that you could have an understanding

10   of it to explain it to the people that you were training;

11   isn't that right?

12   A    Yes.

13   Q    And you would put together these test scenarios sometimes

14   by yourself and sometimes with your team members who were on

15   the training team; isn't that right?

16   A    Yes.

17   Q    And you would agree with me that the software that was

18   being implemented changed over time; isn't that true?

19   A    Constantly.

20   Q    And that's because Shipcom had a development team that

21   was working on improving that software; isn't that true?

22   A    True.

23   Q    When you first started, for example, there was only a

24   couple of modules of the software, like versions of the

25   software; would you agree with that?

CHARLES BETHAS - CROSS BY MR. MACDOWALL                    46

1    A    Yes.

2    Q    And over time more modules got added; isn't that true?

3    A    True.

4    Q    So you would have to learn how to use all of those

5    modules so you could teach on them; isn't that true?

6    A    True.

7    Q    One of those modules was the POU module that sort of

8    tracked the inventory and supplies for the hospital; is that

9    accurate?

10   A    Yes.

11   Q    And there was a different module called the procurement

12   module that was used by the hospitals to procure items by

13   purchasing them; is that right?

14   A    It was a purchasing ordering system.  That's what it was.

15   Q    And it was to get materials for the hospital to use,

16   these surgical supplies, medical supplies, etcetera?

17   A    Correct.

18   Q    So you'd agree that that procurement module related to

19   the hospital's procurement processes; is that right?

20   A    Yes.

21   Q    And it was changing the way that procurement happened

22   within the hospitals when they implemented the new system;

23   isn't that true?

24   A    As far as work flow, no.  By process, yes.

25   Q    Now in order to train the hospitals at the site about the

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    differences that Shipcom was doing to these different

2    processes, you would agree with me that you had to first

3    understand what the original processes were at the hospital;

4    isn't that true?

5    A    I would have to discover that onsite prior to.

6    Q    And you would need to do that in order to explain to the

7    hospital personnel Here's how you do it now and here's how

8    it's going to be different later; isn't that right?

9    A    Correct.

10   Q    And in order to figure that out you would speak with

11   logistics personnel at the hospital, right?

12   A    Yes.

13   Q    For example, you'd speak to the supply technicians who

14   were in charge of stocking supply closets and ordering the

15   supplies; is that accurate?

16   A    Yes.

17   Q    You'd also speak with the clinicians like the nurses and

18   the doctors to figure out how they're interacting with the

19   procurement process in their jobs, right?

20   A    The clinicians wouldn't be involved with that, but the

21   purchasing agents would be.

22   Q    Okay.  And you'd speak to the clinicians about how

23   they're involved with other aspects like monitoring inventory

24   supplies, right?

25   A    Correct.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q   You'd also speak with management level folks like the

2    chief facility logistics officer at these hospitals; is that

3    true?

4    A   Yes, sometimes.

5    Q   And sometimes you'd interact with the chief financial

6    officer of a hospital; is that true?

7    A   Possibly, yes.

8    Q   You say possibly.  Did you do that in your job?

9    A   Not consistently from site to site, but there were times,

10   yes.

11   Q   And I believe you testified yesterday that the solution

12   at each hospital varied because the hospitals' needs were

13   different; is that right?

14   A   That's right.

15   Q   In fact you said that no hospital was the same; is that

16   right?

17   A   That's correct.

18   Q   And you worked at approximately 25 different hospitals

19   over the course of your employment with Shipcom; is that true?

20   A   That's true.

21   Q   And we just got finished talking about a group of people

22   that you talked with, the logistics officers, the clinicians,

23   sometimes chief financial officers.  You trained all those

24   folks at one point or another during the course of your

25   employment at these hospitals; is that right?

49

1    A    Yes.

2    Q    And you had different modules of the software you were

3    teaching to different groups of people at a time; isn't that

4    right?

5    A    Yes, sir.

6    Q    You would also make sure that the right people were being

7    trained at the hospitals; isn't that true?

8    A    With the help of a site manager, yes.  We were dependent

9    on them to tell us who those people were.

10   Q    You would make sure that you assessed whether or not you

11   had everyone you needed to train on that list; isn't that

12   true?

13   A    Correct.

14   Q    For example, if someone happened to leave off the fact

15   that there was a second shift of nurses that you hadn't

16   trainer, you would bring that to someone's attention to make

17   sure that they were trained; is that right?

18   A    Generally that was brought to our attention, but it was

19   resolved, yes.

20   Q    But you would bring that to someone's attention if you

21   noticed it?

22   A    If I knew it, I would.

23   Q    Now we already talked about -- well, you talked about on

24   direct examination the different phases of the training.

25   There was a pre-implementation training and the post-

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    implementation training, right?

2    A    Correct.

3    Q    And the major difference is that pre-implementation

4    training was more classroom based before the site was actually

5    live, the software was working; is that right?

6    A    Correct.

7    Q    And the post-implementation training was more one-on-one

8    shadowing these folks as they were actually going about the

9    hospital using the new upgraded software?

10   A    Correct.

11   Q    In order to conduct that classroom style training you had

12   to coordinate with the hospitals to make sure you had a place

13   to train; isn't that accurate?

14   A    No, I coordinated with the site managers for them to

15   procure classrooms, conference rooms, warehouses, wherever the

16   training needed to be done.  We would have to do that.

17   Q    So it was important that you have a place to train,

18   right?

19   A    Absolutely.

20   Q    Okay.  Once you were actually in these training classroom

21   type settings you would do knowledge checks to make sure that

22   the folks were understanding the messages you were trying to

23   deliver; is that right?

24   A    Correct.

25   Q    You would have demonstrations to make sure, sort of

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    testing them, calling them out and saying Here's -- Let's go

2    over what we just did; is that right?

3    A    That would be a very good description.

4    Q    And at certain points you had to deal with the challenge

5    of folks who were reluctant to change; isn't that true?

6    A    That was one, yes.

7    Q    You had to exercise patience and repeated training and

8    make sure you used your skills as a trainer to make sure the

9    message was ultimately delivered to that person; isn't that

10   accurate?

11   A    Correct.

12   Q    In the post-implementation phase after the software was

13   sort of live you had sometimes to retrain some of these folks

14   on what you had talked about during the pre-implementation

15   phase; is that right?

16   A    Yes.

17   Q    That's because sometimes there was a gap in time between

18   when you first did the initial classroom setup and the time

19   the software was actually live onsite and they were using it;

20   is that right?

21   A    That's correct.

22   Q    Am I right that your work history that we talked about

23   earlier, that it helped you perform your job as a trainer?

24   A    Oh, yes.

25   Q    And that's because you had worked in training for

1    literally decades before you went to work for Shipcom?

2    A    Correct.

3    Q    It helped you communicate with the staff effectively; is

4    that right?

5    A    Yes, it did.

6    Q    And your experience in medical -- other medical-related

7    businesses also helped you with your training; isn't that

8    true?

9    A    It was an advantage, yes.

10   Q    And that's because you sort of knew how to speak the

11   language to folks you were training; isn't that accurate?

12   A    That's correct.

13   Q    Mr. Bethas, I believe on direct examination you talked

14   about your performance review that you had at Shipcom; is that

15   right?

16   A    Yes.

17   Q    And you talked about your self-evaluation part of that

18   performance review; is that true?

19   A    That's true.

20   Q    You also had a review done by your manager who was Ed

21   Price; isn't that right?

22   A    Yes.

23   Q    Mr. Bethas, I'm displaying on the screen here what is

24   Defendant's Exhibit No. 17.  Do you recognize this document as

25   that performance review that your manager filled out?

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    A    The heading, yes.  Can you make that larger?

2    Q    Yes.  Do you recognize it now as the manager's evaluation

3    form review?

4    A    Yes, it is.

5    Q    Okay.  And it looks like the review period is August 11th

6    of 2014, to August 11th of 2015; is that right?

7    A    Yes.

8    Q    Like to direct your attention to box no. 5 of this

9    document.  You see box no. 5 there, Mr. Bethas, that I pulled

10   out on the screen?

11   A    Yes.

12   Q    And just to sort of explain what we have here.  It's a

13   box that says proficiency at improving work methods and

14   procedures as a means toward greater efficiency.  Is that what

15   it reads?

16   A    Yes, it does.

17   Q    Okay.  So you're being evaluated on that item; is that

18   your understanding?

19   A    Yes.

20   Q    And over on the right-hand column you see vertically

21   written six different columns there, if you will.  No. 5 is

22   "exceptional"; is that what it reads?

23   A    Yes.

24   Q    No. 4 is "highly effective"; is that right?

25   A    True.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1   Q    No. 3 is "proficient"; is that true?

2   A    Correct.

3   Q    No. 2, can you read that for me?

4   A    "Inconsistent."

5   Q    "Inconsistent."  And then No. 1 is "unsatisfactory"; is

6   that right?

7   A    Yes.

8   Q    And the last box is "not applicable"; is that right?

9   A    Correct.

10  Q    Okay.  So on No. 5 it looks like Mr. Price rated you as

11  No. 4, "highly effective" at that particular task; is that

12  right?

13  A    Correct.

14  Q    In his comments down below he provides a brief

15  explanation, doesn't he?  You see that?

16  A    Yes.

17  Q    It says "initiated efforts to develop a virtual

18  procurement environment with VISTA," comma, "produced protype

19  training kit"; isn't that right?

20  A    Correct.

21  Q    And you testified earlier that you did develop this

22  virtual procurement environment?

23  A    No, I put together training kits with supplies in it that

24  would be shipped to the site ahead of time so we would have

25  the tools we needed to train.

1    Q    Okay.  So that's the second part that he's talking about

2    there, the prototype training kit; is that right?

3    A    Yes.

4    Q    Okay.  And this was a kit that you delivered to the

5    different sites to help with your training; is that accurate?

6    A    Yes, and they were locked.

7    Q    This first part, the virtual procurement environment with

8    VISTA that we're talking about or that's mentioned in this

9    document, that's a reference -- an idea that you had and

10   pitched to Shipcom's development team; isn't that right?

11   A    I presented the idea to my manager.

12   Q    And the idea was to use this test environment as a

13   learning tool onsite at the hospitals; isn't that true?

14   A    Actually more for trainers to be able to effectively know

15   the software, become subject matter experts.  We never used

16   the training environment during our presentations.

17   Q    But you did use it otherwise to become subject matter

18   experts; is that right?

19   A    Correct.

20   Q    Okay.  And this was an idea that you came up with that

21   wasn't there, wasn't happening before you came up with it; is

22   that right?

23   A    It was a resource that was in place.  We got permission

24   to use it.

25   Q    But people weren't using it before you came up with this

1    idea; is that what you're testifying to?

2    A    The trainers were not, no.

3    Q    Okay.  You also suggested the idea because you thought

4    it'd be an effective learning tool for all those folks, right?

5    A    Yes.

6    Q    Now the training kit that we were talking about a moment

7    ago, that was like a model of the VA's hospital system; is

8    that accurate?  Is that a good way to describe it?

9    A    On a very small scale.

10   Q    And it was a model of sort of the distribution point and

11   the reference of all these -- or the pathways for all of these

12   items to be distributed throughout the hospital; is that

13   accurate?

14   A    Correct.

15   Q    You used this model in your training as a technique to

16   sort of improve the process or to improve the learning

17   process, right?

18   A    Correct.

19   Q    Sort of a hands-on learning tool; wouldn't you agree with

20   that?

21   A    Yes.  We had the resources in place.  They were provided

22   for at each site prior to me ever arriving onsite or any of

23   the trainers.  However, there was oftentimes when materials

24   would be taken out of there and we'd show up and not have the

25   hands-on tools we'd need to train.  So I put them in a small

1   box that was a representative of the tools that were exploited

2   already onsite.  Had a lock on so when they showed up I knew

3   what I had to train.

4   Q    Okay.  So you just did it a different way so that you

5   could improve it and do it a better way, right?

6   A    I could secure the environment that I was training in,

7   yes.

8   Q    And the reason you wanted to do that, you thought it

9   would be an effective learning tool because of your prior

10  experiences in training; isn't that true?

11  A    Yes, and I also wanted to be responsible for what -- I

12  wanted to have accountability.

13  Q    Mr. Bethas, let's look at box no. 7.  Do you see it

14  pulled up on the screen there?  Do you see it?

15  A    Yes.

16  Q    And box no. 7 reads "ability to work independently"; is

17  that right?

18  A    That's correct.

19  Q    And it looks like Mr. Price checked the third box there;

20  is that true?

21  A    Yes.

22  Q    So he rated you as proficient in that category; would you

23  agree with that?

24  A    Yes.

25  Q    And you believed that you had the ability to work

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    independently; isn't that right?

2    A    I did.

3    Q    Mr. Price explained here, it reads "very thorough, making

4    sure training needs are met at go-lives and formal training";

5    isn't that correct?

6    A    That's correct.

7    Q    And you would agree with that assessment, wouldn't you?

8    A    Yes.

9    Q    In fact, you believed that you demonstrated that through

10   your successful training of so many folks; isn't that true?

11   A    Yes.

12   Q    Let's look at box no. 9.  Box no. 9 reads "willingness to

13   take on additional responsibilities," does it not?

14   A    Yes, it does.

15   Q    It looks like you were rated by Mr. Price as highly

16   effective at this particular task; is that true?

17   A    Yes.

18   Q    And you agreed with that assessment, did you not?

19   A    Yes, I did.

20   Q    Mr. Price explained here "really goes the extra mile at

21   go-lives to meet the customer's needs," dash, "whatever they

22   may be"; isn't that what he put?

23   A    Yes.

24   Q    And in fact, you agree with that assessment, as well,

25   don't you?

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    A    Yes.

2    Q    You testified earlier that there were times when

3    management at these VA hospital sites would ask you to stay

4    around longer, in fact; is that true?

5    A    And that's with regard, too.

6    Q    And that's because of the benefits that you brought to

7    the table to your experience as a trainer, true?

8    A    True.

9    Q    Look at page number 4.  At the top of this page it says

10   performance summary.  And no. 1 says "list all aspects of

11   employee's performance that contribute to his or her

12   effectiveness."  Did I read that right?

13   A    Yes.

14   Q    And here it says "excellent at developing rapport with VA

15   staff, leading to enhanced customer satisfaction and

16   attendance at training events"; is that right?

17   A    Correct.

18   Q    And you agreed with that assessment, did you not?

19   A    I did.

20   Q    The next line reads "good ideas" -- or excuse me, "good

21   knowledge of the system."  Did I read that right?

22   A    Yes.

23   Q    And the system being referred to there is the CATAMARAN

24   system; is that right?

25   A    Correct.

1    Q    And you agreed that you had good knowledge of the system,

2    didn't you?

3    A    I did.

4    Q    And you developed that knowledge in the ways that we

5    talked about earlier, by playing with the test environment,

6    making sure you understood how it worked; is that right?

7    A    Correct.

8    Q    Review also says "good ideas for improving our training,"

9    dash, "-- training kits," comma, "virtual environment."  Did I

10    read that right?

11    A    Correct.

12    Q    And those are the ideas that we talked about earlier.

13    A    Yes, it is.

14    Q    You would agree with me, Mr. Bethas, that over time you

15    became better at your job as a trainer?

16    A    Yes.

17    Q    You learned from your training experiences; wouldn't you

18    agree with that?

19    A    Always.

20    Q    You learned best practices to put in place to make

21    training more effective, didn't you?

22    A    In that environment, yes.

23    Q    And those ideas were implemented by Shipcom, weren't

24    they?

25    A    These two were, yes.

1   Q    You would consider those ideas well received by the

2   company, wouldn't you?

3   A    Yes.

4   Q    Now earlier you testified that you said your ideas were

5   sort of futile.  Do you remember testifying to that?

6   A    Yes, I do.

7   Q    But here are two examples of when the company accepted

8   ideas that you had for improving training processes; isn't

9   that right?

10   A    That is correct.

11   Q    You believe that Shipcom was actually good about taking

12   suggestions or ideas; isn't that right?

13   A    In these two aspects they were.

14   Q    Mr. Bethas, let's look at that self-evaluation that you

15   talked about on direct examination.

16           MR. MACDOWALL:  Your Honor, this is Defendant's

17   Exhibit No. 18.

18   BY MR. MACDOWALL:

19   Q    Mr. Bethas, I pulled out the top portion of this document

20   under the words "job descrip --" -- "job definition," excuse

21   me.  Do you see that?

22   A    Yes.

23   Q    And you write here "go-live implementation, version

24   implementation," is that right?

25   A    That is correct.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q    And this refers to your selection by Shipcom for giving
2    training when the CATAMARAN system was actually going live at
3    the site; is that accurate?
4    A    That's correct.
5    Q    Okay.  You were there to provide training to make sure
6    that that transition, it went smoothly; isn't that accurate?
7    A    That was their end goal, yes.
8    Q    You were also involved in implementation of new versions
9    of CATAMARAN when they came about and you would have to go
10   back to old sites to implement those new versions that were
11   being rolled out; isn't that true?
12   A    I would have to train on those new versions.  They had
13   already been implemented prior to me arriving.
14   Q    But you were training on the new versions that were being
15   implemented or had been implemented, right?
16   A    Training on the new versions after the go-live, I did
17   training.
18   Q    Let's look at box no. 5.  I believe you already talked
19   about this during direct examination.  That's your handwriting
20   there, is that right?
21   A    Yes.
22   Q    And you put that you developed and accomplished BETA
23   Enterprise virtual training environment with VISTA interface
24   via CATAMARAN.  Is that what that reads?
25   A    Yes.

1    Q    Okay.  And you rated yourself in this category as

2    exceptional, right?

3    A    Correct.

4    Q    Exceptional at proficiency, at improving work methods and

5    procedures as a means toward greater efficiency; isn't that

6    true?

7    A    Correct.

8    Q    The next -- no. 2 that you write here says "developed

9    concept and built first training mobile kit."  Is that right?

10   A    Yes, we talked about that earlier.

11   Q    And that's the kit that we talked about that you would

12   ship to the different sites to use as a hands-on learning

13   tool?

14   A    Correct.  The BETA Enterprise was something that was

15   already in place with development.  I simply went to them and

16   asked them how they used it.  They said I was welcome to use

17   it, as well.

18   Q    Appreciate you adding that information, but just to be

19   clear, it wasn't being used at the sites in the way that you

20   wanted it used until you pitched that idea; isn't that right?

21   A    It was actually used later to train our trainers.

22   Q    Okay.  But it wasn't being used in the way that you were

23   suggesting until you suggested it; isn't that accurate?

24   A    That would be true.  It was not a resource the trainers

25   had access to.

CHARLES BETHAS - CROSS BY MR. MACDOWALL

1    Q    Let's look at box no. 7.  This is that box about the
2    ability to work independently.  Did I read that correctly?
3    A    Yes.
4    Q    And you rated yourself as exceptional in this category;
5    is that right?
6    A    That's correct.
7    Q    And you put "DC site go-live support solo for
8    approximately eight weeks"; is that what you wrote?
9    A    True.
10   Q    And that's because you were at the DC medical site by
11   yourself for eight weeks during this go-live time; is that
12   right?
13   A    Correct.
14   Q    You were the only person from Shipcom on that site for
15   that period of time; isn't that true?
16   A    Correct.
17   Q    And in fact, you were at that hospital for more than
18   eight weeks; isn't that accurate?
19   A    Yes.
20   Q    You ended up staying there longer than even this review
21   reflects?
22   A    Yes.
23   Q    There were other occasions when you were onsite by
24   yourself, you just can't recall how many; isn't that accurate?
25   A    That's correct.

1    Q    Let's look at box no. 9.  Box no. 9 reads "willingness to

2    take on additional responsibilities"; is that right?

3    A    Yes.

4    Q    And you rated yourself in this category as exceptional,

5    as well; isn't that true?

6    A    Yes.

7    Q    You noted there, I think it says "virtual training

8    concept to completion."  Is that what that says?

9    A    Yes.

10   Q    And when you were referring to that you were talking

11   about obtaining a copy of the development environment and

12   setting up additional records to make sure that the

13   demonstration environment worked properly; isn't that what's

14   that talking about?

15   A    Correct.

16   Q    And it was there to have a more pertinent training

17   experience; isn't that accurate?

18   A    Correct.

19   Q    Let's look at box no. 11.  Box no. 11 here says

20   "adeptness at analyzing facts, problem solving, decision

21   making, and demonstrating good judgment."  Is that what that

22   reads?

23   A    Yes.

24   Q    And you rated yourself as exceptional in that category,

25   didn't you?

1    A    Correct.

2    Q    And you wrote in the handwritten portion "has

3    demonstrated site lead skills and worked as public relations

4    during crisis management," open parens, "(DC and Durham),"

5    close parens.  Is that right?

6    A    That's correct.

7    Q    That's because you actually did those things at those

8    particular sites, demonstrating those site lead skills; is

9    that accurate?

10   A    I would have to close the gap on some of the skills that

11   the site lead project managers did not have.  Empathy was one

12   of them, and being kind, listening was the public relations

13   portion.  By that time, often they were in crisis mode.

14   Q    And that's why you were the only one from Shipcom left on

15   that site, is that right?

16   A    Yes.

17   Q    Let's look at page number 4 of this document.  Talk about

18   that first portion there again, Mr. Bethas, the performance

19   summary.  And paragraph number 1 says "list all aspects of

20   employee's performance that contribute to his or her

21   effectiveness."  Did I read that right?

22   A    Yes.

23   Q    And you wrote "has developed ability to continually

24   improve upbeat attitude in/under adverse conditions, has great

25   ability to be able to work with any site as Shipcom employees'

1    willingness to" and what does the rest of that read?

2    A    "Travel or change work locations."

3    Q    Okay.  Other than the part that you just finished reading

4    did I read that accurately?

5    A    Yes.

6    Q    And you obviously agree with that assessment because you

7    wrote it; is that right?

8    A    Correct.

9    Q    And you worked to continually improve by making sure you

10   were learning the software and teaching it to the best of your

11   ability to the folks you were training; is that accurate?

12   A    That was a given and I also worked very hard on my

13   attitude and my presence while onsites.

14          MR. MACDOWALL:  Your Honor, at this point we pass

15   the witness.

16          THE COURT:  All right.  Redirect?

17          MR. SLOBIN:  Yes, Your Honor.

18          THE COURT:  Mr. Slobin.

19          REDIRECT EXAMINATION OF CHARLES BETHAS

20   BY MR. SLOBIN:

21   Q    Hello again.  Charles, you -- Mr. MacDowall went over

22   some of your other jobs that you had before Shipcom.  You

23   remember that?

24   A    Yes.

25   Q    Okay.  In a broad picture here, did you have the same job

1    duties at Shipcom as you did at your other employers?

2    A    Absolutely not.

3    Q    Okay.  And we've established that you were essentially a

4    teacher at Shipcom.  Tell me about --

5           MR. MACDOWALL:  Objection, Your Honor,

6    mischaracterizes the testimony.

7           THE COURT:  Overruled.

8    BY MR. SLOBIN:

9    Q    We can keep going.  So I've said we've established you're

10   a teacher.  Tell me what generally you were doing in your

11   other jobs that was different than that aspect?

12   A    I would suggest best practices, demonstrate solutions

13   that I came up with.  I took control of the projects from

14   being given a blueprint for an oncology hospital and a

15   deadline they would see their first patient.  I made

16   everything happen in between.

17   Q    Okay.

18   A    So I had much different experiences and responsibilities

19   with the other companies that I've worked for.

20   Q    And what were some of those responsibilities that were

21   different or that stand out in your mind as being different

22   than when you were at Shipcom?

23   A    Working in the private sector versus a government

24   facility.  That was the largest difference.  I was also

25   somewhat shackled into a very fine subset of my skill sets I

1   had enjoyed with previous positions.  So, in other words, I

2   was continuing on a very narrow path.

3   Q    You're talking at Shipcom?

4   A    Yes.

5   Q    Okay.  And I believe that it came out that you had talked

6   about you'd done training at other -- for other employers.

7   A    Oh, sure.

8   Q    Okay.  Were you involved in any of the training

9   materials, that process of creating or content or anything?

10  A    To some extent previously, yes.

11  Q    Okay.  All right.  And so, when Mr. MacDowall said Hey,

12  you'd been paid a salary at your other employers and you

13  expected to be paid a salary at this job, is that -- I mean

14  that's a fair statement?

15  A    Yeah.  It was traditional employment compensation.

16  Q    Okay.  But once you got in you realized that the jobs

17  were different; is that fair?

18       MR. MACDOWALL:  Objection, Your Honor, leading.

19  BY MR. SLOBIN:

20  Q    Is it fair to say there was differences between the jobs?

21       MR. MACDOWALL:  Objection, Your Honor.  This is

22  still leading.

23       THE COURT:  Sustained.

24  BY MR. SLOBIN:

25  Q    Okay.

1    A    Working at Shipcom was like working --

2    Q    Mm, mm, mm.  I got to ask you a good question, I'm sorry.

3         Well, you've already established that.  Okay.  All

4    right.  I'll move on.

5         Let's talk about this virtual training kit and your

6    box.  That module box that we were talking about with your

7    little lock and everything.  All right.  What's in there?

8    A    There were small sections of shelving.  There was a

9    louvered rack that could sit on a table.  There were four bins

10   that could go on it with alcohol swabs.  A few pieces of

11   inventory.  It was hooked to our laptop that we also projected

12   from.  It was a representation of the VA's entire networking

13   system in one box that I could ship locked up and know I had

14   when I got there.

15   Q    Okay.  And what were you using those items for?

16   A    Props.

17   Q    Okay.  All right.  But did the content of the materials

18   that you were training the VA staff on, did that change?

19   A    Oh, no.  They would have a presentation that would

20   possibly be concerning using the Motorola handheld device.

21   They'd show a picture of it on the screen and then tell steps

22   about how it would be used.  And I would simply hold one up

23   and go "this is what one looks like; here, you hold it."

24   Q    Okay.  So Mr. MacDowall asked you a series of questions

25   about you making the VA's work environment more efficient.  Do

1    you recall that?

2    A    Yes.

3    Q    Okay.  Were you giving advice to the VA on the efficiency

4    of what they were doing?

5    A    No, they already had the work processes down and they

6    were very well defined.  And they did not have the ability --

7    "they" being the employees of the VA, did not have the ability

8    to deviate in any way from what they had always been doing.

9    Q    Okay.  And again, whether it's syringes or whatever, are

10   you telling them, Hey, how many things to order?

11   A    No.  Those were -- that was part of the software to

12   provide.  That was the reason to have the software to begin

13   with is so that based on usage they would know how many to

14   order based on the lead time to get them to the site.

15   Q    All right.  And do you have any idea how much of any

16   product the hospital would need?

17   A    I had zero clue.

18   Q    Okay.  And did you offer any advice on how much product

19   they should order?

20   A    That would have been presumptive.  No.

21   Q    Okay.  Were you offering any solutions to the VA

22   hospitals?

23   A    It was a CATAMARAN system.

24   Q    Okay.  But again, that's something you didn't create?

25   A    No.

72

1   Q    All right.  Mr. MacDowall asked you a lot of questions

2   about you spending time to understand the materials that you

3   were training on.  Remember that?

4   A    Yes.

5   Q    Okay.  Do you see anything wrong with that?

6   A    No.  Generally when I get in front of an audience I need

7   to have enough credibility to be able to ask for the attention

8   of the audience and be a solution for them.

9   Q    How would you describe yourself as a teacher?

10  A    Experienced, perceptive, task-driven.

11  Q    How would you describe yourself as an employee?

12  A    Model.

13  Q    Okay.  Do you have high standards?

14  A    Yes, I do.

15  Q    Did Shipcom management ever call you down to Houston to

16  sit down with you and ask you about your ideas and how to

17  better make the teaching -- or how to make the teaching

18  environment better?

19  A    Absolutely not.

20  Q    Okay.  You mentioned a couple of ideas that you had

21  offered up.  Is that really the extent of it?

22  A    Via email, yes.

23  Q    Okay.  And we talked about just the two ideas.

24  A    (No audible response.)

25  Q    Is that a yes?

1   A    Yes.

2   Q    You'd mentioned in your review something about public

3   relations.

4   A    Yes.

5   Q    Okay.  Were you involved -- and I know I asked you this

6   earlier, but were you involved in actually doing public

7   relations for the company?  What did you -- Or let me ask you

8   a better question.  What did you mean by that?

9   A    Well, I was the representative of the company.  I

10  represented what their mission was within the environment of

11  our client.  And I made sure that they understood that

12  Shipcom, as well as myself personally, had their best interest

13  in mind, that we were sympathetic and that we would be there

14  as long as it took to see the project through.

15  Q    Okay.  And why would you do that personally?

16  A    It's based on the core values that I was raised with.

17  That being integrity.

18  Q    I'm going to put back up here --

19       (Pause -- talking off the Record.)

20  BY MR. SLOBIN:

21  Q    This is the job description of trainer that we talked

22  about earlier.  Do you recall this?

23  A    (No audible response.)

24  Q    Do you see public relations on there?

25  A    No, it's not on there.

CHARLES BETHAS - REDIRECT BY MR. SLOBIN                    74

1     Q    Okay.  Would you say that was one of your primary duties?

2     A    It was something that needed to be done.  I had the

3     ability to do it, and while I was there I accomplished that.

4     Q    Well, what was your primary duty?

5     A    My primary duty was to give them the information about

6     the system and then exit the building afterward.

7     Q    Okay.

8              MR. SLOBIN:  I'll pass the witness, Your Honor.

9              THE COURT:  Thank you.

10             And for the Record this exhibit you just put up, can

11    you give us the number?

12             MR. SLOBIN:  I'm sorry.  It's Plaintiffs' Exhibit

13    No. 10.

14             THE COURT:  Thank you.

15             Any recross, Mr. MacDowall?

16             MR. MACDOWALL:  (No audible response.)

17             THE COURT:  Mr. MacDowall, any Recross?

18             MR. MACDOWALL:  No, Your Honor.

19             THE COURT:  All right.  You may step down,

20    Mr. Bethas.  Thank you.

21        (Witness steps down.)

22             THE COURT:  Ladies and gentlemen, we will take our

23    break at this point and work on getting the microphone fixed.

24    Let's take a 15-minute break.  So be back just before

25    10:00 a.m.

1          (Recess taken from 9:42 a.m. to 9:57 a.m.)

2          (Outside the presence of the jury.)

3               COURTROOM CLERK:  Do you want me to call?

4               THE COURT:  I would, but we're ready.  She's ready.

5               MR. SLOBIN:  I'm sorry, Your Honor. Do you want me

6     to put a witness on the stand?

7               THE COURT:  Is the jury ready?  We'll go ahead and

8     let the jury come in and you can --

9               MR. SLOBIN:  Okay.

10              THE COURT:  And just for the witnesses benefit, we

11    are not going to move the microphone back and forth on the

12    desk; just adjust the mouth piece.  And we have attempted to

13    turn up the volume.  So hopefully that will work better.

14              UNKNOWN 1:  I thought I was going deaf.

15              UNKNOWN 2:  I could hear me fine.

16              THE COURT:  Ready.

17              COURTROOM CLERK:  All rise for the jury.

18         (Jury enters courtroom 9:57 a.m.)

19              THE COURT:  Be seated, please.  Mr. Slobin, you may

20    call your next witness.

21              MR. SLOBIN:  Your Honor, we call -- Plaintiff's call

22    Chris Kehn to the stand.

23              THE COURT:  Raise your right hand, Mr. Kehn.

24         (Witness sworn.)

25            DIRECT EXAMINATION OF CHRISTOPHER MICHAEL KEHN

1   BY MR. SLOBIN:

2   Q    Good morning, Kehn.  How are you doing today?

3   A    I'm good, a little tired, but --

4              THE COURT:  We adjusted the volume on the

5   microphone, ladies and gentlemen, so it should be louder now.

6              MR. SLOBIN:  I may wake everybody up.

7   BY MR. SLOBIN:

8   Q    Will you please state your full name for the record?

9   A    Christopher Michael Kehn.

10  Q    Okay.  And Mr. Kehn, are you familiar with Shipcom?

11  A    Yes, I am.  I worked there from July 2014 until about

12  March of 2016.

13  Q    Okay.  And what was your position at Shipcom?

14  A    Trainer.

15  Q    All right.  And what did you essentially do as a trainer?

16  A    We go on site, teach the software using PowerPoint slides

17  rinse, wash, repeat.  Basically site to site to site.

18  Q    Okay.  And do you mind unpacking that a little bit for

19  me?  Give me a little more and the jury a little more

20  understanding on what you were doing on a day-to-day basis?

21  A    On a day-to-day basis, we get on site, we would

22  present -- well, it appears obviously -- but prior to go-live,

23  what we would do is we go on site, teach the modules that we

24  had set up previously and then -- not we, sorry, but.

25  Q    Don't worry.  I understand the nerves.  Tell me kind of

1    what you would do on a day-to-day basis.  And let's just talk
2    about kind of pre-implementation.
3    A    Okay.  We would teach using decks that were created.  We
4    would teach using PowerPoint slides.
5    Q    Okay.  And when you're teaching, how long are these
6    courses or classes or these presentations that you're giving
7    to the VA?
8    A    They range anywhere between 45 minutes per module to an
9    hour and half per module.  I know that the slide decks that
10   you had anywhere between 45 to 55 PowerPoint slides in each
11   one.
12   Q    Okay.  And when you -- is there kind of an average range
13   of whether it's hours or days that it would take to teach the
14   course?
15   A    I think each site we were at were two weeks, you know, it
16   just kind of varied.  I mean, it would be the same thing.  It
17   would be going just to channel sites.
18   Q    Okay.  And for the entire two weeks, you're going
19   through -- is it you're going through PowerPoint
20   presentations?
21   A    Correct.
22   Q    Okay.  And you were teaching the CATAMARAN Software; is
23   that right?
24   A    That is correct.
25   Q    Were you involved in the creation or development of the

1    curriculum that you were charged with teaching?

2    A    No, I was not.

3    Q    Who was in charge of creating that curriculum?

4    A    That would typically be development.  They put the slide

5    decks together.  If we did anything with them at all it would

6    be just for the format of it.

7    Q    Tell me the process or the people involved when Shipcom

8    is implementing the information, the CATAMARAN System.

9    A    There'd be a site lead at each facility.  There would

10   also be blueprint on site.  There would be -- typically JP was

11   involved in (indiscernible) kind of the head of the program.

12        Are you talking about on-site or just?

13   Q    No, on-site.

14   A    On-site.  The site leads were there.  They ran the show

15   at each facility.  There were also blueprints there.

16   Occasionally one of the V.P.'s would be there.  But it was

17   pretty much the site leads that ran it.

18   Q    Okay, what do you mean that they ran the show, the site

19   leads?

20   A    They would put up -- they would determine what each

21   facility needed.  They would determine which facility needed,

22   what they needed to be trained on.  So if there was, you know,

23   surgery day, -- if one facility had the kiosk and the other

24   facility didn't have a kiosk, they would determine whether or

25   not we would, you know, take module or pull the module from

1     the training deck.

2     Q    Okay.  Were you responsible for evaluating what was going

3     to be taught to the hospital?

4     A    No, not at all.

5     Q    Did you have any input into what was going to be taught

6     to the VA hospitals?

7     A    No, I don't believe so.

8     Q    Could you deviate from any of the training materials?

9     A    No, we were not supposed to deviate from the training

10    materials.  We weren't even supposed to hide certain slides.

11    It just -- yeah, we didn't do anything with the deck itself.

12    Q    Okay.  And I get that you were not supposed to, but did

13    you anyway?

14    A    If it didn't make sense, as in like the kiosk situation,

15    yes, we would just hide it if we didn't hear from  site lead

16    before.  But that was the only time we'd ever deviate.

17    Q    Okay.  So, give me an example of something that just

18    wouldn't make sense.

19    A    Well what wouldn't make sense is if we would go out to a

20    facility and it didn't have like the kiosk that they're using

21    now.  But with the kiosk, if the facility didn't have one, why

22    would we train on it.  There'd be no need to train on how to

23    use it, so we just pulled that from the slide.

24    Q    Were you -- were you involved in the training schedule,

25    like where you would train or when you would train?

1    A    No, our manager would basically tell us where we were

2    going.  Sometimes, you know, the day before we were supposed

3    to leave, we'd get our itinerary.  He'd be in charge of

4    telling us where we would go.

5    Q    And how many hospitals did you train at?

6    A    Anywhere between 30, 50 somewhere.  It's a wide range.

7    Q    And describe for me that kind of process of going from

8    place-to-place.

9    A    It was miserable, to be honest.  But a lot of times our

10   travel itinerary wouldn't even be set prior to meaning that we

11   were buying all our tickets last minute.  So we would

12   get -- we'd get the information on where we were going the day

13   before.

14       We just -- kind of where we need to go to put out a fire.

15   By that I mean that where we need to go to provide the

16   facility more training.

17   Q    So how much notice were you given on you need to be there

18   or where whatever place you need to go to?

19   A    Less than 24 hours sometimes.  I had gotten my itinerary

20   the midnight before I was supposed to leave for taking a

21   flight the following day.

22   Q    Okay.  All right.  And who's paying for your tickets?

23   A    We were.  We're all taxpayers, right?  No, the -- would

24   technically paying for the tickets.  However, sometimes it

25   would even be us -- well not the tickets, but the rental cars

1     and stuff we would have to cover the cost for that

2     occasionally on our own.

3     Q     Did you get reimbursed for those costs?

4     A     Eventually yes.  I know that a few of us had issues with

5     reimbursement somewhere two to three months after the fact we

6     would finally get out money.  I know a couple of people had

7     issues with credit card --

8             MR. MACDOWALL:  Objection, Your Honor.  The witness

9     is -- he's testifying to hearsay or speculating.

10            THE COURT:  Sustained.

11    BY MR. SLOBIN:

12    Q     That's all right.  I'm moving on anyway.  You'd indicated

13    a little more and I don't want -- you don't need to spend a

14    ton of time on this, but tell us again the difference between

15    the pre-implementation and the post-live.

16    A     Well one we'd be training with slide-decks.  The other

17    you would be training in person -- both in person.  Excuse me.

18    We'd be training in a live environment.  So the software would

19    actually be used by the facility.  We would go and we'd just

20    follow around supply techs or follow around the warehouse --

21    whoever is using our software.

22            So what we would do is just tag along with them and then

23    help them with their order flows.

24    Q     Okay and when you were doing the kind of -- was it

25    one-on-ones or how many did you -- the kind of post-live?

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1     A     Typically it was a one-on-one.  Usually it would be like

2     either two supply techs with us or three supply techs with us

3     because there'd be -- we didn't have enough trainers on site,

4     to, you know, meet the needs.  So we always have to get a

5     collective group of people together when we were training.

6     Q     Okay.  And what materials were you training them from?

7     A     The slide decks and the handouts, the quick reference

8     guides -- which I believe Chad has mentioned earlier.  It

9     would be those.

10    Q     All right.  And did you have any involvement in drafting

11    any of that information?

12    A     No.

13    Q     Did anyone from Shipcom come to you and ask if you would

14    revise or alter any of their training materials for a better

15    training experience?

16    A     Not for a better training experience.  I mean, like we

17    said, we would change maybe the form as in like the

18    color -- not the color, but just the grammatical errors.

19    That's what we would change on them.

20    Q     Okay.  But other than grammatical errors, are you

21    changing the content of the materials?

22    A     No, that was all handed to us.

23    Q     Okay, here comes the laundry list.  Did you -- and I'll

24    try to, again, break it out.  Did you do any work directly

25    related to tax, finance or accounting?

1    A    No, I did not.

2    Q    All right.  Did you do any work related to budgeting or

3    auditing?

4    A    No.

5    Q    Did you do any work related to insurance, quality control

6    or purchasing?

7    A    No.

8    Q    Did you do any work relating to procurement, advertising

9    or marketing research?

10   A    No.

11   Q    Did you do any work related to safety and health or

12   personal management?

13   A    No.

14   Q    Did you do any work related to human resources, employee

15   benefits or labor relations?

16   A    Absolutely not.

17   Q    Did you do any work related to public relations or

18   government relations?

19   A    No.

20   Q    Did you do any work directly related to computer network?

21   A    No.

22   Q    Did you do any work directly related to internet and

23   database administration?

24   A    Not at all.

25   Q    Did you do any work directly related to legal and

84

1    regulatory compliance?

2    A    No, sir.

3    Q    Did you -- were you engaged in running Shipcom?

4    A    No, we trained.

5    Q    Okay.  Were you responsible for determining Shipcom's

6    overall course or policies?

7    A    No, I was not.

8    Q    Did you design any of the CATAMARAN software?

9    A    No.  It was designed prior to.

10   Q    Were you part of any team that designed the CATAMARAN

11   software?

12   A    No, I was not.

13   Q    Did you advise the VA hospitals on how to configure and

14   modify the CATAMARAN software to run their business?

15   A    Not at all.  Not at all.

16   Q    Did you have authority to formulate or affect Shipcom's

17   management policies?

18   A    No, I did not.

19   Q    Did you have any authority to interpret or implement

20   Shipcom's management policies?

21   A    No, I did not.

22   Q    Did you have any authority to formulate or affect

23   Shipcom's operating policies?

24   A    No, sir.

25   Q    Did you have any authority to interpret or implement

1    Shipcom's -- oh I'm sorry -- Shipcom's operating policies?

2    A    No.

3    Q    Were you able to commit Shipcom in matters that have

4    significant financial impact?

5    A    Not at all.

6    Q    Did you have any authority to waive or deviate from

7    established policies and procedures without prior approval?

8    A    No.

9    Q    Did you have authority to negotiate and bind Shipcom on

10   significant matters?

11   A    No, I did not.

12   Q    Did you provide consultation or expert advise to Shipcom

13   management?

14   A    No.

15   Q    Were you involved in planning long or short term business

16   objectives for Shipcom?

17   A    No, we were not.

18   Q    Did you investigate and resolve matters of significance

19   on behalf of Shipcom's management?

20   A    No.

21   Q    Did you represent the company in handling complaints,

22   arbitration disputes, or resolving grievances?

23   A    No.

24   Q    Did you ever negotiate a contract with the VA?

25   A    We did not.

1   Q    Did you negotiate any pricing terms with the VA?

2   A    No.

3   Q    Did you participate in any management meetings at Shipcom

4   regarding the direction of the company?

5   A    No.

6   Q    Did you have any input into the hospitals that you

7   trained at?

8   A    No.

9   Q    Did you ever discipline employees?

10  A    No.

11  Q    Did you devise any marketing plans?

12  A    Not at all.

13  Q    Did you decide whether or how to recruit potential hires?

14  A    No.

15       (Pause in the proceeding.)

16       THE COURT:  I'm not sure what that was.

17       MR. SLOBIN:  I think it was Mr. MacDowall.  No.  I

18  don't know what that was.

19       All right, sorry.  I was correct.

20  BY MR. SLOBIN:

21  Q    I believe you told me when we started with Shipcom.  When

22  did your employment end?

23  A    March of 2016.

24  Q    Okay.  And why did your employment end?

25  A    Pretty much we lost the contract with the VA and so the

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1    300 employees that we added, all went back to whatever jobs

2    they could go to afterwards.

3    Q    Okay.  Let me go through some Exhibits with you.

4    A    Okay.

5    Q    Will you turn to Exhibit -- Plaintiff's Exhibit 33?  Do

6    you see that?

7    A    Yes.

8    Q    Okay.  And what is Plaintiff's Exhibit 33?

9    A    That's an employment offer I received.

10   Q    Okay.  And does it describe the duties that you were to

11   do while at Shipcom?

12   A    Yes, it does.

13   Q    Is that a fair representation?

14   A    It's fairly accurate, yes.

15   Q    Okay.  And does it indicate your compensation?

16   A    It does. Number two.

17   Q    Okay.  How were you compensated?

18   A    Annual salary was $65,000 paid monthly.

19   Q    Okay.  Did that take into account the hours that you

20   worked or was it just a salary?

21   A    I guess when we signed this, we were indicating that we

22   were going to be working 70 to 80 hour weeks at some times.

23   So when I did accept this, this was more along the lines of

24   accepting it based on, you know, thinking you're average

25   working average work week of between, you know, 40, 55 hours.

1    Q    Okay.  And would you say that you would work more or less

2    than what you thought you were going to work?

3    A    Obviously, I think we worked more.  You know, upwards of

4    20, 24 hours in a day I worked.

5    Q    Okay.  All right, I'm going to put up Plaintiff's Exhibit

6    34.  I'm going to go through just a couple of things.  Do you

7    know what this document is?

8    A    I believe it's a performance review.

9    Q    Okay.  And who prepared this document?

10   A    Our manager, Ed.

11   Q    Will you read item number one for me?

12   A    "Skill and proficiency in training on assignments.  Chris

13   does a good job conducting instructor lead training and is

14   very effective at providing go-live support."

15   Q    Okay.  Two things.  Just speak a little bit slower for

16   the Court Reporter, maybe.

17   A    Yes.

18   Q    And would you agree with that statement?

19   A    Yes, I would agree with that statement.  It was

20   just -- we conduct our training, we instruct the VA how to use

21   the software, and I guess that I was fairly effective.  I

22   hope.

23   Q    Okay.  Will you turn to -- you can't.  Turn to the next

24   page in your book.  Will you take a minute and read item six

25   for everybody?

1    A    "Communicates effectively with supervisor, peers and

2    customers.  Too often negative comments are made about the

3    company to coworkers and myself.  For example, when I

4    announced the new trainers I hired and asked everyone to the

5    team, their response was an angry announcement stating he

6    would not recommend this company to your worst enemy."

7    Q    Did you really say that?

8    A    Yes, I did.

9    Q    Okay and why is that?

10   A    Around this time is the time where -- well, I had a good

11   feeling there's some issues with (indiscernible) and this was

12   why I wrote the email that you guys saw the other day.  That

13   was continuing on during this time as well.  And just conflict

14   between myself and my manager.

15   Q    All right, let's bring up that email so that we talk

16   about it.  It's Exhibit 41 in your book.  And before we kind

17   of get into digging into the email, would you just give me

18   some context as to why you wrote Exhibit 41?

19   A    I think it was briefly touched on that it had to do with

20   Father's Day.  What happened was that my father was scheduled

21   for surgery the Tuesday after Father's Day and the week prior

22   to that I found out my grandfather was diagnosed with terminal

23   stage four cancer.

24        So what I did is I told both my manager and the travel

25   team to make sure that if they book my flight on a Sunday that

1    it's got to be later than 6:00 p.m.  I figured that was an

2    easy way to, you know, being able to spend some of that time

3    with my family that day.

4         And this was also the trip where I received my itinerary

5    the midnight before the day I was supposed to travel.  So I

6    get my itinerary at midnight and it says that my flight is

7    supposed to be leaving at 2:00 p.m.

8         I went ahead and said no that's not going to work and I

9    made changes to my travel so I could spend more time with my

10   family that weekend and then went on to the site afterwards on

11   Monday morning -- which is what we usually travel was Monday

12   morning.  But we certainly get forced to travel on Sundays as

13   well.

14   Q    Okay.  So just to be clear, let me just unpack some of

15   the stuff you said.  You had some -- your dad was going to

16   have surgery?

17   A    Correct.

18   Q    It was father's day?

19   A    Yes.

20   Q    And did you say it was your grandfather's birthday?

21   A    No.  My grandfather had -- was just diagnosed with

22   terminal cancer and they gave him about a month at that point.

23   Q    Okay, all right.  And you're saying that midnight -- so

24   we're talking like Saturday night?

25   A    Yeah.

1    Q    For a travel the next morning at or next afternoon at

2    2:00?

3    A    Correct.  And that was also after asking specifically if

4    we could -- if I could -- make sure that if I traveled on that

5    Sunday that it was much later than that 2:00 p.m. flight that

6    came my way.

7    Q    Okay.  And then is that what prompted this email?

8    A    Yeah.  I mean it was that and it was -- excused me.  I

9    was being written up for that is what prompted this email.

10   Was the fact that I was written up for making the changes even

11   though I communicated to both my manager, his manager, what I

12   was going to be doing.

13        And then actually asked for a review right after that

14   too.  And instead of a review I was -- instead of a review I

15   didn't hear back from either my manager, my manager's manager

16   and the next thing I got was a performance improvement plan

17   right after that.

18   Q    All right.  How would you describe your emotional state

19   at that point?

20   A    Not the best, I guess.  I was a little angry, a little

21   worried, obviously too.

22   Q    Okay.  And what was your goal in writing this Plaintiff's

23   Exhibit 41?

24   A    I wanted to be vocalize what I hadn't vocalizing too much

25   of the people that I had seen on site.  I wanted to let our

1    management know, our legal know, our VPs know that I think we

2    were having issues and I think they needed to be addressed and

3    I was trying to get an audience for a long time by talking to

4    site leads, talking to managers about this prior to.  That was

5    even, let's see, April of 2015 is when I started discussing

6    this FLSA stuff.

7         When I didn't get any audience, then I got the

8    performance improvement plan.  This is what kind of resulted.

9    Not the best way to handle it as I state later on, but yes.

10   Q    Okay, so let's -- again let's unpack that.  So did you

11   just testify that as early as April of 2015, you mentioned

12   FLSA issues to the company?

13   A    I'd say March even -- late March.

14   Q    Okay.

15   A    Just after Justin left and after a bunch of the good

16   employees started leaving Shipcom, there was very little

17   retention.  So frustration grew and that's when I started to

18   communicate this.

19   Q    Okay.  And who did you talk to at the company?

20   A    I talked to my manager about it, Ed Price.  I talked to

21   Rahul Jani (phonetic) who is a site lead at a

22   different -- Durham, excuse me.  I talked to the site lead at

23   Fayetteville about it.  I talked to Rahual Gupta (phonetic)

24   about it, Durham.

25        There's numerous people I talked to about this prior to

1    this email.

2    Q    Okay.  Let's kind of -- I hope I captured all the names.

3    So let's make sure we get through this, okay.  So you said you

4    spoke to Ed Price?

5    A    Correct.

6    Q    Who is Ed Price?

7    A    Ed Price is the training manager.

8    Q    All right.  And when do you think you spoke to Ed Price?

9    A    I would say he was in April, maybe March, late March,

10   early April.

11   Q    Okay.  So it's well before this email, right?

12   A    Yes, well before this email.

13   Q    Okay.  And what do you recall talking to Ed Price about?

14   A    That I think that we're -- our job should have been -- we

15   should have been paying overtime.  That's what I thought.

16   Based on our job duties and based on what I know.

17   Q    Do you have any experience in the FLSA?

18   A    Employment line, I was a practicing attorney for roughly

19   two years prior to this position.

20   Q    Okay.  So we didn't go over that.  Let's just establish

21   that really quickly.

22   A    Okay.

23   Q    And again, are you an employment lawyer?

24   A    No, I'm not an employment lawyer.  I did divorce work.

25   Q    Okay.  All right, but you did go to law school?

1   A    Yes, I did.

2   Q    Okay.  Where did you go to law school at?

3   A    Ohio Northern University.

4   Q    Okay and did you get a degree from there?

5   A    Yes, I did.

6   Q    All right and did you take the bar exam?

7   A    Yes, I did.

8   Q    All right and so you were actually a practicing attorney;

9   is that fair?

10  A    That is fair.  I was a practicing attorney in Ohio.

11  Q    Okay.  And how long did you practice?

12  A    A little under two years.  Approximately two years.

13  Q    Okay.  And what kind of law did you practice?

14  A    Mostly family, guardian ad litem.

15  Q    All right.  And when you were in law school, did you take

16  any classes that would related to the FLSA?

17  A    Employment law.

18  Q    Okay.  And was there something that was going on at work

19  that triggered memories of law school?

20  A    It was the monotonous day-in-day-out routine that we had.

21  It was just the same thing over and over again.  And then

22  knowing that we had no responsibility in terms of management,

23  employees and basically the laundry list of things we just

24  went down.  I was pretty sure that we were incorrectly

25  classified to begin with.

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1    Q    All right.  And so you'd indicated you talked to Ed

2    Price.  And then I believe you mentioned the name Rahul Jani?

3    A    Yes.

4    Q    All right.  And for the record that's R-A-H-U-L?

5    A    R-A-H-U-L.

6    Q    J-A-N-I?

7    A    Correct.

8    Q    All right, who is Rahul Jani?

9    A    Rahual Jani is what I would consider one of the inner

10   circle individuals part of the families who come.  He was a

11   site lead, essentially.  He was one of the people that ran his

12   site and --

13   Q    And what do you mean by inner circle?

14   A    Inner circle would have been -- not anything in a bad

15   way, but it was kind like the joke that we talked about in the

16   pool, the stream.  Rahul Jani is like the younger group of

17   people that were very close with our president of

18   (indiscernible).

19   Q    And what did you talk to Rahul Jani about?

20   A    Same thing.  That we -- I thought there was violations

21   there and I wanted him to be aware of it as well.  He was one

22   of my closer friends in the company, so.

23   Q    And when do you recall talking to Rahul Jani?

24   A    I recall talking to Rahul Jani -- which I believe was

25   either April or May.

1    Q    All right.  You mentioned somebody, I believe, Malek?

2    A    Yeah Malik.  Malek is essentially the acting HR director

3    prior to Andy Diaz coming on.

4    Q    Okay.  And do you recall when in time you spoke to Malek?

5    A    Yes, that was when I was in the Houston office, again he

6    was somebody I considered close friend.  Another person I felt

7    like I could talk to.  So we discussed, you know, these

8    violations I thought were going on. I believe that was in

9    April as well.

10   Q    Okay.  All right, for the record it's M-A-L-E-K.

11   A    Correct.

12   Q    Did you also mention Rahul Gupta?

13   A    Yeah Rahul Gupta is one of the VP's of something.  I

14   can't remember the VP of -- we had a ton of them, so.

15   Q    Okay.  And what did you talk to Rahul Gupta about?

16   A    Same thing.  FLSA violations that I thought were -- I

17   thought going on in the company.

18   Q    All right.  And when in time do you believe spoke to

19   Rahul Gupta?

20   A    It was also when I was in the Houston office. It should

21   have been -- I believe it would have been April of 2015.

22   Q    All right.  Did you mention someone Ms. Shreen

23   (phonetic)?

24   A    Yes.  Ms. Shreen Konava (phonetic).

25   Q    Okay.  Who is that person?

1    A    She, I guess the renaissance woman of the company for a

2    time period before she left because of frustrations as well.

3    She did a little bit of everything.  She was Reddy's right

4    hand man for awhile.  She was business development.  She

5    drafted business development plans.  She kind of was an

6    administrative assistance.  She also booked travel.  She did a

7    little bit of everything within the company.

8    Q    Okay.  And when do you recall talking to her?

9    A    I think as early as January, February because it was

10   about during the time we were dating for awhile.

11   Q    Okay.  All right, January, February of 2015?

12   A    Correct.

13   Q    And -- all right, so lets get back to Exhibit 41.  All

14   right, you see here, consider this email notice of the issues

15   below?

16   A    Yes.

17   Q    All right.  So if you don't mind, just kind of summarize

18   what you're telling the company at this point.

19   A    One is that (indiscernible) is classified.  It's kind of

20   why we're sitting here right now.  And the second one is just

21   something I threw in there that I thought may have been, you

22   know, we weren't paying any state taxes to the states that

23   we're traveling to.  And I know that there's an exception --

24        MR. MACDOWALL:  Objection, Your Honor.  As he said,

25   he's testifying to actual fact.  He's speculating.  There's no

1      foundation for that.

2              MR. SLOBIN:  He's just summarizing the document,

3      Your Honor.

4              THE COURT:  I don't think that the witness is

5      testifying to that as a certainty.  He's just summarizing the

6      information in the document, so.

7              MR. MACDOWALL:  So as long as that's true, Your

8      Honor.  It sounded like he was giving the reason he was

9      complaining as a fact underlines.

10             MR. SLOBIN:  Your Honor, I have a solution.  I can

11     move on, but -- I'm sorry.

12             THE COURT:  Okay, well just for the jury's purposes,

13     the testimony and the document are not representations to the

14     truth of whether or not there were any tax code violations.

15     And the witness is just testifying about what he wrote in the

16     document.

17             So let's move on.

18     BY MR. SLOBIN:

19     Q    Will you do me a favor and will you please read item

20     number one?

21     A    "I believe I, as well others, have been miss classified

22     under FLSA laws.  I should have been paid hourly entitled to

23     overtime based on the statute how Courts have interpreted it.

24     My role as a trainer does not fit within any of the exemptions

25     the statute carves out.  I'm asking to be compensated for the

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

99

1    additional hours I've worked plus interest."

2    Q    All right.  And item two, please.

3    A    "You may be violating multiple taxes -- multiple state

4    tax codes.  My paycheck does not withhold any state taxes and

5    some of the states we have worked within require individuals

6    to file taxes if you perform any work related tasks within

7    state lines."

8    Q    Okay.  And then just continue on to "this company."

9    A    "This company ingest, digest and spits up nothing but

10   waste when it comes down to their employees.  I can easily

11   give you an overwhelming number of examples that would fall

12   inline with my previous statement.  Companies that treat their

13   employees this way need to simply go away.  The company return

14   on investment and their overall financial situation is

15   undoubtedly important, but that should always take a backseat

16   to the individuals who with their blood, sweat and tears into

17   keeping the cogs running smoothly day in and day out."

18   Q    That's enough.  How would you describe yourself as an

19   employee?

20   A    It's all about our time.  It's all about their customer.

21   And I would put my blood, sweat and tears into that.  I did

22   everything I could to make sure that the VA was happy.  And to

23   sacrifice my own.

24   Q    Okay.  Do you care about what you do?

25   A    Absolutely.  I care about everything I do.

1    Q    Okay.  I think in some questioning yesterday,

2    Mr. Notestine when he was talking to Goenka, that this had a

3    threat of litigation.  Was that your intent when you wrote

4    this?

5    A    Not at all.  The last thing I wanted to do was to be

6    sitting in this seat right now.  That's why I had the

7    conversation that I had with the people that I had.  That's

8    why I sent this email.  And that we were unhappy with the way

9    that things rolled out and the way that they handled the

10   situation. That's when I decided to contact you.

11   Q    And tell me what the intent of this -- what are you

12   trying to tell the company?

13   A    Obviously lose my job, no.  The intent of this was simply

14   to just to put them on notice that I wanted them to know that

15   there was lots of good people leaving this company.  I wanted

16   them to know that the retention rate that we had was awful.

17   There's such a high turnover rate and the new faces -- people

18   that were learning a brand new software that they're

19   unfamiliar with, there's an obvious reason why the program was

20   failing, why we lost the contract.

21        Things weren't working right because they were running so

22   ineffectively.

23   Q    What did you want them to do?

24   A    Change.  I wanted them to change.  I wanted them to kind

25   of pay attention and actually listen to us which they never

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1    took any information in.

2    Q    Okay, flip to the next page.  Do you see where it says,

3    "in conclusion?"

4    A    Yes.

5    Q    Please read that paragraph for me.

6    A    "In conclusion, I'm not looking to prove a point or cause

7    massive uproar frivolous money seeking individuals who file

8    such claims are no better than the company who sees their

9    employees as replaceable.

10        "I only want to right -- I only want to right what I feel

11   is wrong with corporate America.  To quote Bob Dillon, times

12   they are changing. I'll be in Houston through Friday.  Fine if

13   you'd like to chat.  Good night."

14             And then (indiscernible).

15   Q    Okay, so let's recap a couple things.  You've been

16   complaining about -- you testified that you've been

17   complaining about FLSA for how many months?

18   A    At this point it would have been -- this is in July when

19   this email was sent -- so it would have been -- January in

20   training, so it would have been about -- seven months.  Excuse

21   me.

22   Q    Okay.  And did they finally do anything about it?

23   A    Yeah, roughly a month later we received a letter saying

24   that we were going to be reclassified.

25   Q    Okay.  Lets look at that.

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1          MR. SLOBIN:  Plaintiff's Exhibit 36, Your Honor.

2          THE COURT:  Thank you.

3   BY MR. SLOBIN:

4   Q    All right, what is this document?

5   A    That's was the September 1st dated document saying that

6   we were going to be reclassified and how they were going to

7   pay us our back-pay, overtime.

8          So for the -- how many hours was it -- 805 hours of

9   overtime, I was paid $8,924.

10  Q    Okay.  And did you think that was an accurate

11  calculation?

12  A    I think it's accurate if you use the fluctuating work

13  week method, but it's not accurate to what I believe we should

14  have been paid.

15  Q    Let's take a look at Exhibit 37 -- Plaintiff's Exhibit

16  37.  What is Plaintiff's Exhibit 37?

17  A    It's a letter from Andy Diaz -- who was the HR Director

18  at the time -- saying that our status according to the

19  official -- just kind of reiterates the email that was sent.

20  Q    Do you know when you received this?

21  A    I believe it was right around the same time.  I'm not,

22  I'm not -- I can't really recall to be honest.

23         (Pause in the proceeding.)

24  Q    You were in the room yesterday when Mr. Goenka was

25  testifying.  Do you recall that?

CHRISTOPHER MICHAEL KEHN - DIRECT BY MR. SLOBIN

1    A    Yes.

2    Q    And there was some questions about Exhibit -- Plaintiff's

3    Exhibit 41 and your complaint and then the companies policies

4    and procedures.  Do you recall that?

5    A    Yeah, I believe so.

6    Q    Okay, and I believe the testimony was -- I'm not trying

7    to misstate anything -- was that you didn't follow the

8    company's policy and procedures in making that complaint.  Do

9    you recall that?

10   A    Yes, I do.

11   Q    Okay.  Tell me why you didn't follow the company's

12   policies -- let me finish the question.  Tell me why you

13   didn't follow the company's policies and procedures when

14   giving that complaint.

15   A    We didn't have an employee handbook.  We had no policies.

16   We had no procedures.  In fact, when my grandfather later

17   passed -- about a month later which is in August of 2015 -- I

18   didn't even know we had bereavement.  I asked my manager for

19   it.  He didn't even know we had bereavement. He said that we

20   didn't.  I had to use my sick days.

21        A month later we get a policy and procedures handbook

22   published and it states any full time employee should get

23   three days of bereavement per year.

24        I mean that's -- it didn't get published until September.

25   We had no company policies.  We grew too fast, too quickly as

1    they -- as I mentioned and we didn't have a lot of things in

2    place that should -- that a company should have had in place

3    prior to early on.

4    Q    All right, so you threw out a whole bunch of stuff at me,

5    so let me kind of break it down, again.

6         Let's talk about this bereavement leave.

7    A    Yes.

8    Q    Okay, so I'm sorry for the loss.  But tell me, you took

9    some time off?

10   A    Yes, I traveled to New York.  I was supposed to be doing

11   site training in New York.  I found out as I touched down that

12   my grandfather had passed about a month after -- or

13   whatever -- approximately a month in August when he passed.

14        And I called my manager as to, you know, get a flight

15   back home and he said he was going to book me a flight.  I was

16   on performance improvement plan at this time that said that if

17   I booked my flight or changed any more travel that I was going

18   to be fired.  So I had to sit there in a hotel for two days to

19   kind of get over what it was I actually ended up training

20   Thursday and Friday.

21   Q    So you didn't make it to the funeral?

22   A    The funeral was later on and that's actually when they

23   did give me a single day of bereavement that day.  But that

24   was like six months later.  It was more of a -- it wasn't

25   actually a funeral.

1 Q Was the -- was the leave counted as any specific type of

2 time?

3    MR. MACDOWALL:  Objection, Your Honor.  Let us go

4 on.  I'm not sure what the relevance of this entire line of

5 questioning is.

6    MR. SLOBIN:  Your Honor, the relevance is policies.

7 They seem to make this a big issue yesterday about following

8 policies.

9    THE COURT:  I think you established that the policy

10 manual was not given to them until after this time period.  I

11 don't think we need to go into --

12    MR. SLOBIN:  That's fine, Your Honor.

13    THE COURT:  -- too much more of this.  Just wrap up

14 this line.

15    MR. SLOBIN:  Okay, just to get an answer to that

16 question.  Do you mind reading back the question?

17    THE COURT:  This is an electronic record.

18    MR. SLOBIN:  Oh, sorry.  I'll start again.

19 BY MR. SLOBIN:

20 Q Was your time that you said you took off, was that

21 counted as any specific type of time?

22 A It was -- that was sick days.  I had to take sick days.

23 Q Okay.  All right.  So were you paid for that time?

24 A Yes, I was paid for that time using --

25 Q Sick days?

1    A    Yes, sick days.

2    Q    All right.  I'll move on.  And I just want to be 100

3    percent clear and I think you've got it.  So when do you

4    believe -- did you eventually receive an employment manual?

5    A    Yes, I was in Fayetteville.  That would have been in

6    September.

7    Q    Okay, so that was two months after you complained?

8    A    Yes, correct.

9         (Pause in the proceeding.)

10        MR. SLOBIN:  Your Honor, I'll pass the witness.

11        THE COURT:  All right.  Mr. MacDowall, do you need

12   the overhead to be connected to your computer?

13        MR. MACDOWALL:  Yes, Your Honor, although I think

14   I'm going to use the Elmo first.

15        THE COURT:  All right.

16        (Pause in the proceeding.)

17        CROSS-EXAMINATION OF CHRISTOPHER MICHAEL KEHN

18   BY MR. MACDOWALL:

19   Q    Good morning, Mr. Kehn.

20   A    Good morning.

21   Q    You're a college graduate; is that right?

22   A    That's correct.

23   Q    You graduated from Case Western University; is that true?

24   A    Case Western University, that's correct.

25   Q    That's in Cleveland?

1    A    That is.

2    Q    You graduated there in 2008 with a degree in Political

3    Science; did you not?

4    A    I did.

5    Q    Then you graduated from Ohio Northern University School

6    of law; is that true?

7    A    College of law if you want to be correct, but yes.

8    Q    And that was in 2012?

9    A    Yes, it was.

10    Q    So you obtained your J.D.?

11    A    Yes.

12    Q    Is that right?  And then you took the Ohio bar

13    examination; is that right?

14    A    That's right.

15    Q    And you passed that?

16    A    Yes.

17    Q    So you're a licensed attorney in Ohio.  Is that accurate?

18    A    That's correct.

19    Q    And you practiced law for approximately two years and you

20    testified to earlier; is that right?

21    A    That is correct.

22    Q    And then in the summer of 2014, you applied for a job

23    with Shipcom as a trainer; is that accurate?

24    A    That is accurate.

25    Q    You left the practice of law?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL      108

1    A    Yes.

2    Q    And Shipcom made you an offer of employment.  I believe

3    you reviewed that during your direct examination; is that

4    right?

5    A    Yes.

6    Q    That offer indicated that you'd be employed as a trainer

7    by Shipcom; is that right?

8    A    That's correct.

9    Q    And you were offered an annual salary of $65,000 for that

10   position; is that right?

11   A    That is right.

12   Q    And you reviewed that offer, didn't you?

13   A    Yes.

14   Q    As a lawyer you knew that it was important to review that

15   offer; isn't that right?

16   A    Yes, I do.

17   Q    And you accepted that offer by signing it; didn't you

18   not -- did you not?

19   A    Yes.

20   Q    Okay.  So you knew when you were going into this

21   employment you were going to be paid $65,000 a year for all

22   services to be performed for the company; isn't that accurate?

23   A    It's accurate to a certain extent.

24   Q    To the extent that that's what the document said that you

25   signed; isn't that right?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1   A     That is correct.

2   Q     Okay.  Now we've heard testimony that you just gave a few

3   moments ago about your complaint that you made on July 8th of

4   2015 regarding your belief that you were misclassified as an

5   exempt; is that right?

6   A     That's right.

7   Q     And that's the first time that you ever complained to

8   management about that issue; isn't that accurate?

9   A     No, it's not.

10  Q     Do you remember giving a deposition in this case,

11  Mr. Kehn?

12  A     I believe so.

13  Q     I was at the deposition asking you questions; is that

14  right?

15  A     Uh-huh.

16  Q     And we were at your attorney's office; is that true?

17  A     Yes.

18  Q     Mr. Sinkule, your attorney, was there with you?

19  A     Uh-huh.

20  Q     And Court Reporter was taking down your answers to all

21  the questions that I asked?

22  A     Yes.

23  Q     And you were sworn in to tell the truth at the

24  deposition; is that right?

25  A     Yep.

1    Q   And that deposition was videotaped; was it not?

2    A   It was videotaped.

3          MR. MACDOWALL:  Your Honor, at this time I'd like to

4    show a clip of that deposition to the jury.  Can I publish

5    that?

6          THE COURT:  Is this going to be a clip of the

7    question that you just asked -- the previous question that he

8    responded now?

9          MR. MACDOWALL:  Yes, Your Honor.

10          THE COURT:  All right, proceed.

11      (Pause in the proceeding.)

12          MR. MACDOWALL:  I apologize, Your Honor, for the

13    delay here.

14      (Pause in the proceeding.)

15      (A video recording was played from 10:41 a.m. to

16    10:45 a.m. for the Court.)

17    BY MR. MACDOWALL:

18    Q   So, Mr. Kehn, the first time that you brought to

19    management's attention any issue with respect to your belief

20    you were misclassified was in that email that we've already

21    seen; is that right?

22    A   That is incorrect.

23    Q   So were you telling the truth during that deposition?

24    A   Yes, I was.  That was the first time written.  I gave

25    notice -- I spoke about it a significant amount of times in

1   person to multiple people within management.  And that's what

2   I was referencing there that it was the first time notice

3   giving written notice.

4   Q    And who of the folks -- you talked about all the folks

5   during direct examination who you allegedly informed about

6   this issue in March and April in 2015; is that right?

7   A    That is right.

8   Q    Okay.  Who of those were in management?

9   A    My manager, Ed Price, the Rahaul Jani, he's management.

10  He's site lead.  Rahul Gupta, he's a VP, so he's management

11  obviously.  There was also the site lead in Fayetteville.

12  She's management.

13  Q    Okay.  Did you know that there was a -- you mentioned

14  earlier you knew Andy Diaz was the Director of Human

15  Resources; is that right?

16  A    I don't know when he came on, but yeah he at some point

17  was.

18  Q    You don't recall him being hired by the company in April

19  of 2015?

20  A    I remember a conversation with Malek saying that he had

21  no experience, yes, around that time.

22  Q    Did you ever take this alleged concern of yours to

23  Mr. Diaz's attention as Human Resources person?

24  A    No, I took it to Malek's attention.  He's human

25  resources.

1    Q    Now in response to this email, you were later

2    reclassified -- excuse me.  After you filed this or after you

3    sent this email in July of 2015, you were reclassified by the

4    company as non-exempt from overtime; isn't that accurate?

5    A    That's accurate.

6    Q    You started to receive overtime from the company; isn't

7    that true?

8    A    No, we were not allowed to work overtime, but yeah.

9    Q    But when you would, you would receive overtime; is that

10   right?

11   A    No, in fact they still have a few hours that weren't paid

12   for.

13   Q    The company paid you for the time that you did work

14   overtime for the two years prior to your reclassification; is

15   that accurate?

16   A    Yes.

17   Q    And they paid you $8,924.20; did they not?

18   A    They did for 800 and some hours of overtime.

19        MR. SLOBIN:  Objection, relevance, Your Honor.

20        MR. MACDOWALL:  Your Honor, at very best, they've

21   opened the door.  They want to talk about damages issues

22   without allowing us to talk about those as well.  The witness

23   has been questioned about the document where he was

24   reclassified.

25        THE COURT:  Well, do you have a point?

1          MR. MACDOWALL:  That's it, Your Honor. Just that he
2     was paid.
3          THE COURT:  All right, let's move on.
4     BY MR. MACDOWALL:
5     Q    Mr. Kehn, let's talk a little bit about that complaint
6     for a moment.
7     A    Okay.
8     Q    This is Plaintiff's Exhibit Number 41; is it not?
9     A    Yes, it is.
10    Q    And it's a copy of that complaint that you sent on
11    July 8th of 2015?
12    A    Yep.
13    Q    And the top of this email was sent to a whole bunch of
14    folks classified as Vice President of the company; is that
15    accurate?
16    A    Accurate enough, yeah.
17    Q    And at the bottom of this email, you attached a copy of
18    the email that you sent to JP previously; is that right?
19    A    That is right.
20    Q    The portion we're showing to the jury now starts with JP
21    and it says, "fair warning" and it goes on that's the portion
22    that you sent to JP; is that accurate?
23    A    Yes, that the email I sent to JP.
24    Q    And you start off in this paragraph, you state, "fair
25    warning this is an apology and a rant all in one, so please do

1    not let the rant supercede the fact I'm admitting that I

2    handled the situation poorly."  Did I read that accurately?

3    A    You did read it accurately.

4    Q    And the situation you're referring to is changing your

5    flight without informing the company and going through the

6    proper procedures for doing so; is that right?

7    A    What procedures?  We didn't have procedures.

8    Q    You are -- you would agree with me that the situation

9    we're talking about is your changing your flight; is that

10   right?

11   A    That's correct.

12   Q    Okay.  And you handled that situation poorly; is that

13   accurate?

14   A    Poorly in sense if I was a manager, yeah, I would be

15   upset for the way I handled the situation.

16   Q    And that's the situation that you were written up for; is

17   that right?

18   A    I believe so.

19   Q    You go on and on in this and we don't have to go through

20   all of it, the jury can certainly read it, but here on the

21   next page in the fourth full paragraph, it starts with,

22   "Additionally a fair amount", do you see that?

23   A    Yes.

24   Q    You write here, "Additionally a fair amount of my work

25   week is spent performing or providing additional aid for tasks

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

115

1    that would ordinarily go to other departments such as travel

2    coordinators, tech writers, data team, blueprint, install

3    technicians and in some instances IT."  Did I read that

4    accurately?

5    A    Correct.

6    Q    So you take on other job responsibilities that weren't

7    necessarily assigned to trainers during your employment; is

8    that what you're saying?

9    A    I'm saying I did what I had to do for the team.  That's

10   what I did.  That wasn't our main job duty.  Our main job duty

11   to teach.

12   Q    Let's go to the last page of this email that you wrote

13   and the last full paragraph or excuse me.  The paragraph that

14   read "if plans go accordingly."  Do you see that?

15   A    Yes.

16   Q    Let's start with the fourth line where it reads, "I also

17   feel."  Do you see that line?

18   A    I also feel.  Yeah.

19   Q    Okay.  It says, "I also feel I can provide solutions you

20   might have not thought of that could address the pain points

21   within the program.  Take this all for whatever it is worth to

22   you.  I've lost sleep thinking about all of this so I needed

23   to get it on paper and send something out and this was the end

24   result."  Did I read that accurately?

25   A    Yes.

1    Q    What you're talking about there is wanting to sit down

2    with members of the company -- in particular J.P. Renaud,

3    right?

4    A    Yes.

5    Q    And talk to them about some ideas you had for improving

6    or improving the processes at Shipcom, right?

7    A    Yeah, we were the boots on the ground.  We had a lot of

8    information I think he would have seen was useful.

9    Q    I believe you testified in direct examination that you

10   worked at between 35 and 50 hospitals during the course of

11   your employment with Shipcom.  Is that accurate?

12   A    That's accurate.

13   Q    And would you agree that when working at these hospitals,

14   you were training folks on the CATAMARAN software system that

15   was being implemented at those hospitals?

16   A    We trained on CATAMARAN, correct.

17   Q    And it's the CATAMARAN software that we talked about

18   extensively during the course of this trial, right?

19   A    Yes.

20   Q    And the purpose of CATAMARAN was to improve the

21   hospital's efficiencies with respect to their management of

22   their inventory supplies.  Is that accurate?

23   A    Yes. Did it though?

24   Q    Excuse me?

25   A    I said, did it though?  That was the point of the

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    program, but it didn't necessarily make it.  If anything, it

2    was more inefficient.

3    Q    Okay, that might be your belief, sir, but the purpose of

4    the software was to improve the VA hospital's efficiency;

5    isn't that right?

6    A    That's correct.

7    Q    And you would agree that the reason the supplies needed

8    to be monitored by the VA was that it was spending a

9    substantial amount of money on supplies.  Is that accurate?

10   A    Yes.

11   Q    And some of those supplies were being wasted or

12   mishandled by their old supply change system; isn't that true?

13   A    It was true for most places.  It was an almost impossible

14   problem to fix.

15   Q    Okay.  But my question is a little bit different.

16   A    Okay.

17   Q    When the VA had the old system, they were mishandling

18   funds in some way that was causing waste; is that right?

19   A    Yes.

20   Q    And the purpose of CATAMARAN Solution was to improve that

21   so there wasn't as much waste in these VA hospitals; is that

22   true?

23   A    Yes.

24   Q    And your job as a trainer was to explain to the VA

25   hospital staff how the system worked to do that job, right?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    A    It was yeah, to train them on it.

2    Q    And we talked about all the different ways that the

3    software system worked to monitor the supplies in order -- so

4    that they would know what supplies were in the hospital; is

5    that right?

6    A    Yes.

7    Q    And they would know how many supplies they should be

8    reordering at a particular time; is that true?

9    A    Yeah and assist them.

10    Q    And you don't only train them on the software and how

11    that worked, but you also trained them on the hardware pieces

12    that were used to implement the software or use the software;

13    is that right?

14    A    Yeah.

15    Q    Those include those kiosks that we talked about

16    throughout the course of this trial where staff could go up

17    and order supplies if necessary?

18    A    Uh-huh.

19    Q    And those handheld scanners, for example, and the

20    overhead displays all those were part of the solution; isn't

21    that true?

22    A    That is true.

23    Q    And that solution that we're talking about, you would

24    agree, was this redesign of the hospital system or the

25    hospital inventory system; is that right?

1    A    Yeah.  Yes, excuse me.

2    Q    And as part of implementing this new system or this new

3    solution, you also had to explain to the VA personnel how

4    supply chain -- some supply chain concepts that would be

5    applied; isn't that true?

6    A    We read from a slide deck that these were created with

7    the theories behind chain -- supply chain management, yes.

8    Q    So you had a whole training program on supply chain

9    concepts that was useful to the VA in understanding how the

10   system was going to work?

11   A    We had a module talking about supply chain theories and

12   concepts.  Yes, a module.

13   Q    And you trained that particular module to the folks at

14   the hospital?

15   A    Yes.

16   Q    And it was important -- that was important because it

17   helped the hospital staff understand what the solution was and

18   why it was beneficial to them; isn't that true?

19   A    True.

20   Q    Now you would agree with me that you, yourself, as a

21   trainer had to have sufficient understanding of the solution

22   in order to train others on it; wouldn't you?

23   A    Yes.

24   Q    And to obtain that understanding, you would study, for

25   example, work flows of how these different processes worked in

1       the hospital or should work under the new system; isn't that

2       true?

3       A    We didn't study anything.  We then -- there's just slides

4       that we created that we learned, taught, read.  That was it.

5       Q    How would you learn if you weren't studying them, sir?

6       A    Sorry, excuse me.  I didn't mean to say learn.  I guess

7       it was just reading them and learning the concept.

8       Q    You used the term again there.  You learned by reviewing

9       the materials?

10      A    Yes, that's how we did it is we reviewed the materials.

11      We didn't study in-depth supply chain management.  I had no

12      background in supply chain management.  I had no background in

13      logistics.  We would just -- we learned all of us had

14      different backgrounds and varying backgrounds.

15      Q    And because you didn't have any background in supply

16      chain logistics, you had to study the materials that were

17      provided to you so you could teach someone about supply chain

18      concepts; isn't that accurate?

19      A    Accurate enough.

20      Q    When there weren't prepared work flow solutions already

21      given to you by the -- by Shipcom to sort of understand how

22      things worked, you would use trial and error technics in the

23      testing software to figure out how the system worked; isn't

24      that true?

25      A    Shared rarely, yes.

1    Q    And you did that also so you could be able to communicate

2    with the VA hospital staff your understanding of how it works,

3    so that they would understand?

4    A    It would be our understanding of how the proof of concept

5    works because the proof of concept wasn't necessarily the

6    exact same thing as what we were -- that was rolling out on

7    site.

8    Q    But -- let me re-ask my question.  The reason you were

9    studying and doing this trial and error technics and reviewing

10   the materials that you were going to be training is so that

11   you could explain it in a way that made sense to the people

12   you were talking to?

13   A    Yeah.

14   Q    And during the course of your employment, the CATAMARAN

15   system actually changed over time; isn't that true?

16   A    Yes.

17   Q    As the development team at Shipcom worked to improve its

18   functionality to help the VA hospital, right?

19   A    Yes.

20   Q    And you had to understand how all these changes that were

21   happening in the software actually worked in practice, didn't

22   you?

23   A    Yes, we did.

24   Q    Because you were going to be explaining to the VA

25   hospital staff all these changes that were happening to -- or

1    all these new developments to the software; isn't that right?

2    A    A lot of the times it was because we had to go back and

3    train them on the software that they were actually rolling out

4    on that facility because when we went on site prior to

5    go-live, we were training them on something that was entirely

6    irrelevant from what they got.

7         So, yes, a lot of times we had to go back and train them

8    on the new software because what they were initially trained

9    on was no longer applicable.

10   Q    We talked about how training happened in the

11   pre-implementation phase and the go-live phase?  You talked

12   about that in direct examination, right?

13   A    Yes.

14   Q    And the pre-implementation phase was more the classroom

15   based discussions that we talked about?

16   A    Yes.

17   Q    Okay.  And in those classroom based settings, you were

18   testing folks to make sure that they understood the concepts

19   that were being delivered?

20   A    We weren't allowed to test the VA.  There was no testing

21   done whatsoever.

22   Q    Maybe I'm using the wrong term.  You would make

23   sure -- you would -- questions and answers basically with the

24   folks who were there trying to learn to make sure they were

25   understanding, right?

1    A    Correct.

2    Q    And in the post-implementation phase you were shadowing

3    these folks walking around with them making sure they were

4    doing things correctly; is that accurate?

5    A    That's accurate.

6    Q    And in those settings there wasn't a PowerPoint slide

7    that you were presenting to them.  You were actually walking

8    with them and talking with them, conversing that sort of

9    thing?

10   A    We had put -- we had put reference guides which were

11   essentially the slides printed out that we used to do these

12   walk-throughs.  So yes.

13   Q    So you were referring to those reference guides every

14   time you talked to someone about something?

15   A    If we needed to, yes.

16   Q    Okay.  But if you -- sometimes you didn't need to because

17   you had an understanding of the system and how it worked,

18   right?

19   A    Yep.

20   Q    You would agree with me that you learned from your

21   experiences as a trainer, wouldn't you?

22   A    Yes.

23   Q    You learned ways to improve your training to become

24   better at it?

25   A    Yes.

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    Q    It was a skill that you were developing?

2    A    Yes.

3    Q    And based on your experiences, you would provide feedback

4    to Shipcom about ways that the whole training program could be

5    improved; isn't that accurate?

6    A    No, it's no accurate.

7    Q    Never gave ideas about how things could be improved at

8    Shipcom?

9    A    Very rarely.  I think as Chad stated, it became very

10   clear that they weren't interested in what our opinion was so

11   we kind stopped after a point.

12   Q    So was it rarely or never?

13   A    It was rarely, rarely.  Excuse me, it was never, but it

14   was rarely.

15        (Pause in the proceeding.)

16   Q    Mr. Kehn, if you could turn to Defendant's Exhibit No. 39

17   in your notebook.  Let's start with 47, actually.  I'm going

18   to do it differently.

19        Let's start with 47, Mr. Kehn.  Nope it is 39, I'm sorry.

20   Different number.  Thirty-nine is the right one.

21        (Pause in the proceeding.)

22   Q    You see it there in your book?  You can see on the screen

23   here as well?

24   A    Yes, sir.

25   Q    Okay.  And this document is a series of emails between

1    Justin Novick and folks at Shipcom; is it not?

2    A    Yes, it is.

3    Q    And you're copied on this email; is that right?

4    A    That is correct.

5    Q    Let's start at page 918.  Do you see those numbers at the

6    bottom, 918 there?

7    A    Uh-huh.

8    Q    That's an email, it looks like, from Justin Novick to

9    Hiten Patel on February 2nd, 2015; is that right?

10   A    Yes.

11   Q    And who is Hiten Patel?

12   A    He's the president or something like that.  Senior vice

13   president, it states right there.

14   Q    Senior vice president of Shipcom, right?

15   A    Correct.

16   Q    And Jean-Paul Renaud is copied on this email; is that

17   right?

18   A    Yes.

19   Q    Who is Mr. Renaud?

20   A    Mr. Renaud is the -- he's kind of in charge of the

21   kill-you program which is the program that we print out for

22   the VA.

23   Q    So Mr. Renaud is Mr. Patel's boss; is that accurate?

24   A    I don't know if that's accurate or not.  I'm not sure

25   how -- we didn't have any kind of document stating what our

1    corporate ladder looked like so I wasn't sure.

2    Q    Okay.  He was also up in management, right?

3    A    He's upper management, yes.

4    Q    Starts here, "The following information is meant for

5    internal use only and reflects some of the feedback from

6    previously trained sites as well as some personal opinions of

7    mine."  Did I read that accurately?

8    A    Yes.

9    Q    The next sentence says, "Kehn, please follow-up with any

10    thoughts on this."

11    A    Yes.

12    Q    "Any of your thoughts on this."  Did I read that

13    accurately?

14    A    Yes.

15    Q    And Kehn is referencing you there, right?

16    A    That is correct.

17    Q    Then in the next paragraph, start there.  It says, "We

18    need to be firm in our agendas and schedules.  The level based

19    training is written for a reason in that it will provide for

20    conceptual comprehension in a tear-driven system."  Did I read

21    that accurately?

22    A    Yes.

23    Q    And you were, in fact, having problems with some of the

24    VA hospitals not abiding by the training schedules that you

25    guys had established for some of the folks to be trained; is

1    that right?

2    A    Yeah, it's --

3    Q    That was a problem for training.  People weren't showing

4    up on time; is that accurate?

5    A    That is accurate.

6    Q    So here Mr. Novick appears to be suggesting that you be

7    firm on the agendas?

8    A    Yes.

9    Q    Would you agree with that?

10   A    Yes.

11   Q    And you and Mr. Novick actually discussed that being a

12   problem before he wrote this email; wouldn't you agree with

13   that?

14   A    Yeah, over a beer.

15   Q    Let's go to the bottom paragraph there.  It says:

16       "Next, we need to pro-actively address the fact that

17       we're not training in a site specific live environment.

18       There is a training server for task driven learning

19       modules and we will offer open house for sandbox

20       purposes, but will not be training the end users on the

21       job."

22           Did I read that accurately?

23   A    Yes.

24   Q    And what he's referring there to, correct me if I'm

25   wrong, is the fact that you were training before Shipcom was

1    actually or excuse me, CATAMARAN was a live software at the

2    hospital.  It was just being implemented at that pont; is that

3    right?

4    A    Correct.

5    Q    And you're trying to train folks on a software system

6    that's not actually live in the hospital at that point; is

7    that right?

8    A    That's right.

9    Q    And so it was creating some issues for you in training;

10   is that what he's saying?

11   A    Yes, that's what he's saying.

12   Q    And would you agree with that assessment?

13   A    I mean, the issue here was -- it's Clarksburg specific.

14   The FCO there did not want that death PowerPoint and he'd

15   heard through the grapevine that that's what this was going to

16   be.

17        So what it is, is me and Justin had to sit down and try

18   to figure out an alternative.  So yes, we were forced to based

19   on the circumstances.

20   Q    Okay.  I think we'll get to that in a moment, but I guess

21   my question was just you were having issues with training

22   folks in an environment where Shipcom was not live?  Is that

23   the point that he's making?

24   A    I believe so.  I would have to re-read this entire thing

25   and take some time if I want to be sure -- be certain.

1    Q   Well just that paragraph that I just read.  Would you

2    like to take a moment to re-read that?

3    A   Please.

4    (Pause in the proceeding.)

5    A   Okay.

6    Q   So the portion that we just read is talking about the

7    problems you-all were running into with training folks in this

8    environment before CATAMARAN was actually operational in the

9    facility; isn't that right?

10    A   Correct.

11    Q   Okay.  It then goes on to say, "Prior to go-live, our

12    goal in training per Brett Hayden's team pass document is" go

13    to the next page here.  "Task.  Ensure the VA MC logistics and

14    clinical staff receive personalized in-depth training to best

15    prepare logisticians for conversion to CATAMARAN software and

16    POU Inventory Management system.  Provide classroom, hands on

17    and on-the-job training as well as help to analyze and

18    implement work flow solutions for targeted VAMC staff

19    utilizing CATAMARAN processes."  Did I read that accurately?

20    A   Yeah, I believe that's what a site lead had in mind for

21    the training team, but it was never actually produced to the

22    group.  This was just something that was between myself and

23    Novick that we took on our own.

24    Q   What did you take on your own?  What are you saying?

25    A   What I mean by that is that Novick took on the fact that

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    we had to try to revamp -- make something work, but we didn't

2    have any -- first of all we didn't have a manager at the time,

3    so what we had to do was just try to make sure that this FCO

4    was happy.

5         It was never implemented after.  It was never talked

6    again after.  It was just this one single instance.

7    Q    Okay.  So let me make sure I understand your testimony.

8    What you're talking about is the fact that you and Mr. Novick

9    had to come up with a way to satisfy the customer because

10   there wasn't a manager coming up with a solution on your

11   behalf.  Is that what you're saying?

12   A    No, it was because we had to make due with what we had.

13   Q    And you made due with what you had to the best of your

14   ability to make the client happy; is that right?

15   A    No, because we still ended up training on PowerPoint

16   slides.  We had to do death by PowerPoint which is why he was

17   upset in the first place.

18   Q    Okay, but you were trying to come up with a solution to

19   that issue.  Is that what I'm understanding?

20   A    Yes, over a beer.

21   Q    Okay.  In the next paragraph it says:

22        "Kehn and I have developed a training model that allows

23        for presenting central office approved training material

24        developed jointly between Shipcom, training and technical

25        writing teams and central office project management along

1          with allowing the end users to intensively function

2          within the training server and POC demo environments."

3               Did I read that accurately?

4     A    Yes.

5     Q    So you'd agree with me that you and Mr. Novick developed

6     a training model, right?

7     A    There's nothing that we really developed.  There's

8     nothing developed.

9     Q    So is he lying when he says Kehn and I have developed a

10    training model?

11    A    It's PowerPoint slides.  That's what we're talking about

12    here.  We didn't develop anything.  We didn't create anything.

13    We took PowerPoint slides and put them together.

14    Q    I guess that wasn't my question.

15    A    Okay.

16    Q    My question was is Mr. Novick being accurate when he

17    says, "Kehn and I have developed a training model?"

18               MR. SLOBIN:  Objection, vague, Your Honor.  What

19    Mr. Novick talk about Mr. Novick's words.

20               MR. MACDOWALL:  I believe it's talking about

21    Mr. Kehn and Novick developing this, Your Honor.  So I'm not

22    sure how I can be more clear than that.

23               MR. SLOBIN:  Your Honor, --

24               THE COURT:  Rephrase.  Rephrase it --

25               MR. MACDOWALL:  Yes, Your Honor.

1          THE COURT:  -- the question.

2    BY MR. MACDOWALL:

3    Q    Mr. Kehn is it or is it not accurate that you and

4    Mr. Novick developed a training model?

5    A    I won't say we developed anything, no.  It's not

6    accurate.

7    Q    Okay.  Do you remember providing a deposition in this

8    case?  You said that earlier you did.

9    A    Yeah and I think I said something along the lines of

10   Novick putting something together.

11          MR. MACDOWALL:  Your Honor, may I approach the

12   witness?

13          THE COURT:  Yes.

14   BY MR. MACDOWALL:

15   Q    Mr. Kehn, I'm handing you sealed copies of the deposition

16   transcript we received from the Court Reporter.  If you could,

17   turn to page 75.  Line number six.  If you'll read along

18   silent with me.

19          It says:

20          "Q    What was the training model that you and Mr. Novick

21          developed?

22          "A    I love Justin to death.  He has a tendency to

23          include me in everything.  He did try to put together a

24          training model that would help us to train the VA staff.

25          I think it was actually referred to once as chiclets

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1        because of the way it looked.  Nothing was implemented.

2        Nothing was taken from it.  This is one of those examples

3        I gave earlier about we would try to bring information to

4        the people above us and nothing ever came from it."

5        Let's jump down to line 20.

6        "Q   When you do you recall developing the training model

7        with Mr. Novick?

8        "A   Right about that time because I saw that line.  Then

9        the -- then the early part or so many sites, I'm not

10       sure.  Can you give me approx --

11       "Q   Can you give me an approximate date?

12       "A   A year, honestly I'm not sure.

13       "Q   What year was it?

14       "A   End of 2014, possibly beginning 2015. It was early

15       on.  Justin stopped being employed with Shipcom in March

16       of 2015, so it had to be July, March."

17       Did I read that accurately?

18   A   Yeah, that's accurate.

19   Q   You designed this model to solve scheduling issues; did

20   you not?

21   A   I did not design a model.  I think it specifically states

22   that Novick tried to put something together to easy the pain

23   at one facility and that was it.

24   Q   His model that was developed was designed to solve

25   scheduling issues; would you agree with that?

1    A    Sure.  Like I said I don't recall a whole lot about this

2    because it was never made a big deal.  Nothing was ever taken

3    from it so I don't know specifically what it was that we were

4    even trying to focus on.

5    Q    If you could, sir, please turn to page 76, line number

6    five.  I want you to read along with me as I read it. Are you

7    there?

8    A    Nope.

9    Q    Okay, 76, line five.  Are you there?

10   A    Yes.

11   Q    It says,

12       "Q   And why did you decide to develop the training model

13       from Mr. Novick?

14       "A   Trying to figure out some of the frustrations that

15       we had. Figure out what we can kind of herd and get rid

16       of some of that.

17       "Q   What sort of things?

18       "A   Scheduling was a huge issue.  Getting the VA on

19       board with what we needed and what they were willing to

20       do was always a problem."

21       Did I read that accurately?

22   A    Yes.

23   Q    Let's look back at Defendant's Exhibit Number 39 if we

24   could.  Go to the first page.  And this is an email, again,

25   from Justin Novick to Hiten Patel; is that right?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    A    Yes.

2    Q    And it's dated February 4th, 2015?

3    A    Uh-huh.

4    Q    The first -- let's read the first line here.  It says,

5    "Attached please find two documents and one field of text in

6    the body of this message.  Explanation as follows."  And then

7    it has three bullet points.

8         First bullet reads, "Agenda.  This is brand new.  You-all

9    are the first to see it.  Idea being that we can confirm all

10   classroom attendees ability to perform hands-on and functions

11   related to the central office approved PowerPoints.  I would

12   like to edit this a bit still so please don't publish it until

13   you see fit.

14        "I'll be 100 percent complete on this by tonight or

15   tomorrow."

16        Did I read that accurately?

17   A    Yes.

18   Q    You recall being involved in the creation of this agenda,

19   don't you?

20   A    I recall being cc'd on these emails or I remember being

21   cc'd on his emails.

22   Q    Can you say that again?  I'm sorry, I didn't hear your

23   answer.

24   A    I remember being cc'd on these emails.

25   Q    Okay.  Do you remember being involved in the creation of

1    the agenda that he's talking about?

2    A    Not exactly.

3    Q    Okay.  If you could, turn in your transcript, page 76.

4    Let's go down to line number 21.  It says,

5         "Q   If you could then, turn back to the first page, 916.

6         Do you recall receiving or being copied on this email

7         from Mr. Novick?

8         "A   I'm sure I was.

9         "Q   No reason to dispute that you received this email?

10        "A   No.

11        "Q   In the first bullet point that's put into this

12        email, Mr. Novick is describing this agenda that he calls

13        brand new.  Do you see that?

14        "A   Uh-huh.

15        "Q   Do you recall reviewing that agenda?

16        "A   Yes, I think so.

17        "Q   Do you recall being involved with him in developing

18        that agenda?

19        "A   Yeah, he bounced a bunch of ideas off me regarding

20        it."

21        Did I read that accurately?

22    A    Yes, you did.

23    Q    The ideas that Mr. Novick was bouncing off you, including

24    this agenda issue, was designed to streamline the training

25    process.  Would you agree with that?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    A    It was something that he took up on his own that he

2    wanted to do, correct.

3    Q    But you were involved in this bouncing of ideas.  Would

4    you agree with that?

5    A    Yes, absolutely.

6    Q    It was designed to make the training system more precise.

7    Would you agree with that?

8    A    That was the attempt.

9    Q    Let's go back this exhibit here.  Defendant's Exhibit 39

10   and look at the next bullet point.  It says, "Metrics."  Do

11   you see that?

12   A    Yes.

13   Q    It says, "Metrics.  This was a task assigned to us by

14   Brett Hayden as we left Coatesville.  This document in it's

15   current form reflects what I observed while training one of

16   the item managers in Coatesville.  I want this to apply to the

17   agenda."

18        Did I read that accurately?

19   A    Yes, he wants it to apply to the agenda.  Yes, you did.

20   Q    And you recall these metrics, don't you?

21   A    I'm not entirely sure about what this entire document

22   was, to be honest.  And I think I did state that clearly

23   within the deposition, too.  I'm not entirely sure what this

24   whole agenda is.

25   Q    Just to make sure.  Go to the attachments to this

1     document.  Let's go to page 926 and 927 which are the last two

2     pages in this Exhibit.  See that there, 926 -- the one

3     referred to in your booklet?  Do you recognize this document?

4     A     Yes.

5     Q     Okay.  And again, let's turn to 927 just to make sure.

6     This is the rest of it.  See that?

7     A     Yes.

8     Q     Okay.  This is the metrics that's being referred to in

9     the email that we're talking about, right?

10    A     It's a list of modules, correct.

11    Q     Okay.  It's called metrics; is that accurate?

12    A     It's called metrics, yes.

13    Q     And these metrics reflect what you observed at

14    Coatesville?

15    A     It just looks like a list.

16    Q     Okay.  Did it reflect what you did at Coatesville?

17    A     Yes, the reflection to the modules we train on.

18    Q     And do you recall conversation with Brett Hayden after

19    Coatesville where he asked for you-all to come up with some

20    ideas about the frustrations you were experiencing at that

21    particular site?

22    A     Yes.

23    Q     And these metrics was one of the ideas you came up with

24    to address his concerns?

25    A     How is it a switch to anything?  It look like a list,

1   modules that we trained on?

2   Q    I'm asking you the question, sir.

3   A    Okay, sorry.

4   Q    Did you come up with that in response to Mr. Hayden's

5   question of you to come up with something to address the

6   concerns?

7   A    Yes.

8   Q    And those metrics were designed to simplify the materials

9   that you understood.  Is that accurate?

10  A    Yes.

11  Q    Now let's go to the final bullet point of Defendant's

12  Exhibit Number 39 in that email.

13       Final bullet point reads, "Superuser Agenda.  This is

14  what Kehn and I came up with after push back from the FCLO at

15  Clarksburg due to his dislike of PowerPoint driven courses."

16       Did I read that accurately?

17  A    Yes.

18  Q    And the FCLO is what?

19  A    He's the logistics for the VA hospital system.

20  Q    Okay.  Not a Shipcom employee.  Someone who is for the

21  VA, right?

22  A    Correct.

23  Q    And this person had a dislike for a PowerPoint driven

24  courses at Clarksburg; is that accurate?

25  A    That's accurate.

1    Q    And the superuser agenda is something that you and

2    Mr. Novick developed in response to that; is that accurate?

3    A    Yes, we had to, given the circumstances or our manager is

4    Don, he left and they waited six months before they hired a

5    new manager.  So we didn't have anybody else.

6    Q    And this new superuser agenda you were coming up with was

7    a way to try to rely on PowerPoint less; is that accurate?

8    A    It was an attempt.

9    Q    And you used that new approach when you presented at

10   Clarksburg, didn't you?

11   A    We ended up still using the training PowerPoint slides.

12   Q    But you used your new -- this new system to some degree;

13   isn't that accurate?

14   A    What system did we use?  I'm sorry, you're asking the

15   question differently.

16   Q    And that's -- yes, the superuser agenda.  Did you not use

17   that whenever you worked for them?

18   A    Yes, we trained -- what I remember about Clarksburg is

19   that we trained very similar to how we always trained any

20   other facility.  We ended up still having to use the slide

21   decks.  I don't know what we necessarily added to it because

22   this is a while ago.  I can't necessarily recall.

23   Q    But you recall using this idea that you and Mr. Novick

24   came up with to try and reduce the amount of reliance you had

25   on PowerPoints.  Even though you still had to use some, try to

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    reduce it in order to appease the client; isn't that accurate?

2    A    One facility.  And then after that it was right back to

3    normal, yes.

4    Q    Let's look at Defendant's Number 40.  This is a series of

5    emails between you and Mr. Novick; is that right?

6    A    Yes it is.

7    Q    And the bottom email is a copy -- has a copy and paste of

8    a conversation  -- text messaging conversation basically

9    between Mr. Novick and someone else at the company; is that

10   right?

11   A    I believe so.

12   Q    Okay.  It was a conversation between Mr. Novick or excuse

13   me, a series of messages that Mr. Novick sent to J.P. Renaud;

14   is that your understanding?

15   A    I believe so.

16   Q    Okay.  And copied and paste that and put it into an email

17   to you; is that right?

18   A    Yes.

19   Q    And he's describing in this email, Mr. Novick is, an idea

20   for improving the training process; is that right?

21   A    Yes.

22   Q    And he wanted your response to it; is that accurate?

23   A    Yes.

24   Q    And you state here after reviewing it, "Dude, that sounds

25   like a -- it's Fing brilliant."  Did I read that right?

1  A    Yes.

2  Q    So you thought that Mr. Novick had some sort of brilliant

3  idea for improving processes at Shipcom; is that accurate?

4  A    Uh-huh.

5  Q    And link -- this is a link chat conversation.  Link is a

6  chat, sort of, messaging system you guys had at Shipcom for

7  communicating with one another; is that right?

8  A    That's correct.

9  Q    Mr. Novick had a lot of ideas for improving Shipcom's

10  processes, would you agree with that?

11  A    I believe I call him an "idea man" in the deposition,

12  correct.

13  Q    And he'd bounce a lot of those ideas off of you, right?

14  A    Yeah.  Yes.

15  Q    Let's turn to Defendant's Exhibit Number 49.

16        THE COURT:  The previous Exhibit is which?

17        MR. MACDOWALL:  Forty, Your Honor.

18        THE COURT:  Forty.

19     (Pause in the proceeding.)

20  BY MR. MACDOWALL:

21  Q    Do you recognize this document, Mr. Kehn?

22  A    Yes, I do.

23  Q    It's a copy of your performance review that was filled

24  out by your manager, Ed Price; is that right?

25  A    Yes.

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    Q   And the review period on this document is from July of

2    2014 to December of 2015; is that accurate?

3    A   That is accurate.

4    Q   Let's look at box number two.  Box number two is for the

5    item, "Posses skills and knowledge to perform the job

6    competently."  Did I read that right?

7    A   Yes.

8    Q   It looks like Mr. Price rated you as proficient in that

9    category.  Would you agree with that?

10    A   Yes.

11    Q   And he notes here, "Good knowledge of the CATAMARAN

12    system and how logistic staff use it.  Good technical

13    knowledge about the CATAMARAN system.  For example, weighted

14    bins, added racks/shelf/item, C-R-I-L, R-I-L-PO process."  Is

15    that right?

16    A   Yes.

17    Q   And that C-R-I-L and the last part that's a procurement

18    process; is that accurate?

19    A   Yes.

20    Q   So he's saying you had good knowledge of all those

21    systems that CATAMARAN was using; is that right?

22    A   Yes.

23    Q   And you would agree with that assessment?

24    A   Yes.

25    Q   Let's look at box number five on the next page.  Box

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1  number five says, "Proficiency at improving work methods and

2  procedures as a means to a greater efficiency."  Do I read

3  that right?

4  A    Yes.

5  Q    Here you're rated as efficient; is that right?

6  A    Yes.

7  Q    Look at box number 7.  "Ability to work independently."

8  Mr. Price rated you as proficient.  Is that accurate?

9  A    That is accurate.

10  Q    You'd agree with that assessment, wouldn't you?

11  A    Sure.

12  Q    Let's go to page 1040 of the document.  The performance

13  summary section.  And the first paragraph, "List all aspects

14  of employee's performance that contribute to his or her

15  effectiveness."  Did I read that accurately?

16  A    Yes, you did.

17  Q    Here it says, "Chris is effect at post go-live

18  support-problem solving issues, elbow-to-elbow coaching on

19  procurement, DP/POU replenishment et cetera."  Did I read that

20  accurately?

21  A    Yes, you did.

22  Q    And you would agree that you were effective at post

23  go-live support; is that right?

24  A    Yes, I would.

25  Q    And that's where the system is actually going live at the

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    hospital when you're having to train folks in a sort of a

2    one-on-one setting; is that right?

3    A    Uh-huh.

4    Q    And you would agree that you were effective at problem

5    solving issues?  You would agree with that too?

6    A    We had a help desk.  They were problem solving group of

7    people.

8    Q    Okay, but what about you?  You would agree that you were

9    a problem solver, you were good at that, right?

10   A    Yeah, I can't think of a single specific problem, though,

11   specifically.

12   Q    Problem with the scheduling issues that we're talking

13   about earlier.  You were coming up with ideas to try and solve

14   that, right?

15   A    Justin, I believe, was coming with the ideas.

16   Q    Okay, but you're describing yourself here or you would

17   agree with this assessment that you were good at problem

18   solving, right?

19   A    Yes.

20   Q    Okay.  Let's look at Defendant's Exhibit Number 50.

21   Starting with the third page of the document, 1030.  Do you

22   recognize that document, Mr. Kehn?

23   A    Yes, I do.

24   Q    It's a copy of your self evaluation performance review;

25   is that right?

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    A    Yes.

2    Q    And it's for the same period of time although it looks

3    like it's from July 2014 to January 2016, including an extra

4    month in the review; is that right?

5    A    Yes.

6    Q    Okay.  Look at box number two, we talked about earlier.

7    You rated yourself as highly effective that possesses skills

8    and knowledge to perform the job competently; is that right?

9    A    That is correct.

10   Q    And you write here, "I have been with CATAMARAN since the

11   initial training documentation was created and took it upon

12   myself to understand the software since day one.  I believe

13   this has paid off and resulted in gaining a very good

14   understanding of how the software works."  Is that accurate?

15   A    That's accurate.

16   Q    And you took it upon yourself by jumping into the job

17   immediately and involving yourself in those training materials

18   that you needed to be able to teach others on, right?

19   A    Correct.

20   Q    Let's look at box number five on the next page here.

21   This is the one for proficiency and improving work methods and

22   procedures as a means towards greater efficiency.  You rated

23   yourself as proficient; is that right?

24   A    That is correct.

25   Q    And you explain, "I should work on being more vocal about

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    my ideas to improve work methods and procedures.  I have a

2    document devoted entirely to this, but have not had an

3    opportunity to sit down and discuss my thoughts with upper

4    management."  Is that right?

5    A    That is correct.

6    Q    Let's look at box number seven down there.  Ability to

7    work independently.  Again, you rate yourself as highly

8    effective in this category; is this right?

9    A    That is right.

10   Q    It's actually higher than Mr. Price even rated you; is

11   that true?

12   A    That's true.

13   Q    And you explain, "This job requires an individual to work

14   efficiently and independently in order to survive."  Is that

15   what you wrote?

16   A    Yes, I was relating to travel and all the travel that was

17   involved, correct.

18   Q    Okay.  You didn't put that in there did you?

19   A    No, I did not.

20   Q    Okay.  So the only independence that you exercised with

21   respect to your job was with respect to travel?

22   A    No, that's not the only, but that's what the majority of

23   what that conversation -- what that statement was regarding is

24   travel because we were traveling so much and much was by

25   yourself.  All of us coming from different states.  That's

1    what I meant by independent.

2    Q    And you spoke about the fact that you were training

3    either just with another trainer or by yourself; isn't that

4    right?

5    A    Always with another trainer.

6    Q    Okay.  So you had to work independently with respect to

7    training folks; didn't you?

8    A    Yes.

9    Q    Okay.  Let's look at box number eight.  Ability to work

10   cooperatively with supervision or as part of a team.  You rate

11   yourself as exceptional; is that right?

12   A    Yes.

13   Q    And you write here, "I may not be the most vocal

14   individual in the room, however I do listen attentively to

15   others when they speak or have ideas and I'm capable of having

16   a back-and-forth discussion and provide feedback to others who

17   come to me with ideas."  Is that right?

18   A    That's correct.

19   Q    We already talked about how you had multiple

20   back-and-forths with Mr. Novick about ideas; is that true?

21   A    That's true.

22   Q    Let's look at box number 13.  Box number 13 says,

23   "Identifies performance expectation, gives timely feedback,

24   and conducts formal performance appraisals."  Is that right?

25   A    Yes.

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1  Q    You rate yourself as proficient in that category; is that
2  right?
3  A    Yes.
4  Q    And then you note here, "I know what is expected of me in
5  both the training and go-live setting.  I can accomplish my
6  task with very little over-sight if necessary."  Is that
7  accurate?
8  A    That's accurate.
9  Q    It's also accurate that, that -- you could actually do
10  that, not just that you put it on this document, but could
11  actually do that in your job; is that right?
12  A    Yes because what we did is go on site, rinse, wash and
13  repeat and a lot of times our manager wasn't even on site with
14  us.  So it was -- that's what I mean by little oversight.  We
15  didn't have a manager in the building with us, like, you know,
16  most typical jobs would have.
17  Q    Mr. Kehn, if you could turn to document number
18  51 -- Defendant's 51 in your notebook.  Do you recognize this
19  document, sir?
20  A    Yes.
21  Q    It's a copy of your LinkedIn profile; is that right?
22  A    That's correct.
23  Q    A little wide, we need to get in there as close as
24  possible.
25       All right, I'm going to read this first paragraph here.

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1    It says, "I began my professional career as an attorney.  In

2    2014 I made the decision to walk away from the legal field by

3    accepting a corporate trainer/implementation specialist

4    position with Shipcom Wireless.  Specifically the contract I

5    was hired on to support was for the implementation of the

6    company's proprietary software into every major veteran's

7    affair medical facility nationwide."  Did I read that right?

8    A    Yeah -- yes.

9    Q    The next paragraph reads, "While at Shipcom, I was able

10   to combine my technical legal background with my new found

11   understanding of healthcare operations -- well, operational

12   improvements in the healthcare field.  Our team was

13   responsible for becoming subject matter experts on the

14   software."  Did I read that accurately?

15   A    Yes.

16   Q    Okay.  And all that's a truthful statement; isn't it?

17   A    Yes.

18   Q    Okay.  Turn to the last page of the document.  Here under

19   list of accomplishments you include a description for

20   CATAMARAN; is that right?

21   A    I believe so.

22   Q    I'm going to read this.  It says, "Prior to a highly

23   visible software proof of concept presentation, our team

24   worked together with our technical writers to provide input in

25   offering and editing multiple highly detailed user manuals and

CHRISTOPHER MICHAEL KEHN - CROSS BY MR. MACDOWALL

1      reference guides applicable to various roles in hospital

2      supply chain management including chief logistic officers,

3      item managers, supply technicians, materials handlers and

4      clinicians.  This two-week project was immediately followed by

5      successful on-site demonstration training for the contract

6      approval committee."  Did I read that accurately?

7      A    That's correct.

8      Q    And is that an accurate description of what you did?

9      A    We sat in a room as we went over documents with the VA

10     site of the contract.  This is the sales pitch.  This is

11     LinkedIn.  This is trying to get a job.

12     Q    It's accurate that you were working with these folks who

13     helped these highly technical user manuals?

14     A    That was our technical writers.

15     Q    But you were in the room helping them do that because you

16     had expertise as a trainer to know how to communicate those

17     ideas; isn't that right?

18     A    I was in the room -- this was right after I was hired, if

19     you notice, I think the date -- it was just me learning the

20     software at that point.  I was in a room sitting there

21     listening to people talk about the software, yes.

22     Q    Okay.  So then is it accurate or inaccurate that you were

23     in there developing these user manuals?

24     A    The team that was in there was developing the user

25     manuals.  That is accurate.

1          MR. MACDOWALL:  We'll pass the witness, Your Honor.

2          THE COURT:  Any redirect Mr. Slobin?

3          MR. SLOBIN:  Yes, Your Honor.  Thank you.

4       (Pause in the proceeding.)

5        REDIRECT EXAMINATION OF CHRISTOPHER MICHAEL KEHN

6  BY MR. SLOBIN:

7  Q    Let's go back to Defendant's Exhibit 51.

8       (Pause in the proceeding.)

9  Q    Mr. Kehn, this is the same document that the Defense

10 Counsel was just referring to.  It says, "Worked together with

11 our technical writing team of technical writers."  Did you

12 provide any input into what they were writing?

13 A    No, we did not.

14 Q    Did they ask for your input on what they were writing?

15 A    We were not there for input.  We were there to learn.

16 Q    Okay.  Did you have anything to do with writing or

17 drafting, preparing the actual materials of the content of the

18 materials that went into the CATAMARAN software PowerPoint

19 presentation?

20 A    No, those were technical writers.

21 Q    Okay.  How complicated -- on a scale of one to ten --

22 would you say the materials were that you were presenting to

23 the VA personnel?

24 A    Four, logically a four.

25 Q    Okay.  And again, I don't know if the jury fully

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1    understood, but tell me you keep saying, "rinse, wash,

2    repeat."  Explain that.

3    A    What I mean by that is that this the way that it was

4    created and the way the slides were actually put together is

5    so any individual could step in and can teach this course with

6    very little understanding of supply chain concepts to begin

7    with.  That's why all of us have various different

8    backgrounds.

9         They weren't meant to be something that, you know, we in-

10   depth knew.  It was just simply any question outside of what

11   was on the PowerPoint slide, we didn't -- we very rarely able

12   to answer.

13   Q    Okay.  So let's talk about the email, the superuser

14   agreement or superuser document and this whole new methodology

15   for -- that we all refer to.  You saw that?

16   A    Yes.

17   Q    Who asked you guys to do that?

18   A    No one did.

19   Q    Okay.  Why -- and I know that's -- let's get this really

20   clear.  Who drafted that email?

21   A    The email was drafted by Justin Novick.

22   Q    Okay.  Were you involved at all in drafting the email?

23   A    Not the email at all, no.

24   Q    Okay.  Did you and Justin have conversations about the

25   training system, the CATAMARAN system?

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1    A    Absolutely.  It was our job and we were on-site by

2    ourselves all the time.  So yeah, of course we'd be talking

3    about it.

4    Q    Okay.  And you guys had ideas; is that fair?

5    A    That's fair.

6    Q    Okay.  Why did you have ideas -- let me ask you this?  Do

7    you believe that the training process should have been

8    improved?

9    A    Absolutely.  The VA wasn't happy with the product.  We

10   were just trying to figure out a way to make them happy.  It

11   wasn't necessarily our job, it was just something that we did

12   on the side when we were -- when we had nothing else to do.

13   Q    Tell us what it's like when you're presenting to a room.

14   How many people are you generally presenting to?

15   A    Depends on the size of the facility.  I mean, it could be

16   anywhere between, you know, three to five people and upwards

17   of 20 live statisticians sitting in a room at a time.

18   Q    Okay.  And what is that teaching process like?  I mean,

19   is it --

20   A    It's death by PowerPoint.  Literally that's why that's

21   why that CFO wanted that -- wanted us to do something

22   different.  We really couldn't.  We tried to use the proof of

23   concept and that wasn't working properly.

24   Q    Okay.  And let's go into a little more detail about -- I

25   think it was -- is it Clarksburg?

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1    A    Correct.

2    Q    Okay what is -- who is that person?

3    A    I can't remember the name specifically.  I just know

4    that's the CFO there.

5    Q    Okay.  Someone in charge?

6    A    Yeah, he's in charge of the logistics -- the logistics

7    team over at the facility.

8    Q    And what did he tell you and Mr. Novick?

9    A    He said that I don't want anymore PowerPoint slides.  He

10   just flat out said if that's what it is, I don't want you guys

11   here.  We were almost kicked off site.

12   Q    What do you mean by that?

13   A    He told us that if it's just going to be different when

14   we come on site just giving PowerPoint slide presentations, he

15   would kick us off site.  He wouldn't allow us to do our

16   training.

17   Q    Okay.  So what did you guys then try to do?

18   A    We tried to think of an alternative way of trying to get

19   these guys to learn the system.

20   Q    Okay.  Were you going to teach them different materials?

21   A    No.  It was the exact same materials.

22   Q    Okay.  The concept which is to teach them how?

23   A    Using the proof of concept which is that point -- I think

24   Chaze (phonetic) touched on this earlier -- it was like this

25   small kit that we had to use for training that a lot of times

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1     we had issues.

2     Q    Okay.  So did you have any desire to -- did you deviate

3     from the lesson?

4     A    No.  Ended up still having to use PowerPoint slides.

5     Q    Okay.  And I just want to clear this up real quickly.

6     You keep referring to Chaze do you mean Charles Bethas?

7     A    Yeah, I'm sorry.  Chaze is Charles Bethas.  Excuse me.

8     Q    Was your job to develop materials?

9     A    No.  My job was to train.

10    Q    Did your primary duty of training ever change?

11    A    Absolutely not.

12    Q    Did you have any discretion on what you could train?

13    A    No.  We were given the slides by -- the VA had the okay

14    on it.  The technical writers made them up.  We were given the

15    slides and we trained on them.

16    Q    Okay.  Talked about our performance review and your

17    comment about working independently and you tried to say some

18    stuff about travel.

19    A    Yes.

20    Q    What were you trying to tell us?

21    A    That the -- it goes back to what I said before it's just

22    about the frustration of the travel and not knowing what city

23    we were going to be in until the day prior to leaving.  Not

24    getting our itinerary until the day before leaving.  We -- a

25    lot of times were told when we wouldn't be paid for it.

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1          Yes, we would get compensated after the fact.  Well a lot

2     of the times we had to cover the cost initially.  It was just

3     that in order to survive with this job you had to be very --

4     very good at traveling.  You had to be very proficient at it.

5     Q     All right.  And so when you responded to that answer

6     about working independently, was that what you were referring

7     it?

8     A     Yes, it is what I was referring to.

9     Q     Okay, all right.  And you would know because you filled

10    that out, right?

11    A     That's correct, I filled that out.

12    Q     Let's talk about that.  So you were saying that sometimes

13    you're notified maybe the day or night before as to where you

14    were going to go?

15    A     Yes.

16    Q     Okay.

17    A     That's correct.

18    Q     Okay.  So are you spending time understanding what

19    that -- whatever hospital you're going to go to what the

20    system is, how they work, what their past system was?

21    A     We would have no time.  I know that there was assessments

22    on Sharepoint, but we never get a chance to read them.  We

23    were never asked to read them.  They were just there.

24          We didn't have time to assess the facility.  We would get

25    on site and just kind of hit the ground running and train the

CHRISTOPHER MICHAEL KEHN - REDIRECT BY MR. SLOBIN

1     PowerPoint slides.

2     Q    So is it a situation where you walk in and the live tech

3     or the lead tech says here's what you're doing?

4     A    Yeah, that's what it had to be because the site leads

5     knew what was best for the site.  We would get there, they

6     would tell us what we needed to train and then we would go

7     from there.

8     Q    All right.  And then you were training whatever slides

9     were given to you?

10    A    Correct.

11         (Pause in the proceeding.)

12    Q    You talked a little bit about -- Mr. MacDowall talked a

13    little bit about maybe procurements and supply chain and all

14    that.  Are you an expert on what the VA hospitals would need

15    to supply their offices?

16    A    Not at all.  We wouldn't know anything about quantities

17    or quantity needs of items or they were just simply how to use

18    the software to purchase.

19    Q    What about pricing for those products?  Do you have any

20    knowledge about that?

21    A    Not at all.

22    Q    Were you negotiating any of those contracts for the VA?

23    A    No, we were not.

24    Q    Was giving Shipcom ideas on how to improve the training

25    part of your primary duties?

1    A    It was not.

2    Q    Did management at Shipcom ever call you up and say

3    Mr. Kehn we want to sit down with you and talk about your

4    ideas on improving our products?

5    A    No, ,--

6              MR. MACDOWALL:  Objection, Your Honor.  Leading.

7              THE COURT:  Sustained.

8              MR. SLOBIN:  Your Honor, I'll pass the witness.

9              THE COURT:  All right.  Anything else,

10   Mr. MacDowall?

11             MR. MACDOWALL:  Brief Recross, Your Honor.

12          RECROSS-EXAMINATION OF CHRISTOPHER MICHAEL KEHN

13   BY MR. MACDOWALL:

14   Q    Mr. Kehn, you just testified that you didn't really know

15   a whole lot about procurement; is that right?

16   A    Not that I didn't know a lot of it, just that it wasn't

17   the main function of the job.

18   Q    Okay.  But the software that you were -- that was being

19   implemented in the hospitals did relate to procurement of the

20   hospitals, right?  Procurement for the hospitals; is that

21   accurate?

22   A    Yes, for the hospitals.  Yes.

23   Q    And the software would, for example, tell the hospital

24   personnel how much of a certain item they needed to procure to

25   have enough inventory; is that accurate?

CHRISTOPHER MICHAEL KEHN - RECROSS BY MR. MACDOWALL

1   A    That's accurate.

2   Q    And it changed the way that that whole process worked

3   from the way that the VA was doing it before CATAMARAN was

4   implemented; isn't that true?

5   A    Yes.

6   Q    And you were training them on how to use that system

7   properly to do their procurement processes differently; isn't

8   that accurate?

9   A    That's accurate enough, yes.

10  Q    You testified earlier that you copied everyone on

11  your -- you copied management folks on your complaint about

12  allegedly being misclassified; is that right?

13  A    That's correct.

14  Q    Why didn't you copy Rahaul (phonetic) Johnnie or Rahaul

15  Gupta about that on your complaint?

16  A    Because they were lower on the rung on the corporate

17  ladder.  I copied everyone that was in the highest.

18  Q    Same reason you didn't copy Andy Diaz then?

19  A    I think -- I think HR is part of -- he received the HR

20  Department emails and I emailed HR and Legal that was

21  included.

22  Q    You also testified here on redirect examination that it

23  wasn't your job to develop the materials -- the training

24  materials, right?

25  A    That's correct.

1    Q    That's because these training materials had to tell these

2    folks how the software actually worked, right?

3    A    Yes.

4    Q    And how the software worked is the way it worked; isn't

5    that accurate?

6    A    Yes.

7    Q    So you weren't changing how the software worked by

8    changing the materials, that makes sense.  Is that what you're

9    saying?

10   A    Yes.

11   Q    Okay.  But the way you presented the materials to the

12   classroom depended on your -- that was your job, right?  It

13   was to present those ideas in a way that was affective; isn't

14   that true?

15   A    It was to present the ideas that were on the PowerPoint

16   slides, yes.

17   Q    Okay.

18            MR. MACDOWALL:  No further questions, Your Honor.

19            THE COURT:  All right.  Anything else Mr. Slobin?

20            MR. SLOBIN:  No, Your Honor.

21            THE COURT:  You may be excused Mr. Kehn.

22            THE WITNESS:  Thank you, Your Honor.

23        (Witness steps down.)

24            THE COURT:  Counsel would you like to break for

25   lunch now and then pick up with new witness after lunch?

1          MR. SLOBIN:  I would love to break for lunch, Your

2     Honor.

3          THE COURT:  All right.  Ladies and gentlemen, we

4     will break for lunch right now.  Let's return at 12:45.

5          COURTROOM CLERK:  All rise.

6        (Jury exits courtroom at 11:47 a.m.)

7        (Outside the presence of the jury.)

8          THE COURT:  Thank you.

9          You-all maybe excused unless there's anything you-

10    all need to raise.

11         MR. NOTESTINE:  Be back at 1:00?

12         THE COURT:  12:45.

13         Oh Counsel, one point I did want to make.  Let's

14    refer to all witnesses on the stand by their last name as

15    opposed to first names.  Just to keep everything as

16    professional as possible.

17         MR. SLOBIN:  Oh, sorry, Your Honor.

18         THE COURT:  That's all right.  That's fine.

19         MR. SLOBIN:  I know I was going back and forth.

20         THE COURT:  That's all right.  Thank you.

21        (Recess taken from 11:48 a.m. to 12:46 p.m.)

22        (Outside the presence of the jury.)

23         COURTROOM CLERK:  All rise.

24         THE COURT:  Good afternoon everybody.  Be seated

25    please.  Counsel, for our charge conference today -- just so

1    that I can let the Court staff know -- do you think we'll go

2    more than an hour, an hour and ten?

3              MR. SLOBIN:  Your Honor, I don't think so.  I mean.

4              MR. NOTESTINE:  We really don't have many disputes

5    on jury charge -- most of the pattern jury charge direct sites

6    from the regulations.

7              THE COURT:  I had one question on the charge you-all

8    submitted to me there was a Defendant on the goodwill question

9    or instruction.

10             There is a Defendant's suggested question which says

11   if the Defendant has not proved here -- or maybe I have them

12   reversed -- but anyway you both gave me a suggested

13   instruction.

14             Would it be an error to submit both of them so

15   that -- neither one of them is particularly clear.  One says

16   that if the Defendant has not shown by the preponderance of

17   the evidence then your verdict should be for the Plaintiff.

18   Then the other one says that the Plaintiff -- I mean if the

19   Defendant has shown --

20             MR. NOTESTINE:  I was actually just texting my or

21   emailing my -- one of my associates just to ask her how that

22   is written in the pattern of jury charge for discrimination.

23   I don't know how that -- I mean, --

24             THE COURT:  I don't want to create error by

25   including --

1          MR. NOTESTINE:  Yeah, I guess including both of them

2     is probably accurate.

3          MR. SLOBIN:  I don't know, Your Honor.  I would like

4     to look at it when I --

5          THE COURT:  Okay, well just keep it in mind --

6          MR. SLOBIN:  -- while I'm thinking -- yeah.

7          THE COURT:  -- maybe on the break.

8          MR. NOTESTINE:  I know exactly what you're talking

9     about.  I was actually thinking about the same issue.  I

10    believe --

11         THE COURT:  I'm sorry to interrupt you, but

12    Ms. Humphrey's --

13         LAW CLERK:  With respect to the discrimination

14    charge it says if a Plaintiff has proven by a preponderance of

15    the evidence.  But --

16         THE COURT:  That's on the burden side.

17         MR. NOTESTINE:  Right, we had a burden.

18         LAW CLERK:  Right.  And what I had submitted to you

19    was the Defendant --

20         THE COURT:  Okay.

21         LAW CLERK:  -- the Defendant's language.

22         THE COURT:  Okay.  Then that's --

23         MR. NOTESTINE:  Yeah, and I was actually looking at

24    what the pattern jury charge said on that to see how it was

25    it's said on a discrimination case.  I was going to argue that

1   whatever that says is the way we should go.

2           THE COURT:  Is what we can do.

3           MR. NOTESTINE:  Yeah.

4           THE COURT:  I'm inclined to go that way then.  All

5   right.  I'm sorry that I did not give you the opportunity to

6   tell us first what --

7           MR. NOTESTINE: Same idea that I did.

8           THE COURT:  Okay.  And are we ready?

9           MR. SLOBIN:  We are, Your Honor.

10          THE COURT:  All right.  We're ready Ms. Williams.

11  Thank you.

12          COURTROOM CLERK:  All rise for the jury.

13      (Jury enters courtroom at 12:49 p.m.)

14          THE COURT:  Be seated.  Thank you.

15          Counsel, you may call your next witness.

16          MR. SLOBIN:  Your Honor, Plaintiffs call Justin

17  Novick to the stand.

18          THE COURT:  Would you raise your right hand,

19  Mr. Novick?

20      (Witness sworn.)

21          DIRECT EXAMINATION OF JUSTIN ERIC NOVICK

22  BY MR. SLOBIN:

23  Q   Mr. Novick, would you please state your name for the

24  record?

25  A   Justin Novick -- Justin Eric Novick.

1    Q    Okay, Mr. Novick are you familiar with Shipcom?

2    A    I am.

3    Q    Were you employed there?

4    A    I was.

5    Q    All right, from what time to what time?

6    A    That was May of 2013 -- sorry, excuse me -- 2014 to March

7    of 2015.

8    Q    Okay.  And tell me what you did while you were employed

9    at Shipcom.

10   A    I was a trainer.

11   Q    Okay.  And tell me briefly what you did as a trainer.

12   A    We would go to various VA hospitals training their

13   logistics or clinical staff on how to use Shipcom's CATAMARAN

14   software.

15   Q    All right. And I know we talked a lot about that

16   CATAMARAN software was.  But would you again give your version

17   of what the CATAMARAN software was?

18   A    It was an inventory management software where

19   logisticians to order their hospital inventory and clinicians

20   to grab it and use it for the patients.

21   Q    And tell me what was involved in your training duties.

22   A    Primarily it was us using PowerPoint slides to showcase

23   how the software works.

24   Q    And who were you presenting that -- the training to?

25   A    The logistics staff.  So the staff that would make all

1    the magic happen behind the scenes or handle the inventory.

2    And then a little bit of the clinical staff.  So nurses, LPNs,

3    some of the doctors.

4    Q    Who would determine who you were going to train?

5    A    The site leads.

6    Q    Okay.  And who would determine when you were going to

7    train?

8    A    Site leads.

9    Q    And who would tell you where you were going to train?

10   A    Site leads.

11   Q    Okay.  And describe for me, if you will, what the

12   training looked like and felt like when you were going through

13   the process of training?

14   A    Sure.  Classroom setting.  I usually in a small

15   conference room.  Screen just like that and me just kind of

16   running through the slide decks.

17   Q    Okay.  How did the people you were training, how did they

18   receive your training or your instruction?

19   A    Horribly.

20   Q    Okay and what do you mean by that?

21   A    It was real sleepy.  It was just extremely repetitive.

22   The decks themselves weren't very well refined.  It wasn't

23   very showy.  It was just kind of the same thing over and over

24   again.

25   Q    Okay.  And when you would kind of drop into one of the

1    hospitals, how long were you generally there?

2    A    When I first started I was -- when I first started it was

3    pretty much a week at a time.  Eventually it became two weeks

4    and occasionally like three.

5    Q    Okay.  And the entire time that you were at the hospital,

6    what is it that you're doing?

7    A    Training.

8    Q    Same --

9    A    Yeah.

10   Q    -- PowerPoint presentation?

11   A    Same PowerPoint presentations ad nauseam.

12   Q    All right.  And I believe this has come out, but we've

13   talked about different hospitals having different modules.

14   Would you explain that?

15   A    Sure.  So it was essentially like -- there was one-on-one

16   this is why we're here, this is why we're taking up your

17   valuable time.  This is what the software solution is.  Sort

18   of a why and then the modules would either cover various, you

19   know, hardware components as the other Plaintiff's have

20   described.  And then a scaling up by job functions.

21       So going from entry level to item manager essentially.

22   Q    All right.  And would every hospital have the same

23   modules?

24   A    No.

25   Q    Okay.  And why would there be differences?

1    A    The VA hospitals vary by function, as Mr. Bethas

2    described.  So some were specialized in certain fields of

3    medicine.  Some just don't have the resources to have actual

4    closets that, again as Mr. Bethas and Mr. Kehn described, to

5    have things like the kiosk.

6    Q    And if you're teaching different modules to different

7    hospitals, who's directing you?  Like who's telling you this

8    is what you're supposed to teach?

9    A    That would be the site lead with a lot of input from the

10   chief and field chief logistics officers.

11   Q    Okay.  And what kind of notice would you have that you're

12   going to be at Hospital X or Y?

13   A    Extremely last minute.

14   Q    Okay.  And were you able or did you do any prep work when

15   you were heading to a hospital about their systems?

16   A    No.

17   Q    Okay.  Did that at all impact what you were teaching?

18   A    Yes. Yeah, we'd did show up with this, you know,

19   cookie-cutter slide decks and not necessarily know the nuances

20   of these very nuanced hospitals. We didn't know what we were

21   getting into every time we showed up.

22   Q    Okay.  Defendants try to make it seem like you're really

23   involved in that process.  You're figuring out what the system

24   in place and how you're going to change it and how you're

25   going to teach them about the new system.  Is that accurate?

JUSTIN ERIC NOVICK - DIRECT BY MR. SLOBIN

1    A    I wanted it to be.

2    Q    Okay.

3    A    You-all saw my long winded emails and such and as much as

4    I wanted to be, that's not the case.  That was not realistic

5    whatsoever.

6    Q    Okay.  Let me ask you a couple questions -- because

7    that's what I'm here to do.  I'm sorry.  Were you involved in

8    the creation and development of the curriculum that you were

9    charged with teaching?

10   A    I was around it.  I was not primarily involved in it.  So

11   I did not affect the actual creation of it.

12   Q    Okay.  I mean did you do any of the drafting of the

13   training materials?

14   A    No.

15   Q    Okay.  Was your input sought when the drafting of the

16   training materials was being done?

17   A    No, no.

18   Q    Okay.  Who was in charge of the creation and development

19   of the training curriculum?

20   A    It was all management, development teams.

21   Q    Did you follow the training materials?

22   A    To the best of my ability, yes.

23   Q    Could you deviate from the training materials?  Let me

24   ask a more specific question.

25   A    Please.

JUSTIN ERIC NOVICK - DIRECT BY MR. SLOBIN

1   Q    Could you deviate from the content of the training

2   materials?

3   A    Absolutely not.  It was not allowed by the Federal

4   Government or the Veterans Administration.

5   Q    Okay.  And so when you bring that up, did someone review

6   this material before you presented it?

7   A    Absolutely.

8   Q    Okay, who did that?

9   A    That was -- well the development and management teams of

10  Shipcom Wireless as well as the product team from the VA.  So

11  those are the folks at the Government level that were

12  essentially the project management function of implementing

13  this software.

14  Q    Okay.  And how many times did you think that you gave the

15  PowerPoint presentation?

16  A    Three hundredish probably.

17  Q    All right.  And is it essentially the same presentation

18  every time?

19  A    Absolutely.

20  Q    Okay.  What's that like?

21  A    Made me a little nuts.  I think -- I have a healthcare

22  background and I was really excited to actually have -- my

23  healthcare folks.  And eventually realized that it was ad

24  nauseam and it was actually kind of devastating because I

25  thought I was actually going to do some good.

1    Q   How would you describe yourself as an employee?

2    A   Committed.

3    Q   All right.  I think Mr. Kehn described you as an idea

4    guy.  Would you -- do you have the same feeling about

5    yourself?

6    A   I think so.  Yeah, yeah.

7    Q   What does that mean to you?

8    A   I see things that are broken, I like to fix it.  Because

9    I have a healthcare background just like get in there and

10    that's what I feel like I am is an idea guy.  I don't have as

11    education background, but you just get in and fix what's

12    broke.

13    Q   Okay.  Was that part of your job working at Shipcom?

14    A   No.

15    Q   Did they ask you to be their idea guy?

16    A   No. No, no.

17    Q   Okay.  Did you see ways that Shipcom's training could be

18    improved?

19    A   Absolutely.

20    Q   Okay.  Did you ever -- well I'm going to come back to the

21    whole section.  Let me get through some other stuff.  Well,

22    you know, I'll do it.

23    Did you ever provide your thoughts on how they could

24    improve their software?

25    A   I did.

1    Q    Okay.  And let me rephrase that question.  Did you give

2    them ideas on how to improve their software or their training?

3    A    May I answer both?

4    Q    Go for it.

5    A    So in respect to the software, we did receive -- in

6    training we did receive feedback from the actual attendees.

7    There's the people that are, you know, doing the mouse clicks

8    and keystrokes.  This button doesn't make any sense over here.

9    That's a lot of extra work for me to move my arm when I have

10   to do a bunch of repetitive tasks.

11        So yes.  And especially when I first started because I

12   was just going to call myself absolutely fool of myself.  And

13   would occasionally provide feedback to Mufaddal who is one of

14   the developers that I was close with.  I was like hey the

15   end-users think this would be more efficient.

16        So in regards to your question about software, that was

17   my feedback back to them.

18   Q    Okay.  Let me ask you on that really quick.

19   A    Please.

20   Q    So, the idea to move a button over or to make a change

21   that wasn't your -- was that your idea?

22   A    No.

23   Q    Okay, were you just passing on information?

24   A    I was a conduit, yes.

25   Q    Okay.  All right, now let's talk about the actual

1    training.

2    A     Please.

3    Q     Did you have ways that you wanted to improve the

4    training?

5    A     I did have ways that I wanted to improve the training,

6    yes.

7    Q     Okay.  And did you -- were you asked by the company to do

8    that?

9    A     No.

10   Q     Did you convey that to the company?

11   A     I did.

12   Q     Okay.  And how often?

13   A     To the best of my recollection -- as everyone in this

14   room has seen -- there was the email with the feedback and my

15   superuser concept from Clarksburg, so that's a solid one.

16   Q     Okay.

17   A     When I first started, I may have provided feedback to

18   some of the site leads and not necessarily, you know, upper

19   management, but just the folks that I'm in the weeds with.

20   Maybe this would be better.

21   Q     Okay.  And what I just want to make sure I've got my

22   numbers -- my numbers correct.  So you're saying maybe at

23   least one time, okay, out of over 300 presentations; is that

24   fair?

25   A     That is fair.

1   Q    Okay.  All right.  Let's talk about the superuser

2   training.  Is that term -- is that -- did you come up with

3   that term?

4   A    I did not.

5   Q    What is that?

6   A    That's pretty frequently used term in regards to software

7   in general.  So usually when there are trainings being

8   implemented, you'll identify sort of like your basic end user

9   and then there's the superuser.  Ideally these are the sort of

10  folks that can absorb as much of the actual processes as

11  possible and then ideally after you leave they're the ones

12  that are training their staff to scale.

13  Q    So what prompted you to write -- it's Plaintiff's Exhibit

14  30.  What prompted you to write that?

15       (Pause in the proceeding.)

16  A    Thank you.  What prompted me to write this was we were in

17  Clarksburg, West Virginia with -- the chief logistics officer

18  there was not super open to change.  Understandably so and he

19  was just a bit weary of, you know, another business coming in

20  and disrupting his show.  And they -- he was -- nice guy deep

21  down for sure, but he was hostile.  He was hostile to the

22  company.  He was hostile to the materials.  He was hostile to

23  strange faces.  He was protective of his business.

24       That's what the VA -- every site of the VA thinks of

25  itself as a small business because that's how they operate.

1    So when, as Mr. Kehn testified earlier, when he was like we're

2    going to kick you out of this site if you don't come up with

3    something else.

4         And so I stayed up a lot of nights in a row that we can

5    just make this.

6    Q    Okay.  All right. And then there's some references to

7    alcohol in here.  Would you just explain that so that the jury

8    understands?

9    A    I hope that you don't fault me for comforting myself with

10   a few beers while staying up all night away from my friends

11   and losing relationships back home while re-arranging somebody

12   else's blind slide deck.

13   Q    Okay.  And so are you saying that after one of those late

14   nights of having a couple beers you wrote this?

15   A    Absolutely.

16   Q    Okay.  And what was your goal in writing this?

17   A    To -- my goal in writing this and my goal for every

18   moment that I spent with Shipcom Wireless was to make sure the

19   patients get cared better.  To get the things to patients

20   better.

21   Q    Okay.

22   A    And my thoughts was if I can streamline this training and

23   actually not take up these extremely important parts of the

24   machine the logistician and the clinical staff's time as this

25   would take a week of their time or more -- that they would

1    absorb quicker and we could get out of there and stop messing

2    up their shift.

3    Q    Okay.  Were you changing, in your superuser guide here,

4    were you changing the content of what you were training?

5    A    No.

6    Q    Okay.  Is this just a different way of presenting the

7    same material?

8    A    Yes.

9    Q    There was some discussion with Mr. Kehn on this email.

10   Who wrote this email?

11   A    I wrote this email.

12   Q    Okay.  And you sprinkled Mr. Kehn's name throughout this.

13   Why did you do that?

14   A    He was one of my best friends and I would take a bullet

15   for that guy.  And I -- he was putting in 110 percent to be

16   cheesy, I apologize.  And deserved recognition, you know, if

17   he wasn't actually typing an email with me.

18   Q    He wasn't with you when you were typing this up --

19   A    No, no.

20   Q    -- to send?

21   A    This is definitely me in a hotel room.

22   Q    Okay.  And you say you're just giving him some credit

23   for?

24   A    He's not the only one.  I did that with Irfana Hussain

25   who was one of the technical writers who was busting his --

1    excuse me.  He was also putting in a lot of effort and people

2    were working very, very hard and deserved recognition.  So

3    yeah this is kind of my style.

4    Q    Okay.  Again, no one at Shipcom asked you to do this?

5    A    Absolutely not.

6    Q    So you wrote this, you sent it to Shipcom.  I assume they

7    just took this and followed this along and let you do it the

8    way you wanted to do it; is that fair?

9             MR. MACDOWALL:  Objection, Your Honor, leading.

10            MR. SLOBIN:  So what happened.  I'm sorry.

11            THE COURT:  Sustained.

12   BY MR. SLOBIN:

13   Q    What happened when Shipcom received this?

14   A    To the best of my recollection, nothing was acknowledged

15   about the good job or any of that.  It was like, no, no, no.

16   You can't -- it's a contract -- it's the VA contract.  You

17   can't mess with it.  It's been approved by the VA.

18   Q    Okay.  So after you sent this email, I assume you did the

19   training at -- is it?  Where was the training?

20   A    It was Clarksburg, West Virginia.

21   Q    Okay.  Did you -- so you conducted the training?

22   A    I did.

23   Q    All right.  And so how did the training change?

24   A    We were more expedient otherwise we stuck to the script.

25   We just -- we hauled.  We went through it really, really fast

JUSTIN ERIC NOVICK - DIRECT BY MR. SLOBIN

1  because this guy was frankly kind of intimidating.  But

2  otherwise, we did not change a thing.

3  Q    All right. And if I recall your testimony, you said that

4  he did not want you to do PowerPoint presentation; is that

5  fair?

6  A    That is correct, yes.

7  Q    All right, so did you do PowerPoint presentations?

8  A    We did.

9  Q    All right.

10      (Pause in the proceeding.)

11  Q    And then I know we've gone over this plenty of times, so

12  I won't belabor it.  Just tell me the difference between

13  pre-implementation and post.

14  A    Pardon me, I'm sorry.  Pre-implementation is nothing has

15  been -- at least from the software side -- nothing has been

16  installed.  Nothing is live yet.  So the pre-implementation

17  training is us showing PowerPoint presentations.  And then

18  post-implementation -- which I really wasn't around for, I was

19  gone before they could, you know, really role this out.

20      I believe it's more like one-on-one like you're shadowing

21  folks when they're actually performing their actual work.

22  Again, I don't have much experience with that part with

23  Shipcom.

24  Q    Okay, so you weren't there at all during the post?

25  A    I was present -- I apologize.  I'm sorry.

1      Q    Would you like some water?

2      A    I was going to ask for some.  Is that okay?  Appreciate

3      it.  I was present for Coatesville, Pennsylvania.  That was

4      the first -- to my knowledge that was the first go-live.  I

5      was there for maybe a week after the software went live.

6      Q    All right, I'm going to go through this laundry list of

7      questions with you, so try to be expedient.

8           Did you do any work directly related to tax, finance or

9      accounting while you were at Shipcom?

10     A    I did not.

11     Q    Did you do any work relating to budgeting or auditing

12     while you were at Shipcom?

13     A    No, sir.

14     Q    Did you do any work directly related to insurance,

15     quality control or purchasing?

16     A    No.

17     Q    Okay.  Did you do any work related to procurement?

18     A    No.

19     Q    Okay.  And there's been some chatter, if you will, about

20     procurement and purchasing.  Tell me, if you will, did the

21     CATAMARAN software have a function relating to those items?

22     A    Yeah, yes, yes.  That's the purpose of the software.

23     Q    Okay.

24     A    But for the company of Shipcom I never procured any

25     materials that -- excuse me -- that Shipcom needed.

1    Q    Okay.

2    A    Nor did I ever go to the VA and be like you need to buy

3    these -- this type of gloves.

4    Q    Okay.

5    A    In regards to procurement, as they state, this software

6    is essential like a Facebook to buy stuff.  It's like hey like

7    here's how you click on something on a website to make

8    materials show up.  It was completely -- it was a concept at

9    that point.  It was so early in the game.  So no, I had

10   nothing to do with procurement.

11   Q    Did you tell any of the VA hospitals how much of any item

12   to procure or purchase?

13   A    Absolutely not.

14   Q    Did you tell them what items to procure or purchase?

15   A    No.

16   Q    Okay.  Did you do any work directly related to -- excuse

17   me -- advertising or marketing research?

18   A    I did not.

19   Q    Did you do any work directly related to safety and

20   health?

21   A    No.

22   Q    Did you do any work directly related to personal

23   management or human resources?

24   A    No.

25   Q    Did you do any work relating to employee benefits or

1 labor relations?

2 A No.

3 Q Did you do any work related to public relations or

4 government relations?

5 A No.

6 Q Did you do any work related to computer network?

7 A No.

8 Q Did you do any work related to internet and database

9 administration?

10 A No.

11 Q Did you do any work directly related to legal -- excuse

12 me -- and regulatory compliance?

13 A No.

14 Q Were you engaged in running Shipcom?

15 A No. I was a trainer.  Sorry, I apologize.

16 Q No, that's okay.

17 A You've all read these questions a thousand times.

18 Q Were you responsible for determining Shipcom's overall

19 course or policies?

20 A No.

21 Q Did you design any of the CATAMARAN Software?

22 A I did not.

23 Q Were you part of the team that designed any of the

24 CATAMARAN Software?

25 A I was not.

1   Q    Did you have any authority to formulate or affect

2   Shipcom's management policies?

3   A    I did not.

4   Q    Did you have any authority to interpret or implement a

5   Shipcom's management policies?

6   A    I did not.

7   Q    Did you have any authority to formulate or affect

8   Shipcom's operating practices?

9   A    No.

10  Q    Did you have any authority to interpret or implement

11  Shipcom's operating practices?

12  A    No.

13  Q    Were you able to commit Shipcom in matters that have

14  significant financial impact?

15  A    No.

16  Q    Did you have authority to wave or deviate from

17  established policies and procedures without prior approval?

18  A    No.

19  Q    Did you have authority to negotiate and bind Shipcom on

20  significant matters?

21  A    No.

22  Q    Did you provide consultation or expert advice to Shipcom

23  management?

24  A    No.

25  Q    Okay.  Other than -- and I want to be really clear --

JUSTIN ERIC NOVICK - DIRECT BY MR. SLOBIN

1    other than that email that you sent?

2    A    In my opinion, I was not being paid nor was it my primary

3    duty to provide any sort of expert advice or consultation to

4    Shipcom as a company or its management.

5    Q    Did you believe that the advice that you were providing

6    was expert advice?

7    A    Yeah, 27 year old meaning that, for sure.  But it wasn't

8    legal.  It was just me being young and yeah I thought I was

9    awesome.

10   Q    All right.  Were you involved in planning long or short

11   term business objectives for Shipcom?

12   A    No.

13   Q    Did you investigate and resolve matters of significance

14   on behalf of Shipcom's management?

15   A    No.

16   Q    Did you represent the company in handling complaints,

17   arbitrating disputes or resolving grievances?

18   A    I heard a lot of complaints from customers, but that was

19   not my job nor did I do anything to resolve said complaints.

20   Q    Okay.  But was that a task that was assigned to you?

21   A    Absolutely not.  Sorry to cut you off.  I apologize.

22   Q    Did you ever negotiate a contract with the VA?

23   A    I did not.

24   Q    Did you ever negotiate any pricing terms with the VA?

25   A    No.

1    Q    Did you participate in any management meetings at Shipcom

2    regarding the direction of the company?

3    A    No.

4    Q    Did you have any input into which hospitals you were

5    training at?

6    A    No.

7    Q    Did you discipline any employees?

8    A    I did not.

9    Q    Did you devise any marketing plans?

10   A    No.

11   Q    Did you decide whether or how to recruit potential hires?

12   A    No.

13         (Pause in the proceeding.)

14         MR. SLOBIN:  Your Honor, I'm going to put up

15   Plaintiff's Exhibit 26.

16   BY MR. SLOBIN:

17   Q    Mr. Novick, what is this document?

18   A    This appears to my employment offer and agreement letter.

19   Q    Okay.  Is this around the time that you were hired?

20   A    Yes.

21   Q    Okay.  And take a minute to review the duties and

22   responsibilities.

23         (Pause in the proceeding.)

24   Q    Do you see that first bullet?  Let me show you.  It says,

25   "Preparation of Training materials?

1    A    Yes.

2    Q    Okay.  What does that mean to you?  And let me ask a

3    better question, I'm sorry. What does that mean to you in

4    relationship to your job?  Like, what did that -- what did you

5    do?

6    A    To me that was making sure they were accessible.  So

7    having a hard copy on my company issued laptop or on a thumb

8    drive or having printed materials either ahead of time or

9    while in whichever city I was going to be training in.

10   Q    Okay.

11        MR. SLOBIN:  Your Honor, I'm going to put up

12   Plaintiff's Exhibit 32.

13   BY MR. SLOBIN:

14   Q    Mr. Novick, will you turn to that in your book?

15   Actually, it's kind of a thick Exhibit.

16   A    It is.

17   Q    But if you'll talk about the coverage page.  Tell me what

18   this is.

19   A    Excuse me.  I'm sorry.  So this was an email that I had

20   sent to everyone that you see on the to and cc list.  So while

21   we were in Coatesville, it was the first go-live that we did

22   and it was the first time that we had that many boots on the

23   ground.  And as we've all been testifying as today, there was

24   a lot of new faces.  And no one -- excuse me not no one, but

25   the majority of people didn't know what was going on, there

1   were subcontractors, they didn't know what it was that we were

2   actually doing.  It was just a lot of little moving parts.

3       And because frankly this thing didn't work, a lot of VA

4   staffers were asking subcontractors and such like how do I

5   order so and so.  And so JP Renaud -- we've talked about

6   before -- and Reddy as well, I believe, had taken me aside at

7   Coatesville and asked me to put together an internal training

8   webinar basically.  And they asked me to work with Rahual

9   Gupta and Shahrzad Ahmadi using the cc list and this is the

10  email saying look we did it.

11  Q    Okay.  Are these the training materials that you

12  compiled?

13  A    Compiled, yes.

14  Q    Okay.  And what did you compile those training materials

15  from?

16  A    From all of the previously available training materials

17  that we had been training all of the VA staff with.

18  Q    Did you create any new training material?

19  A    The only thing was either an agenda -- because it was a

20  two-day webinar.  So literally a slide that's today on this

21  day we're covering these things.  And I also recall at the end

22  of this deck, I did -- basically I put together a list of sort

23  of best practices for line level employees being on site at a

24  go-live.  So just literally bullet points of things like don't

25  swear, you're in a hospital.  And don't leave the site to go

1   to lunch.  And this is to the best of my recollection.  I

2   apologize.  But other than that, no I did not create any new

3   content.

4   Q    And did you revise any of the content that was already in

5   place?

6   A    No.

7   Q    When did your employment end?

8   A    I'm pretty sure the actual date was March 13th, 2015

9   because it was a Friday the 13th, so it sticks.

10  Q    How did you employment end?

11  A    With a polite two-week notice.  And I resigned.

12  Q    Why did you resign?

13  A    Because that place was a nightmare.

14          MR. MACDOWALL:  Your Honor, this line of question is

15  relevant.

16          THE COURT:  Do you have any further response?

17          MR. SLOBIN:  No.  Oh, do I have any further

18  response?  Your Honor, I think it's relevant.  I think I've

19  asked the other client's why their employment ended.  I

20  thought it was -- I think it's relevant.

21          THE COURT:  Very briefly.  You don't need to -- it's

22  not --

23          MR. SLOBIN:  I'm going to move on.  I just --

24          THE COURT:  All right.

25  BY MR. SLOBIN:

1    Q    How were you compensated while you were at Shipcom?

2    A    I'm a salaried, was paid once a month.

3    Q    Were you ever reclassified?

4    A    I was not.

5    Q    Okay.  Why were you not reclassified?

6           MR. MACDOWALL:  Objection, Your Honor. Calls for

7    speculation.

8    BY MR. SLOBIN:

9    Q    Do you know why you were not reclassified?

10   A    I do not, no.

11   Q    Let me ask this.  So when did you say you were employment

12   ended?

13   A    March of 2015.

14   Q    Okay.  And you've seen documents in front of you during

15   this trial that the reclassification was in September of 2015?

16   A    That is correct, yes.

17   Q    Okay.  So were you there when the reclassification took

18   place?

19   A    I was not.

20   Q    Did Reddy -- and do you have his last name?  I can't

21   pronounce it?

22   A    I apologize, I cannot.  Cherukupally.

23   Q    Did he ever personally observe you performing your job

24   duties?

25   A    Not that I know of, no.

1    Q    Okay.  And what about Nakul Goenka, did he ever

2    personally observe you performing your job duties?

3    A    Absolutely not.

4         (Pause in the proceeding.)

5              MR. SLOBIN:  Your Honor, I'll pass the witness.

6              THE COURT:  All right.  Cross-examination?

7         (Pause in the proceeding.)

8              MR. MACDOWALL:  Thank you, Your Honor.

9              CROSS-EXAMINATION OF JUSTIN ERIC NOVICK

10   BY MR. MACDOWALL:

11   Q    Good afternoon, Mr. Novick.

12   A    Good afternoon.

13   Q    You're a college graduate, aren't you?

14   A    I am.  I went to Malcolm X College in Chicago.

15   Q    Graduated in 2010; is that right?

16   A    I did.

17   Q    Graduated with an associates degree in applied science;

18   is that true?

19   A    Correct.

20   Q    You also earned a paramedic's license there, right?

21   A    I did.

22   Q    And part of earning your college degree, is it true, that

23   you worked as an emergency medical technician for awhile?

24   A    I did.

25   Q    Worked for approximately two years in that position?

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    A    I did.

2    Q    And you worked for a private ambulatory company; is that

3    true?

4    A    Yes.

5    Q    And after you earning your degree and your license, you

6    were promoted to paramedic in 2010; is that accurate?

7    A    That is accurate, yes.

8    Q    And you worked as a paramedic for that company for about

9    three years; is that accurate?

10   A    Yes.

11   Q    And while working as a paramedic, isn't it true that you

12   were one of the ones selected to train incoming EMT's on

13   processes and procedures?

14   A    Yes.

15   Q    You would ride in the back of the ambulance, for example,

16   and assess how the EMT's were doing at their job; is that

17   accurate?

18   A    That is accurate.

19   Q    Provide feedback and instruction; is that true?

20   A    That is true.

21   Q    You also worked for a period of time as a clinical

22   trainer at Malcolm X College; is that accurate?

23   A    Volunteered.  But, yes.

24   Q    And that was the same college where you graduated from;

25   is that --

1    A    That is correct, yes.

2    Q    And as a clinical trainer, you educated EMT students on

3    the use of medical equipment; is that accurate?

4    A    Yep.

5    Q    Showed them how it worked and how they would use it in

6    their jobs; is that right?

7    A    Yes.

8    Q    Now while working as a paramedic, you also worked at the

9    College of Medicine at the University of Illinois Chicago; is

10   that true?

11   A    That is true.

12   Q    You worked in a position called Simulated Technician; do

13   I have that right?

14   A    Simulation Technician, yes.

15   Q    Simulation Technician?

16   A    Yes.

17   Q    And you trained hands-on skills to medical students and

18   medical residence in that job; is that true?

19   A    That is true.

20   Q    Taught them how to use different medical devices?

21   A    May I elaborate?  It's basically it was when residents

22   were and first -- it was like medical students and mostly

23   first and second year residents and first and second year

24   showing them how to do most procedures that typically

25   registered nurses would be doing.

1          Because you always -- University of Illinois at Chicago

2     is really into getting the doctors into the weeds so they

3     could, like, cut down on wait times.  So, sorry.  It's a weird

4     job I needed to explain.

5     Q    And so you were teaching them techniques that they were

6     going to use in their practices; --

7     A    Correct.

8     Q    -- is that right?  You held that job from approximately

9     2010 to 2014 off and on; is that accurate?

10    A    That's accurate, yes.

11    Q    And after working at the University of Chicago, you moved

12    down to New Mexico; is that true?

13    A    University of Illinois at Chicago.

14    Q    Right.  After University of Illinois, Chicago, got it,

15    you went down to New Mexico

16    A    UFC is way better.  Yeah.  Yes, I went to  Albuquerque,

17    yes.

18    Q    And your next place you started working for a hospital

19    system; is that true?

20    A    That's true.

21    Q    And you worked there as a learning coordinator.  Do I

22    have that title right?

23    A    That's what's on my LinkedIn, yeah.

24    Q    Was that actually the title of the job?

25    A    I think so.  Obviously I can't recall, but yeah that's

1    what I go by now.

2    Q    Well in that job, you were registering nurses and doctors

3    for learning modules for things they had to take to keep up

4    licensing that sort of thing; is that right?

5    A    The hospital system was implementing an electronic

6    medical record technology.  It's Epic Systems.  And so in

7    order for the clinical side of the hospital to stay employed,

8    frankly, they had to take a bunch of classes and say I was

9    the -- basically the background guy registering people for

10   classes.

11   Q    You then moved to Los Angeles where you eventually

12   applied for employment with Shipcom; is that right?

13   A    That's correct.

14   Q    And you did that in 2014?

15   A    Correct.

16   Q    And you applied for a job as a trainer?

17   A    That is correct.

18   Q    And you applied for that job because you thought it

19   matched your skill set; is that accurate?

20   A    Yes.

21   Q    And the skill set we're talking about is your skill set

22   that you'd developed working as an EMT, later as a paramedic

23   and doing trainings in those roles; is that right?

24   A    That's correct, yeah.

25   Q    And also in your role as a simulated -- simulation

1    technician as well; is that right?

2    A    Correct.

3    Q    Okay.  And you talked on your direct examination about

4    the offer letter that you signed with Shipcom; is that right?

5    A    Yes.

6    Q    And you reviewed that offer before signing it, didn't

7    you?

8    A    Sort of, kind of.

9    Q    Okay.

10   A    I had just moved to L.A., you know, it's like yes I took

11   the job.

12   Q    Well, you knew going into it you knew that you were going

13   to be compensated at an annual salary of $45,000 a year by

14   Shipcom; did you not?

15   A    That is true.

16   Q    And you knew that that was for all services to be

17   performed for the company during your employment, right?

18   A    To the best of my knowledge, sure yeah.

19   Q    Well, do we need to get it out and read it?  That's what

20   the offer letter said, right?

21   A    If you want to review it, sure.  Yeah, now I'm saying I

22   didn't appreciate the nuances of all of the services being

23   compensated for.

24   Q    Okay.  So then it's your testimony that you may not have

25   read the letter closely enough to understand that, but that's

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

196

1    what the letter said, right?

2    A    Yes, that is my testimony.  Yes.

3    Q    And you were actually compensated by the company at

4    $45,000 annual salary for the majority of your employment; is

5    that right?

6    A    That is true, living in Los Angeles.

7    Q    And then in January of 2015, you received a raise by the

8    company; is that true?

9    A    That is true.

10   Q    You started earning $55,000 annual salary; is that right?

11   A    That is true.

12   Q    You never complained to anyone at Shipcom that you

13   thought you were misclassified as exempt from overtime; is

14   that accurate?

15   A    I did not.

16   Q    Now you talked a little bit on your direct examination

17   about how as a trainer you were out at these medical hospitals

18   training folks on the implementation of the CATAMARAN

19   software; is that right?

20   A    Yes.

21   Q    And we'll cover that in some detail, but I'll go over a

22   couple of things here.  Is it accurate that you worked at

23   approximately 20 different VA medical hospitals during your

24   employment with Shipcom?

25   A    Roughly, yes.

1    Q    And you were training these folks on the inventory

2    management software that was being implemented as part of

3    Shipcom's or one of the modules that Shipcom was running on;

4    is that right?

5    A    Yes.  Yes.

6    Q    And you also trained on the procurement model that would

7    allow the hospitals to procure medical supplies; is that

8    accurate?

9    A    I got to do that maybe twice.  That was -- that came out

10   right when I had resigned.

11   Q    Okay.  And do you recall approximately when that was?

12   A    Like January, February of 2015.

13   Q    Okay.  But up to that point, the POU program -- which was

14   the inventory monitoring part of the program -- was -- was

15   what you were training folks on; is that accurate?

16   A    That is correct, yes.

17   Q    And the hospital staff, just to make sure we're clear,

18   they were using that particular module to make sure they knew

19   how much medical supplies they had at different areas of the

20   hospital at a given time; is that accurate?

21   A    That's accurate, yes.

22   Q    And is it also accurate that that module would actually

23   tell them how much supply they were supposed to have?

24   A    If it was working, yeah.  Theoretically it was supposed

25   to be, yes.

1   Q    And we call that a PAR level, right?

2   A    Correct.

3   Q    It just means the amount of particular type of inventory

4   they should have in supply to make sure they can meet their

5   needs; is that accurate?

6   A    That is accurate.

7   Q    And this particular module, the software, was changing

8   the way that the VA hospitals had been doing it previously; is

9   that accurate?

10  A    To the best of my knowledge, yes.

11  Q    Okay.  And the purpose of monitoring these supplies was

12  to make sure that you optimized patient outcomes; isn't that

13  true?

14  A    For me, yeah.

15  Q    Well for the hospital as well, right?  Isn't that the

16  purpose of --

17  A    Hopefully yes, yes.

18  Q    And training folks was your primary job, right?

19  A    That was my primary function, yes.

20  Q    And you would agree with me that in order to train these

21  folks, you had to have a good understanding of the solution

22  that you were actually training folks on?

23  A    I had to be able to speak about it eloquently, yes.

24  Q    And accurately; is that right?

25  A    To the best of my ability, yes.

1   Q    Enough so that the folks that who were listening to you

2   could use the software effectively; isn't that right?

3   A    Yes.

4   Q    So if I understand your testimony you may not have had to

5   explain it enough so that folks could write their own

6   software, right?

7   A    My testimony is saying that I did not study supply chain

8   management.  I don't understand theories necessarily.  I can

9   point people towards the most efficient way that they can use

10  a software as a service, yes.

11  Q    Okay.  So you understood the software enough so that you

12  could effectively and efficiently train the hospital staff on

13  the use of that software?

14  A    I understood the interface well enough to train people.

15  I don't know anything about backends or coding.

16  Q    Okay.  Let's do it this way then.  At the end of your

17  training session, should the folks that you were training have

18  a sufficient understanding of the software to be able to use

19  it in their jobs?

20  A    Ideally, yes.

21  Q    You developed that understanding that we're talking about

22  of how the software worked and what the solution was through a

23  trial and error process; would you agree with that?

24  A    I do, yes.

25  Q    And that technique of trial and error what we're talking

1    about is your going into the test environment and basically

2    playing with the software to make sure that you understood how

3    it worked; is that accurate?

4    A    That's correct, yes.

5    Q    In a way, you were teaching yourself the software; isn't

6    that true?

7    A    That is true.

8    Q    And you followed that trial and error technique

9    throughout your employment with Shipcom; is that true?

10   A    Yeah.  Yes, that is true.

11   Q    And there were different versions of the software of

12   CATAMARAN that Shipcom rolled out during the term of your

13   employment; isn't that right?

14   A    That is correct, yes.

15   Q    You would estimate there was approximately nine different

16   modules of the system that rolled out during your 10 months of

17   employment?

18   A    Yes, that is correct.

19   Q    Now during the go-live portion of the training on-site,

20   that's when -- excuse me, the pre go-live part of the

21   training.  That's when you were using the PowerPoint

22   presentation; is that accurate?

23   A    Yes.

24   Q    Those were the ones where you just in a classroom setting

25   teaching people that software?

1  A    Yes.

2  Q    In a post go-live setting, you were actually one-on-one

3  with these individuals without PowerPoints, right?

4  A    I'm sorry, can you repeat that?

5  Q    In the post go-live setting, you were in one-on-one

6  situations with the VA hospital staff to train them, right?

7  A    Very briefly.  That wasn't my thing.  I was the classroom

8  guy.  Maybe side-chaired with like a couple of people in

9  Coatesville.

10  Q    During that or during the go-live --

11  A    Yeah, yeah.

12  Q    -- at Coatesville is that what we're talking about?

13  A    Yes.

14  Q    And in that setting, you were one-on-one situation with

15  folks that you were trying to train; is that accurate?

16  A    That is accurate, yes.

17  Q    And isn't it true that you were one of the first trainers

18  that Shipcom hired?

19  A    I was number two.  Excuse me.  That I know of.

20  Q    Let's look at Defendant's Exhibit Number 38.

21       (Pause in the proceeding.)

22       MR. MACDOWALL:  Sorry, Your Honor.  It appears

23  technical difficulties, once again.  Let's switch to the Elmo.

24       (Pause in the proceeding.)

25  BY MR. MACDOWALL:

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL          202

1    Q    Mr. Novick, if you could look at Defendant's Exhibit
2    Number 38.
3         (Pause in the proceeding.)
4    Q    Do you recognize this document, sir?
5    A    I do.
6    Q    And this is a copy of an email that you sent on February
7    3rd, 2015; is that right?
8    A    Yes.
9    Q    And you sent it to a Martin Wiseman (phonetic) at va.gov;
10   is that accurate?
11   A    It appears so, yes.
12   Q    Who is Mr. Wiseman?
13   A    I don't recall, but it had to have been somebody on the
14   logistic staff of one of the VA's.
15   Q    And the purpose of your email is noted there in that
16   first paragraph sort of an introductory email to someone at
17   the VA staff about an upcoming site visit; isn't that
18   accurate?
19   A    That is accurate.
20   Q    And you indicate in this email that you and Mr. Kehn are
21   going to be traveling onsite to conduct training; isn't that
22   accurate?
23   A    Yes.
24   Q    And you attached several documents to this introductory
25   email sort of give an overview of the training program, don't

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1   you?

2   A    I did.

3   Q    And we can see there in those bullet points.  It's an

4   introductory training letter, a logistics training overview, a

5   clinical training overview, and a generic training schedule;

6   is that right?

7   A    Yes.

8   Q    Look at the next page, which is Shipcom 903.  Is this the

9   introductory letter that you wrote to Mr. Wiseman?

10  A    This is in an introductory -- excuse me -- introductory

11  letter that I sent to Mr. Wiseman.  This entire body of this

12  email was actually provided to Shipcom by the VA project

13  staff.  So I believe Bruce Henderson from the VA was actually

14  the guy that sent this entire template to us to send out to

15  everybody.

16  Q    Okay.  And this is a letter to give them an idea of

17  what's upcoming, is that right?

18  A    Correct, yes.

19  Q    Okay.

20  A    And for them to distribute to their staff.

21  Q    Okay.  Let's go to the next page here.  Logistics

22  training overview; is that right?

23  A    Correct.

24  Q    And we see on the lefthand side it has level one, level

25  two, level three and level four; is that right?

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    A    Yes, yes.

2    Q    And that's describing different levels of training for

3    these folks; isn't that accurate?

4    A    Correct.

5    Q    And then in the second column, you have a target audience

6    that describes basically which portions of the VA staff you

7    were targeting for that particular level of training; isn't

8    that true?

9    A    Yes.

10   Q    And then on the right hand side it gives sort of an

11   overview of what those different levels of training would

12   involve; is that right?

13   A    That is correct.

14   Q    I don't need to go into detail there, but if the jury

15   wants to look at that in their deliberations.  Look at -- skip

16   two pages to Shipcom 906.  And here we have a Heal You program

17   training overview display; is that right?

18   A    Yes.

19   Q    And it, again, shows different levels of training there

20   down the right hand side; is that right?

21   A    That is correct.

22   Q    And along the bottom we have -- it says, "Supply tech,

23   item manager, superuser, train the trainer" is that right?

24   A    Correct.

25   Q    And those were basically target audience of those

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    different types of training modules; is that true?

2    A    Sure.

3    Q    And all of these different boxes are titles of different

4    training modules that you, as trainers, would train on?

5    A    Correct.

6    Q    Is that true?

7         (Pause in the proceeding.)

8    Q    Now when you were training these folks, you had to take

9    feedback from them, right, to try and figure out how things

10   could be improved wouldn't you?

11   A    Correct.

12   Q    And Shipcom didn't have in place any sort of formalized

13   feedback method?  You sort of relied on your experience to do

14   that; isn't that true?

15   A    Common decency, yes.

16   Q    I'd like to look at Plaintiff's Exhibit Number 39.  I

17   believe you looked at this on direct examination.  This is

18   that February 7th -- February 4th email that you sent to

19   folks.  Do you recognize that document?

20   A    I do.

21   Q    I'd like to first start with the third page -- which is

22   Shipcom 918 -- it's the email that you sent on February 2nd of

23   2015.  And just so we can be clear about who these folks are

24   again, your sending this email to Hiten Patel, right?

25   A    Yes.

1    Q    And he was one of the Vice Presidents of the company?

2    A    Yes.

3    Q    And you were copying Jean-Paul Renard for one; is that

4    right?

5    A    Yes.

6    Q    And he was your boss; is that true?

7    A    I don't know if that was there yet, so to the best of my

8    knowledge he was functioning as my manager at that point, yes.

9    Q    Mr. Renard was a Vice President of the company?

10   A    I can't remember his exact title, I'm sorry.  He was up

11   there.

12   Q    And Christopher Kehn is one of the Plaintiff's in the

13   lawsuit, right?

14   A    Yes.

15   Q    And then Steve Baczewski -- how do you say that?

16   A    Baczewski.

17   Q    Baczewski.  Do you know who that is?

18   A    I can't recall.

19   Q    And you sent this email in order to provide some feedback

20   to these folks, right?

21   A    Yeah, kind of, yeah.

22   Q    Well, --

23   A    I mean, really this is explaining my like hey by the way

24   this is what we're out here doing.  So in case you need to

25   talk to anybody about why these trainers are around here on

1    your site, this is it.

2    Q   Okay.  Well you say there in the first line, "The

3    following information is meant for internal use only and

4    reflects some of the feedback from previously trained sites as

5    well as some personal opinions of mine."  So, is that

6    accurate?  Is that what that says?

7    A   Yes, that is what that says.

8    Q   So would you agree with it you were providing feedback to

9    your superiors based on previously trained sites?

10    A   100 percent.

11    Q   Okay.  You were also providing some of your personal

12    opinions; is that true?

13    A   Absolutely.

14    Q   Okay.  One of those is there at the second paragraph.  It

15    says, "We need to be firm on our agendas and schedules.  The

16    level base training is written for a reason in that it will

17    provide for conceptual comprehension in a tear driven system

18    and breaks down as follows."  Did I read that accurately?

19    A   You did.

20    Q   Okay, so you were trying to tell your bosses that we need

21    to be firm in our agendas for a particular reason, right?

22    A   Yes.

23    Q   Okay.  And one of those reasons was you were having

24    trouble with some of the VA hospitals not abiding by those

25    agendas; isn't that true?

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL                208

1    A    Yes, that was happening.

2    Q    And it was important that they abide by those agendas so

3    that you can get out the training that you needed to; is that

4    right?

5    A    Yes, and also this -- we were following (indiscernible)

6    vision which was -- this is how we trained so this was our

7    job.

8    Q    Okay.  Let's jump down to the last full paragraph there

9    on this page.  It says, "Next we need to pro-actively address

10   the fact that we are not training in a site-specific live

11   environment.  This is a training server for task driven

12   learning modules."  And it goes on.  Did I read that

13   accurately?

14   A    There is a training server, yes.

15   Q    There is a training server for task driven learning

16   modules?

17   A    Correct.

18   Q    Okay.  And so here the feedback you're providing to them

19   is that we're having some trouble with the VA hospitals

20   learning in a sort of testing environment as opposed to a live

21   environment; is that accurate?

22   A    To the best of my recollection, yes.

23   Q    Then you go on and you state at the last sentence there

24   on this page, "Prior to go-live, our goal in training for

25   Brett Hayden's team pass document is" and the next page there

1   at the top, it says, "Training Team Task.  Ensure that VAMC

2   logistics and clinical staff receive personalized in-depth

3   training to best prepare logisticians for conversion to

4   CATAMARAN software and POU inventory management system.

5       "Provide classroom hands on and on-the-job training as

6   well as help to analyze and implement workflow solutions for

7   targeted VAMC staff utilizing CATAMARAN processes."  Is that

8   right?

9   A    That is what that says, yes.

10  Q    And that was the goal of the trainers; isn't that true?

11  A    Per Brett Hayden's document, yes.

12  Q    And in fact, while you were on-site you were trying to

13  provide hands on training weren't you?

14  A    Ideally, yes.

15  Q    You were trying to provide on-the-job training, weren't

16  you?

17  A    Trying to, yes.

18  Q    And you were trying to analyze and implement workflow

19  solutions for the VAMC staff; is that true?

20  A    We were trying to help to, yes.

21  Q    Okay.  And the next line there, or the next paragraph it

22  says, "Kehn and I have developed a training model that allows

23  the presenting central office approved training materials

24  developed jointly between Shipcom training and technical

25  writing teams and central office project management along with

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    allowing the end users to intentively function within the

2    training server and POC demo environments."  Did I read that

3    accurately?

4    A    You did.

5    Q    And isn't it true that you and Mr. Kehn developed the

6    training?

7    A    No. I did.

8    Q    You developed the training model on your own?

9    A    No.  I shuffled around the slide deck.  Kehn didn't have

10   anything to do with it is what I'm saying.

11   Q    So what you wrote in this email to your superiors,

12   including a lot of vice presidents in the company, was

13   inaccurate then?

14   A    In a really polite way, yeah.

15   Q    Let's look back at the first page of the document then.

16   This is the email that you wrote on February 4th of 2015,

17   right?

18   A    Yes.

19   Q    Okay here you point out that you are attaching several

20   different documents to this email; is that right?

21   A    Yes.

22   Q    One of those -- the first bullet here in this document

23   indicates that you have an agenda.  This is brand knew.

24   You-all are the first to see it.  Is that right?

25   A    Yes.

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    Q    And this is an agenda that you came up with; is that
2    true?
3    A    Yes.
4    Q    Okay.  And the idea here for this new agenda was to
5    confirm all classroom attendees ability to perform hands-on
6    and functions related to central office approved PowerPoints;
7    isn't that true?
8    A    Yes.
9    Q    Okay.  And the second bullet here is referring to a
10   metrics that you had developed; is that true?
11   A    Yeah, yes.
12   Q    And this metrics was developed in response to one of your
13   superiors request after Coatesville; isn't that accurate?
14   A    Yes, Brett Hayden.
15   Q    And you were doing the -- you were creating these things
16   in order to improve the training process, weren't you?
17   A    No, it was more like to make sure I was actually hitting
18   the things that the end-users would need to do.  Like it
19   wasn't like a deliverable or anything.  It's just -- okay,
20   they did all this stuff so I did a good job is kind of the
21   idea.
22   Q    So if your job is to make sure that they can do what they
23   need to do at the end of the day, then those things help
24   you -- these things that you developed helped you do that;
25   isn't that accurate?

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    A    Yeah, yes.  Yeah.

2    Q    Finally in this final bullet point, we talked about that

3    superuser agenda that you talked about on direct examination,

4    right?

5    A    Yes.

6    Q    And this is something that you indicate in this email

7    that you and Mr. Kehn came up with; isn't that accurate?

8    A    That's what it says in the email, yes.

9    Q    Is it accurate that Mr. Kehn and you came up with this

10   superuser training agenda?

11   A    We bounced ideas around, yes.

12   Q    Which resulted in the development in this agenda; is that

13   accurate?

14   A    It resulted in the shuffled around slide deck, yes.

15   Q    And you actually implemented this superuser training

16   agenda to some degree when you went to Clarksburg to try and

17   appease the VA; is that right?

18   A    I am not going to lie.  I can hardly remember Clarksburg.

19   I couldn't tell you because that was right at the end of my

20   sanity at that point and I could not tell you whether I -- to

21   the best of my knowledge I don't believe that I did this at

22   Clarksburg.  I think I developed it at Clarksburg.  I stayed

23   up all night in Clarksburg, but I don't specifically recall

24   doing this with end users.

25   Q    Okay.  Let's look at Defendant's Exhibit 40.  Do you

1    recognize this email, sir?

2    A    I do.

3    Q    And the bottom half of this email is -- has a copy and

4    paste of a link message conversation that you were having with

5    JP Renaud; is that accurate?

6    A    That's correct.

7    Q    JP is a person we've already talked about who was your

8    superior; is that right?

9    A    Yes.

10   Q    And in that linked conversation with Mr. Renaud you're

11   pitching an idea for improving some of the processes that you

12   were using for training at these facilities; is that accurate?

13   A    That is accurate, yes.

14   Q    It was specifically about improving the functionality of

15   the test environment, right?

16   A    I can't say that with certainty, I'm sorry.  It was

17   improving something.

18   Q    It certainly wasn't to harm the system, right?

19   A    Absolutely not.

20   Q    Okay.  The idea was to improve it and you were sending

21   this to your superior to see if they would work on it, right?

22   A    Correct.

23   Q    Idea you came up with?

24   A    Totally.

25   Q    Okay.  And you sent it to Mr. Kehn.  Mr. Kehn responds he

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    thinks it's a brilliant idea; is that right?

2    A    In so many words, yes.

3    Q    Another one of these ideas that you were bouncing around

4    with Mr. Kehn; is that accurate?

5    A    That is correct.

6    Q    Now earlier during direct examination, you testified that

7    when you first started your employment with Shipcom you had

8    some ideas but they sort of fell on deaf ears.  Is that an

9    accurate representation of your testimony?

10   A    Yes.

11   Q    Okay.  Here you're sending these emails in January of

12   2015 and the prior emails that we just talked about in

13   February of 2015; is that accurate?

14   A    That is accurate.

15   Q    We're talking more than seven months into your

16   employment; isn't that true?

17   A    Sure.

18   Q    And you're still pitching ideas to Shipcom about how to

19   improve their processes; isn't that right?

20   A    Seven months in, yes.

21   Q    Even though your testimony is that your original ideas

22   just fell on deaf ears in the past?

23   A    As did these, yes.

24   Q    You also took part in training Shipcom employees

25   themselves; isn't that true?

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1    A    Correct.

2    Q    Not just the VA hospital employees, but Shipcom employees

3    who were going to go out and had to understand how this stuff

4    worked, right?

5    A    Correct, yes.

6    Q    And you took part in a training that took occurred in

7    November or December of 2014; isn't that true?

8    A    I cannot recall the date, I'm sorry.

9    Q    Okay, but you did take part in it?

10   A    I did.

11   Q    And the idea there was to sort of bring Shipcom employees

12   up to speed on how the software was working; is that right?

13   A    Correct.

14   Q    And you were chosen as the one from the trainers who

15   would actually deliver that presentation for the trainers,

16   right?

17   A    From the training group, yes.

18   Q    Because you were the second trainer employed at Shipcom,

19   as far as you can recall, you took part in actually developing

20   the training program, didn't you?

21   A    No.

22   Q    Didn't take part in that?  Okay.  Let's look at

23   Defendant's Exhibit Number 69.

24        (Pause in the proceeding.)

25   Q    Again, very light on this projector.  You can look

1    at -- refer to your booklet there.

2        (Pause in the proceeding.)

3    Q    Mr. Novick, this is a copy of your LinkedIn profile; is

4    that accurate?

5    A    That is accurate.

6    Q    And it's hard to read, but read along with me that

7    first -- that paragraph that we're sort of pulling out here on

8    the overhead projector and see if you can read that.

9        It says, "Skilled project manager with a strong

10   background in training who drives value for clients by

11   defining and executing a results oriented approach to solving

12   complex and technical business problems.  Extensive knowledge

13   of aligning strategy, technology, process engineering/design

14   and data to achieve breakthrough success.

15       "Efficient team leader with strong executive presences

16   and the ability to communicate complex operational topics to

17   audiences of varying backgrounds."  Did I read that

18   accurately?

19   A    You did.

20   Q    Okay.  And is that an accurate description of you?

21   A    I like to think so, yeah.

22   Q    Let's look at the second page of the document, 1134.  And

23   here you include some description of your employment with

24   Shipcom as a systems trainer, right?

25   A    Yes.

JUSTIN ERIC NOVICK - CROSS BY MR. MACDOWALL

1  Q   I'd like to read this paragraph.  It says, "Shipcom

2  Wireless provides software solutions based on automatic

3  identification and data collection, radio frequency

4  identification and enterprise mobility."  Is that right?

5  A   That is true.

6  Q   Okay.  The second paragraph here says, "Developed a

7  successful training program supporting nationwide

8  implementation of Shipcom proprietary software targeting

9  280,000 hospital employees across 152 unique sites.

10  Facilitated implementation and skill retention measurements

11  solutions with clients and end users by building client

12  relationships and working effectively with all internal

13  teams."  Did I read that accurately?

14  A   You did.

15  Q   Is that an accurate description of what you did at

16  Shipcom?

17  A   Safe for developing a training program, yes.

18  Q   Okay.  So when you put on your LinkedIn profile that you

19  developed their training program is not accurate?

20  A   Sure.  It got me a job.

21  Q   Would that be a yes, sir?

22  A   Yes, it's inaccurate.

23  Q   You mentioned an Irfana Hussain, I believe, on direct

24  examination, right?

25  A   Yes.

1    Q    And she was a technical writer at Shipcom?

2    A    I believe that was her title, yes.

3    Q    What do technical writers do?

4    A    I don't know the day-in-day-out, but to my knowledge

5    primarily is working on the slide decks and just documentation

6    like it's fed through the VA.

7    Q    So you knew her from working at Shipcom?

8    A    Yeah, yes.

9    Q    Not anywhere else?  Okay. Here on the second to last page

10   of this document -- it's Shipcom 1137 -- it looks like you

11   have a entry here from Irfana Hussain, do you see that?

12   A    That's a LinkedIn recommendation, yes.

13   Q    Right.  And she rights here, "Justin is a fast learner

14   and knows how to find solutions to any challenge.  He's also a

15   natural leader and knows how to take the lead and work well

16   with any type of group.  I worked with him on creating

17   documents for training and he made sure that everyone on the

18   team was on the same page."  Did I read that accurately?

19   A    You did.

20   Q    Would you agree with that assessment?

21   A    Yeah.

22            MR. MACDOWALL:  Your Honor, I'll pass the witness.

23            THE COURT:  All right, redirect Mr. Slobin?

24            MR. SLOBIN:  Yeah, I have a couple questions.  Your

25   Honor, I'm going to put up Defendant's Exhibit 38.

1          (Pause in the proceeding.)

2              REDIRECT EXAMINATION OF JUSTIN ERIC NOVICK

3      BY MR. SLOBIN:

4      Q    Mr. Novick, do you remember this exhibit?

5      A    I do.

6      Q    Okay.  Who drafted this content?

7      A    This is from -- to the best of my recollection this was

8      from Bruce Henderson from the VA project team.

9      Q    Okay.

10     A    Collaboratively with myself for sure.

11     Q    Okay.  And who asked you to send this document, Exhibit

12     38?

13     A    I can't give you a specific name.  I apologize.  But not

14     myself.

15     Q    Not yourself.

16     A    No.

17     Q    Okay.  This is page 00904.  Who created this content?

18     Let me ask you, did you create this content?

19     A    No.

20     Q    All right.  Page 00905.  Did you create this content?

21     A    I do not believe so, no.

22     Q    Page 00906.  Did you create this content?

23     A    Absolutely not.

24     Q    What about 00907?  Did you create this content?

25     A    No.

1    Q    00908, did you create this content?

2    A    No. No.  This was the VA private team.

3    Q    00909, did you create this content?

4    A    I did not.

5    Q    Would you mind flipping through 00910 through --

6    A    I'm so sorry, which document number was this?

7    Q    So it's the same.  I'm sorry.  I'm looking at the bottom

8    of the pages.

9              THE COURT:  Hand the witness Defendant's exhibit,

10   right here.

11             THE WITNESS:  Thank you, Your Honor.

12             MR. SLOBIN:  Your Honor, do you mind if I'm up here?

13             THE COURT:  That's fine.

14             THE WITNESS:  Thank you.  Thank you, Your Honor.

15   BY MR. SLOBIN:

16   Q    So look at those.

17   A    Yes.  Thank you.

18   Q    As I was asking, Mr. Novick, look through 00910 through

19   the remainder of that document, 00915.  Did you create any of

20   that content?

21   A    No, sir I did not create any of this.

22   Q    Okay.  Let's look at Defendant's Exhibit Number 39.

23        (Pause in the proceeding.)

24   Q    I just want to make sure I understand something.  You see

25   this -- I didn't put it up.  See this Exhibit, Defendant's

1     Exhibit 39?

2     A     Yes.

3     Q     What's the date that you said this?

4     A     This is February 4th, of 2015.

5     Q     Okay.  And when did your employment end?

6     A     I believe March 13th of 2015.

7     Q     Okay.  So you essentially sent this about a month

8     before --

9     A     That's correct.

10    Q     -- at the end of your employment?

11    A     Yes.

12    Q     And are you aware of, I don't know, other emails similar

13    to this where you're providing thoughts and inputs?

14    A     Try me, yes, yes.

15    Q     All right.  Did they ever respond or agree to implement

16    anything that you provided to them?

17    A     No, not that I know of.  No.

18    Q     All right.  And I believe you said it fell on deaf ears

19    or something?

20    A     Yes.

21              MR. SLOBIN:  All right, Your Honor, I'll pass the

22    witness.

23              THE COURT:  Anything else?

24              MR. MACDOWALL:  Just briefly, Your Honor.

25               RECROSS-EXAMINATION OF JUSTIN ERIC NOVICK

1    BY MR. MACDOWALL:

2    Q    Mr. Novick, all those documents that you just went over

3    in Defendant's 39, documents that you said you didn't create,

4    but they describe content that you did train on at these VA

5    hospitals; isn't that accurate?

6    A    That is accurate, yes.

7    Q    Training material that developed over time at Shipcom

8    that you had to learn and learn how to communicate

9    effectively; isn't that accurate?

10   A    That is accurate.

11   Q    And you just testified that you sent that email in

12   February of 2015 right before you left Shipcom in March of

13   that year; isn't that true?

14   A    That is true.

15   Q    So you were still coming up with ideas to inform Shipcom

16   of to try to and improve processes right before you left your

17   employment; isn't that true?

18   A    Was trying to, yes.

19   Q    And that's despite the fact that you've testified that

20   the work that you were doing was nauseatingly mundane; isn't

21   that true?

22   A    Yes.

23   Q    Okay.

24           MR. MACDOWALL:  No further questions.

25           MR. SLOBIN:  One final question, Your Honor.

1              FURTHER REDIRECT EXAMINATION OF JUSTIN ERIC NOVICK

2     BY MR. SLOBIN:

3     Q    Is the reason that you were coming up with new ideas was

4     because it was nauseatingly mundane; is that correct?

5     A    That is absolutely correct.

6     Q    Okay.

7              MR. SLOBIN:  Thank you, Your Honor.

8              THE COURT:  All right, you may be excused.

9              THE WITNESS:  Thank you, Your Honor.

10         (Witness steps down.)

11             THE COURT:  Mr. Slobin, do you have your next

12    witness?  Or Mr. Sinkule?

13             MR. SINKULE:  Plaintiff's call Zahid Islam to the

14    stand.

15             THE COURT:  Okay.  Let me ask the jury if they would

16    like an afternoon break?  Yes.  All right we'll take a -- can

17    we do a 10-minute break?

18             All right, 10-minute break.

19             COURTROOM CLERK:  All rise.

20         (Jury exits courtroom at 2:07 p.m.)

21             THE COURT:  Okay, quick break.

22         (Recess taken from 2:07 p.m. to 2:16 p.m.)

23         (Audio begins abruptly.)

24             MR. SLOBIN:  -- so I just want it look it up.  I'm

25    happy to do it while we're in court, but I just wondering what

1    you're thinking.  We've got two witnesses left today.  I have

2    a feeling this time we'll finish with them, or come close.  So

3    I wanted to get your thoughts on --

4            THE COURT:  You think you'll finish your case today.

5            MR. SLOBIN:  I think that if Mr. Notestine doesn't

6    ask any questions, or very general questions -- no --

7        (Laughter)

8            MR. NOTESTINE:  I only have two questions.

9            THE COURT:  Okay.

10           MR. SLOBIN:  I think if -- at 2:30, at this -- I

11   think that we make there.  It'll be close.

12           THE COURT:  Okay.

13           MR. SLOBIN:  For sure.

14           THE COURT:  Well, my thought was we do the charge

15   conference after 5:00.

16           MR. SLOBIN:  Okay.

17           THE COURT:  So that we're ready tomorrow as soon as

18   your case -- you, you know, put on your case --

19           MR. NOTESTINE:  We just have one witness.

20           THE COURT:  Yeah, so --

21           MR. NOTESTINE:  Yeah, so I mean we should -- I mean

22   depending on when he gets done, we should be done by noon

23   tomorrow at the latest.

24           THE COURT:  Okay.  And I'm happy to give you a few

25   minutes between the time the jury leaves and we start the

1       conference to look over -- I mean --

2               MR. SLOBIN:  Okay.

3               THE COURT:  -- is 15 minutes enough or do you need

4       more time than that?

5               MR. SLOBIN:  Yeah, so I may step out for a little

6       bit to do some research that would think that they will add

7       in, but this is included in the questions, so.

8               THE COURT:  All right.  That's fine.  All right.

9               MR. SINKULE:  Do you want the witness in the

10      stand --

11              THE COURT:  Yeah --

12              MR. SINKULE:  -- or should we wait?

13              THE COURT:  -- we'll go ahead and --

14              MR. SINKULE:  Okay.

15              THE COURT:  -- swear him and get him seated.

16          (Witness sworn.)

17              UNIDENTIFIED SPEAKER:  Your Honor --

18              THE COURT:  Let me ask one more -- well, on the

19      issue of the charge conference, would you all prefer to do it

20      in the morning, but then if we start --

21              MR. SLOBIN:  I'd prefer to do it tonight.

22              MR. NOTESTINE:  I'd rather do it tonight too.

23              THE COURT:  Okay.

24              MR. SLOBIN:  Yeah, I just want to -- I'll be fine.

25      I'll step out when we --

1            THE COURT:  Okay.

2            MR. NOTESTINE:  We have Reddy kind of waiting.  I

3    mean do you think we're going to get to him today?  Can I tell

4    him to leave or --

5            MR. SLOBIN:  I really don't know how long these --

6            MR. NOTESTINE:  Okay.

7            MR. SLOBIN:   -- these witnesses are going to go.

8            MR. NOTESTINE:  We'll wait.

9            MR. SLOBIN:  Yeah, I wouldn't -- I wouldn't have

10   any --

11           MR. NOTESTINE:  I think it's pretty unlikely we'll

12   get to him but --

13           THE COURT:  I think it's unlikely too.

14           MR. SLOBIN:  Sure.

15           THE COURT:  Because you have two witnesses and we

16   have two and half hours.

17           MR. SLOBIN:  I'd say you're probably right, but --

18   and if we end early then we can just work a little bit on the

19   charge before --

20           THE COURT:  The jury probably won't mind going home

21   a bit early, so that's fine.

22           MR. NOTESTINE:  Yeah, so can I go ahead and tell

23   Mr. Rangis (phonetic) --

24           THE COURT:  Yeah.

25           MR. NOTESTINE:   -- to come tomorrow morning?

1           THE COURT:  Yes.  Okay.  Do you want me to let the

2     jury in before you leave, or after?

3           MR. SLOBIN:  I'll leave first.

4           THE COURT:  Okay.

5           MR. SLOBIN:  Thanks.

6           THE COURT:  Okay.  We're ready.

7           THE MARSHAL:  Okay?

8           THE COURT:  Yes.

9           THE CLERK:  All rise for the jury.

10          (Jury enters courtroom at 2:19 p.m.)

11          THE COURT:  Be seated.  All right.  You may proceed,

12    Mr. Sinkule.

13          MR. SINKULE:  Thank you.  Plaintiffs call Zahid

14    Islam to the stand.

15          THE COURT:  Yes, Mr. Islam is on the stand.  Have

16    you been sworn, Mr. Islam?

17          THE WITNESS:  Yes.  Yes, Your Honor.

18          THE COURT:  All right.  Proceed.

19              DIRECT EXAMINATION OF ZAHID ISLAM

20    BY MR. SINKULE:

21    Q    Hi there.  Good afternoon.

22    A    Good afternoon.

23    Q    Can you please state your full name?

24    A    Zahid Islam.

25    Q    And, Mr. Islam, where do you currently live?

1    A    Orlando, Florida.

2    Q    How long have you lived there in Florida?

3    A    In Florida the past 16 months, and prior to Shipcom six

4    years.

5    Q    Okay.  And are you from there -- I guess you're not from

6    there originally it doesn't sound like.  Right?

7    A    No, I'm from the Dallas area.

8    Q    Okay.  And --

9    A    Allen.

10   Q    I'm sorry.

11   A    Allen.

12   Q    Allen.  Okay.  And how long have you -- I'm sorry, how

13   did you end up in Florida?

14   A    Went to college in Tallahassee.

15   Q    And where did you go to school there?

16   A    Florida State.

17   Q    All right.  Did you obtain a degree at Florida State?

18   A    Yes.  I got a bachelor of science in finance and another

19   in real estate, the bachelor in 2011.

20   Q    All right.  And are you familiar with Shipcom?

21   A    Yes.

22   Q    And how so?

23   A    I worked for them between July 2014 and March -- no,

24   sorry, not March, April 2015.

25   Q    Okay.  And how did you come to apply for a job at

1    Shipcom?

2    A    So I had actually met the woman who was either the CFO,

3    or as they're saying, the VP of Finance.  I'm networking with

4    them in Houston, and I was approaching a plethora of people

5    because I was looking for something specific in audit, and I

6    had asked her -- I told her what I was wanting and she told me

7    that should didn't have exactly an audit position, but there

8    was a need in something within the realm of accounting,

9    accounts payable, that could help me get to -- would be a good

10   starting point for my trajectory into internal audit and fraud

11   examination later.

12   Q    Okay.  And then I take it you applied for the job at

13   Shipcom?

14   A    Correct.

15   Q    And what job was that specifically that you applied for,

16   if you recall?

17   A    Accounts Payable Analyst.

18   Q    Okay.  Well, let's take a look at Plaintiff's Exhibit

19   Number 17.

20        (Plaintiff's Exhibit No. 17 identified.)

21   BY MR. SINKULE:

22   Q    Have you seen this document before today?

23   A    Yes.

24   Q    And what is this?

25   A    It's the application that was relayed to me.

1   Q    Okay.  And if you look down on the left hand side, the
2   position desired, position applied for it says, Accounts
3   Payable here.  Do you see that?
4   A    Yes.
5   Q    And did you type that in or did someone else type that
6   in?
7   A    I don't recollect.  I think -- I know my handwriting's
8   there, but the --
9   Q    This is your handwriting?
10  A    Huh?
11  Q    This is your handwriting?
12  A    Yes.
13  Q    Okay.  But in any event Accounts Payable Associate is the
14  position that was applied for.  Correct?
15  A    Correct.
16  Q    And I assume, sir, that you interviewed for the position
17  you applied for.  Is that right?
18  A    Yes.
19  Q    And tell us about the interview or interviews you had in
20  connection with applying for that position.
21  A    So one interview I had was with somebody who went by MT,
22  who's here today, Mustafa is his first name, and he -- I
23  believe he was the VP of the company, and he was an executive
24  and he asked very broadly about my educational background, why
25  I wanted to work for Shipcom, what I was looking for.  He's

1    essentially gauging me, and I imagine, you know, whether or

2    not he liked my personality, and he said that there was, you

3    know, a position within Finance that they sorely needed to

4    fill, which is something that the VP of Finance, when I met

5    her at the network convention she had said, that's the exact

6    claim that there was something there that they needed to fill

7    within Accounts Payable.

8    Q    And just so I'm clear, had you already applied for the

9    position by the time you interviewed with MT?

10   A    I believe so.

11   Q    Okay.  And so was the interview with MT the first

12   interview that you had?

13   A    If my memory serves me, it was the first or second.

14   Q    Okay.  Well, in addition to the interview with MT, it

15   sounds as though there was at least another interview.  Is

16   that right?

17   A    Yes, there were multiple.

18   Q    Okay.  Tell us about those.

19   A    Another interview I had was with the VP of Finance/CFO,

20   Rene Carnes, alongside somebody named Michael, at the time he

21   was the Accounting Manager.  And they really got into the

22   minutia of the role, and they said, for starters, they were

23   elucidating the ERP software which was the VA's -- they

24   claimed the VA's preferred ERP software, Delta TCS Premier

25   (phonetic), which both acknowledged was very antiquated and

1    archaic and gave them difficulty.  It lent itself to a lot of

2    manual processes, but they were saying that that's something

3    that they're -- the team is assessing together.  And they were

4    also saying that they need to fill an accounts payable

5    position because the company had grown astronomically after

6    corralling the VA contract and they needed somebody to -- they

7    just needed somebody to be there in the Accounts Payable

8    position.

9    Q    And I want to break -- one thing you said now just a

10   little bit, because you're speaking about something that I

11   don't know a lot about.  And you said ERP software.  So can

12   you tell us a little bit about what ERP software is?  Is that

13   an acronym?  It sounds like it stands for something.

14   A    Enterprise Resource Planning.

15   Q    So what is the ERP software, what does it do, what's it

16   for?

17   A    Well, it's similar to Oracle, it's an SAP software and

18   that's in effect, and it's supposed to streamline and automate

19   so many functions within Finance and Accounting.  For example

20   it should have ideally like within Accounts Payable the

21   functionality to identify, to book payments, and able to post

22   journal entries, things of that nature automatically.

23   Q    Okay.

24   A    Along side being a repository for --

25   Q    A repository for what?

1    A    Like invoices, et cetera.

2    Q    Okay.  So in addition to the interviews that you've

3    mentioned, were there any others that you had?

4    A    Yes.

5    Q    Tell us about those, please.

6    A    I had another with the CEO himself and the VP of Finance

7    was in the room as well.  And he asked just very broadly why I

8    wanted to work for Shipcom, what do I bring to the table, and

9    that he just was saying that -- I mean, you know, people need

10   you, he's expecting people to come in excited, full of vigor,

11   you know, it's an exciting time, the company just corralled a

12   major contract and he was also really honing in -- he asked me

13   about my educational background, he asked my GPA and he was

14   really honing in on that.  And the VP of Finance was just

15   saying that, you know, He's very academic.  And that was it,

16   it was just very high level and broad.

17   Q    Okay.  And so were there any other interviews besides the

18   ones you've already mentioned?

19   A    There was another one with another executive, I think his

20   name was Ray, although this might have been after I had gotten

21   the offer, so I'm not sure about -- I'm trying to remember

22   because I know at the deposition there was -- I remembered it

23   as an interview but -- technically it was but I don't if it --

24   would categorize it as one because I don't know if it was

25   before or after the offer.

1          But he was just very much crammed with pomp and

2     circumstance, very excited about the VA contract and that the

3     company was staffing up and growing, and he did make the

4     comment that -- he said, I know you're going to be -- you had

5     applied to something in finance doing accounts payable and he

6     asked me, Is that really what you want to do?  And I told him,

7     I mean that's a starting point to where I want to get to.  And

8     then he said something along the lines of, If you don't wind

9     up liking it, then you can come on over and work for me.

10          And then at the time I could comprehend that because

11     my understanding was he was an engineer and I didn't know

12     what -- like as far as working with him like what I would do,

13     which was in alignment with my -- with what I wanted to do

14     with my educational background and experiences.

15     Q    Do you have any educational background in engineering?

16     A    No.

17     Q    Okay.  And so during any of these interviews was there a

18     discussion of what you would be doing if you got the job?

19     A    Yes, when I --

20     Q    High level or low level?

21     A    Well, wen I had the interview, I would say all throughout

22     it was all focused on high level based on knowledge that

23     accounts payable function had to be filled in.  And then the

24     interview with the VP of Finance and Michael, the Accounting

25     Manager at the time, they really delved into the minutia and

1    the details of, you know, the challenges of they need more

2    structure but they need somebody actually just reducing the

3    backlog, getting the payables up to speed.  And then they did

4    indicate that, you know, if somebody could come in and that

5    then things would be carried out scrupulously.

6    Q    Okay.  And after the series of interviews you were

7    offered the position.  Is that right?

8    A    Yes.

9    Q    Okay.  And you accepted?

10   A    Correct.

11   Q    All right.  Let's look at Plaintiff's Exhibit 18.

12        (Plaintiff's Exhibit No. 18 identified.)

13   BY MR. SINKULE:

14   Q    Mr. Islam, have you seen this document before?

15   A    Yes, that's the offer letter.

16   Q    Okay.  And if we look at the first section, the Number 1,

17   it says, Title, Duties, Responsibilities and Performance

18   Measurements.  Do you see that?

19   A    Yes.

20   Q    It says, Your position -- just -- well, that your

21   position will be Financial Analyst with effect from July 18,

22   2014.  You shall perform all duties, services and acts as

23   directed by your supervisor.  Did I read that correctly?

24   A    Correct.

25   Q    Okay.  So this document mentions a different title, it

1       mentions the title of Financial Analyst, and in your

2       application there was the title you applied for of Accounts

3       Payable.  Is there a difference between the two positions to

4       your knowledge?

5       A    Pretty big distinction between the two and it's worth

6       mentioning that I did approach Rene about this, and I think

7       somebody -- I think it was just Rene, but I told her that -- I

8       mean the offer letter says Financial Analyst.  I'm not going

9       to be doing any sort of forecasting or financial modeling or

10      budgeting, am I, because from what I'm seeing on the offer

11      letter, everything is going to Accounts Payable, invoices,

12      that of an AP clerk.  So to me in my mind it was a misnomer.

13      Q    Okay.

14      A    But it just -- it stood that way.

15      Q    And when you asked her this question what was her answer?

16      A    She said she saw it and she was surprised by that as

17      well, but she said that maybe down the line like after I had

18      helped clean up the AP mess and just work on bringing the

19      payables up to speed I could potentially pivot, or move up to

20      something of a Financial Analyst if something like that were

21      to open.  But as it stood we were just going to stay with that

22      position, but it was kind of innocuous to me at them time.

23      Q    Okay.  And where did you end up working for Shipcom?

24      A    Within the Finance Department, it was on the fifth floor

25      at the corporate office in Houston.

1   Q    Okay.  And so we've heard a lot of testimony yesterday

2   and today, especially today, about the other Plaintiffs

3   traveling from site-to-site.  Was that the same sort of setup

4   that you had?

5   A    No.

6   Q    Okay.  So you mentioned you worked in Houston.  Did you

7   work anywhere other than in the Houston office for Shipcom?

8   A    No.

9   Q    All right.  And did you have an office at Shipcom?

10  A    No.

11  Q    Okay.  Where were you situated within the building?

12  A    In a cubicle.

13  Q    Okay.  You mentioned that you -- I believe you mentioned

14  you reported to Ms. Carnes.  Is that correct?

15  A    Correct, she was -- on paper that she is who I was

16  reporting to, but we had a couple of leads, we had a

17  contractor who I believe was as Senior Accountant, his name

18  was Tim Shaffer (phonetic).  And prior to him there was

19  another contractor named Rebecca who was re-training me on

20  everything because I -- outside theoretical education that I

21  had from FSU along the lines of accounts payable and those

22  processes I didn't have on-the-job exposure to and so Rebecca

23  was training me.

24          And then she left, Tim was there, and then they

25  brought in Michael I believe, the Accounting Manager, who I

1   referred in an interview.  He left the day I was hired.  So

2   they brought in somebody at some point shortly thereafter I

3   believe named Brandy Lockwin Moore (phonetic).  She was the

4   Accounting Manager.  So I had a couple of leads.  There were

5   multiple layers of authority above me that I was reporting to,

6   who were coaching me.  I didn't have any direct reports and

7   ultimately I was also reporting to Rene, VP of Finance.

8   Q    Okay.  So you mentioned Tim and Rebecca were contractors.

9   Tim's last name, do you recall?

10  A    Shaffer, Shofer (phonetic).

11  Q    Okay.  And you may have said that.  And then Rebecca,

12  what is her last name?

13  A    I don't remember.

14  Q    All right.  And you said they were contractors.  Does

15  that mean they did not -- they were not considered employees

16  of Shipcom?

17  A    Correct, they were 1099 workers.

18  Q    Okay.  And tell us again, Mr. Shaffer, what was his --

19  did he have a title of any sort even though he was a

20  contractor?

21  A    I believe he was essentially working as a Senior

22  Accountant, I think that's what they had referred to him as,

23  because he was the one really doing the reconciliations

24  between the cash account and the bank statements, and just

25  making sense out of a suspense account that they had, which to

1    dispel some light, this suspense account was supposed to be a

2    temporary measure where you have unclassified credits,

3    unclassified debits.  But they didn't -- they couldn't make an

4    sense of the amounts and the invoices that were there because

5    there were so many invoices that were lost or misplaced, there

6    are hard copies and that's why they brought me in, to

7    basically find those invoices, scan them, and anyway, got off

8    topic.

9    Q   We're going to -- yeah, we're going to get into your

10    duties in just a minute, but so we were talking about

11    Mr. Shaffer, you said he was more acting sort of as Senior

12    Accountant.  What about Rebecca, do you know what -- did she

13    have a title or was she sort of acting in a role?

14    A   It was the same as his, they were basically in the

15    same -- at the same level.

16    Q   Okay.  And then I know that you said later on a lady by

17    the name of Brandy Moore joined the company.  Is that right?

18    A   Yes.

19    Q   And did Brandy join the company as an employee of

20    Shipcom?

21    A   Correct.

22    Q   And what was her role within the company?

23    A   Accounting Manager.

24    Q   Okay.  All right.  And it's your testimony as I

25    understand it that you reported, or assisted Mr. Shaffer,

1   Rebecca and Ms. Moore during your employment with Shipcom.

2   A    Correct.

3   Q    Okay.  Did you and Ms. Carnes -- I know you said you

4   reported to Ms. Carnes on paper directly.  Correct?

5   A    Yes.

6   Q    Okay.  And did you also do some work with her in your

7   position?

8   A    Yes, she would ask me for weekly updates and some of the

9   goals that we have usually at the start of each week,

10  sometimes it would be like biweekly, but I would say it was

11  mostly weekly that we would meet.  And again, I was a raw -- I

12  came in with fresh eyes not having any exposure to this and

13  very green, so she I mean was just trying to do whatever --

14  because people were juggling a plethora of duties.  It was

15  very much a start-up environment so she wanted to make sure

16  that I was getting ample guidance.

17  Q    Did you work with Ms. Carnes the entire time you worked

18  for Shipcom?

19  A    Eight of the nine months.  My final month there there

20  was -- they brought in another person to fill in for Rene.

21  Q    Okay.  And you say fill in for Rene.  Who was that

22  person?

23  A    Her name was Shuba (phonetic), something with an I.

24  Yeah, her name was Shuba.

25  Q    And was -- did Shuba take the place of Ms. Carnes?

1    A    Right.

2    Q    Okay.  So did you then begin reporting to Shuba?

3    A    Yes.

4    Q    All right.  So let's talk about your duties.  You started

5    going into a couple of them, but just tell the ladies and

6    gentlemen of the jury what it was that you were doing for

7    Shipcom in the -- in your position.

8    A    The Billing Department essentially, so just receiving

9    invoices and bills from the vendors, also making  -- just

10   receiving other information from the vendors like 1099 forms,

11   making sure that these are authorized vendors and suppliers,

12   maybe just recording the transactions, recording the invoices

13   and just kind of an -- I'm surprised that there were just

14   stacks of invoices, hard copies laying around.  I just had

15   them, I wasn't receiving for several months physical hard copy

16   invoices.

17           I had a trusty friend that was letter opener that I

18   used often just to -- it was very archaic, I mean I was

19   getting mail, mailed invoices, it wasn't electronic, and the

20   finance team under the guidance of Rene we had decided to work

21   with the IT team on the 6th floor to establish a vendor

22   portal.  Now the IT team would establish the vendor portal,

23   but we were encouraging them to do so as a proprietary portal

24   so that once all the invoices were scanned we could then have

25   some kind of paper trail and then audit the whole process in

1    the event the federal government auditors would examine us.

2           But so there was that, just recording transactions.

3    It was just a lot of drudgery between the scanning.  Just

4    really looking at if -- again, because Dowltec (phonetic)

5    didn't have a feature where it could capture the payments, I

6    had to look to see if there were duplicate payments in there,

7    making sure that we weren't being over-charged or -- also

8    making sure that the payments that we were sending that are

9    authorized, getting approval from just across the board from

10   every department, from every person.

11          I could -- I did not have the latitude or the

12   autonomy to just pitch out payments.  I had to literally go to

13   business process owners, whether it was he supply chain folks,

14   the engineers, upstairs, whatever the case may be I had to get

15   approval from them.  And at the same time I was taking calls

16   from -- really from the first week that I started, from very

17   irate customers, meaning my customers, the vendors, the

18   suppliers as soon as I started.  I mean I was the point of

19   contact so they typically were livid, but, you know, they

20   weren't getting paid, so many days had gone by, so almost

21   routinely they were -- that was, you know, somebody putting on

22   a conniption, but --

23   Q    So how often were you having to make -- take calls or

24   make these calls to the vendors?  Was it daily, was it weekly?

25   A    Probably every other day.

1    Q    Okay.

2    A    But most of -- for the most part the first -- I don't

3    remember how long Rebecca was there, I know she was there for

4    a few months, she was really coaching me on what an AP person

5    does, just showing me the ropes, what I need to do, the

6    importance of getting the invoices handed in, so everyone has

7    a clear visibility of where they are and just a clear

8    visibility of the cash flow in the company and getting them

9    locked in the system.  So she was really training me as far as

10   scanning them in, following a really -- they had like a

11   preferred naming convention for naming the piles of the

12   invoices.

13        So there was just a lot of training from her

14   efforts, alongside her -- alongside somebody from Procurement

15   named Nancy who was telling me how to deal with vendors.  So I

16   was really getting guidance from just across the board because

17   I was very raw coming in with fresh eyes, they were just

18   telling me, Don't take it personally, just be who you are,

19   just be very cordial and try to placate their situation, try

20   to mend the fence with them because up until that point they

21   were getting disregarded.

22   Q    You testified a moment ago that you were assisting at

23   times Mr. Shaffer and Rebecca.  What types of issues or

24   responsibilities were you assisting those two people on?

25   A    Well, they were working on -- their focus I believe was

1    on reconciling the cash account with bank statements, and they

2    would convene with her -- they would convene with me often and

3    just give me pointers on when I was to meet with the lady who

4    was actually sending out the payments to the vendors, whether

5    it was through wire transfers or signing checks, whatever the

6    case may be.  Just really coaching me on what to say and --

7    because it was a little intimidating as far as who this

8    particular person was, and she was really -- but so they would

9    really coach me on that.

10          And they would ask me specific questions on the

11   invoices, procurement and what else, so it was all very inter-

12   dependent, but the leads would ask me to double-check the

13   invoices with the purchase orders and the purchase order

14   was -- is basically like the first official offer from the

15   buyer to seller that delineates the terms of the arrangement

16   whether -- like the quantities and the price, so they wanted

17   me to make sure that those matched, like the invoices matched

18   the POs.

19   Q    All right.  Let's take a look at Plaintiff's Exhibit 19.

20         (Plaintiff's Exhibit No. 19 identified.)

21   BY MR. SINKULE:

22   Q    Have you seen this document before, Mr. Islam?

23   A    Yes, I saw it in the deposition.

24   Q    Okay.  And did you ever see this document when you were

25   employed by Shipcom?

1    A    No, but we sell -- but --

2    Q    Okay.  So this, it says it is a -- well, at the top it

3    says, Position:  Accounts Payable Analyst.  Do you see that?

4    A    Yes.

5    Q    Okay.  And let's just take a look at some of the content

6    here.  So if we look at the first paragraph it says, The

7    Accounts Payable Analyst, AP Analyst, compiles and maintains

8    accounts payable records.  Is that something you did in your

9    position with Shipcom?

10   A    Yes.

11   Q    It goes on to say, The AP Analyst ensures all

12   transactions are complete and there are no gaps in the process

13   or documentation.  If there are any gaps, the AP Analyst

14   should be able to act independently and ensure requisite steps

15   are taken to fill in and missing document or process.  Is that

16   something that you did in your position?

17   A    Yes, for the most part.  But at the same time they were

18   independent, I mean, again, I was getting tremendous guidance,

19   like whenever -- you know, while everyone is busy -- I mean

20   their -- part of their job was to train me, so whatever

21   training I got from them.  They would coach me on that, so as

22   far as independence, I mean I would say it was adequate, but

23   it wasn't -- it's not like I was, you know, completely acting

24   by myself, or completely independently.

25   Q    Okay.  And what I've heard you testify to so far is

1    that -- I haven't heard you say anything about independence so

2    far.  I've heard you to say that you'd been -- you were

3    assisting people, Mr. Shaffer and Rebecca.  Is that accurate?

4    A    Yes.

5    Q    Okay.  Let's look at the last sentence in this first

6    paragraph.  It says, The incumbent will be an individual

7    contributor running and managing the AP function.  Is that

8    something that you did?

9    A    Yeah, I mean essentially I was the AP person.

10   Q    Did you run and manage the AP function?

11   A    I don't know about managing, I mean I was really being

12   guided and I would often defer to the leads and just convened

13   with Rene as well.  But at some point, I would say late in my

14   short stint with Shipcom, again, I was also -- I mean I wasn't

15   getting as much training, but I wouldn't say I was -- I mean I

16   was carrying out the AP Clerk tasks essentially.

17   Q    Let's look down below in the next section,

18   Responsibilities and Duties.  Let's just look at some of these

19   bullet points.  The first bullet point says, Compiles,

20   processes and maintains accounts payable records.  Is that

21   something you did in your position?

22   A    Yes.

23   Q    The next bullet point, Verify approval on all invoices

24   and check requests.

25   A    Absolutely, every day.

1   Q   Okay.  And what does that mean to verify approval on all
2   invoices and check requests?
3   A   Just ensure that the invoices that we're going to pay are
4   authorized and these aren't going to turn out to be
5   unauthorized disbursements to the wrong vendors, so I would
6   have to meet with folks across the board, across the company
7   both meeting at the Houston office and just meet with them and
8   say, hey, like are we authorized to pay these folks, are you
9   familiar with these charges, and things of that nature, so I
10  would -- again, like I couldn't just -- you know, I don't
11  know, you know, just send out a payment.
12  Q   So were you approving the invoices and check requests?
13  A   Was I approving them?
14  A   Yes, were you doing that in your position?
15  A   No, I was retrieving -- I was gathering approval from the
16  necessary ones.
17  Q   Okay.  Let's look at the next bullet, it says, Coding
18  invoice.
19  A   Yes, we had to code counts, travel counts, a cheat sheet
20  that I remember Rebecca gave me early on that I don't know if
21  the former Accounting Manager put together, but it's something
22  that I adhered to and it was simply whatever the nature of the
23  work was as it pertains to what we're being billed for, I
24  would correlate it with that code.  It was just simply
25  matching.

1    Q    The next bullet point reads, Able to prepare and process

2    checks for multi-companies.  Did you do that in your position?

3    A    Yes, that simply just means that I was being sent the

4    invoices and I was opening them and logging them.

5    Q    Okay.  And what does process checks mean?

6    A    Well, when I say -- when I see process checks that is I

7    think of looking at the checks and -- or the bills rather and

8    juxtaposing that with what's on the purchase order and then

9    just recording the transaction in the system.

10   Q    Were you writing the checks?

11   A    No, I was not writing the checks.

12   Q    All right.  The next bullet point says, Update and

13   maintain vendor database.  Is that something you did in your

14   position with Shipcom?

15   A    I think that's referring to the vendor master file, that

16   was already built in to Deltek and I would update it.

17   Q    Okay.  The next bullet, Able to process and enter 200 to

18   300 invoices per week.  Is that something you did?

19   A    I wouldn't say it was weekly, it was probably more

20   biweekly or monthly because we -- man, that's a lot, at least

21   when I was working it was.  It heavy volume but that -- it was

22   not weekly, it was more so biweekly, monthly.

23   Q    Okay.  The next bullet point reads, Audits and verifies

24   expenses reports.  Did you do any auditing from your position?

25   A    No, I was not an auditor.

1    Q    Okay.  Did you do any verifying of expenses reports?

2    A    Expense reports, no.  I believe that's something that

3    Tim, I'm not so sure about Brandy, but I know the contractors,

4    they were working on the expense reports alongside the

5    reconciliations, and if they wanted to pull me in and just

6    look at a couple of things or assist them, then I would assist

7    them.  But while I was working, I wasn't -- in terms of

8    auditing I was -- you know, they -- like I said, I was told

9    that they didn't have an audit position.  So I was not

10   auditing, and I was not working with the expense reports.

11   Q    Okay.  The next bullet reads, Reconciles vendor

12   statements.  Is that something you did in your position?

13   A    No, that's something that really Tim was doing for the

14   most part, and if he needed assistance or something along the

15   lines of smashing things from an invoice or just clarifying

16   things while he's looking at the vendor statements, I was just

17   giving some clarity as far as if he had specific questions

18   about some of those charges or on specific invoices.  But I

19   wasn't doing the actual reconciliation.

20   Q    Okay.  The next bullet point says, Ability to process and

21   follow up on rush items.  Is that --

22   A    Yes.

23   Q     -- something that --

24   A    Yes.

25   Q    Okay.  Can you give us an example, what is a rush item

1   that you might have followed up on and processed.

2   A    Well, the first thing that comes to mind is, and this was

3   very befuddling, the person was sending out the wire payments

4   and just writing the checks and sending out the payments to

5   the vendors.  Sometimes she would just -- often she would just

6   run by my cubicle, and be like:  We need this person to get

7   paid ASAP, record the transaction, code it, have it ready to

8   go for me.

9          And it just put me in a really weird position

10  because I didn't have the time to digest what was going on or

11  if this was authorized.  So I would have to -- you know,

12  initially I was just following directives but it was something

13  where I would defer to the leads, to Tim and also Brandy, and

14  Rebecca early on, and we would just say, Hey, on the breaks,

15  we need to actually examine what's going on here.  And so

16  that's what comes to mind when I think of rush items.  And

17  then alongside it, just taking calls from vendors and them

18  asking for like specific updates at a moment's notice.

19  Q    All right.  The next bullet point reads, Maintains

20  account payable files.  Is that something you did in your

21  position?

22  A    Yes.

23  Q    The next bullet, 1099 preparation.  Is that something

24  else you did?

25  A    That goes back to updating and maintaining the vendor

1    database.  So that's just retrieving -- not retrieving, just

2    gathering 1099 forms from the vendors and just logging it.

3    That's all under the dominion of an Accounts Payable Clerk.

4    Q    Okay.  And the last bullet, Special projects as assigned,

5    it's kind of broad.  And did you work on additional projects

6    as needed?

7    A    Well, there was one assignment that Rene, my -- the VP of

8    Finance, she had encouraged me to get together -- I mean this

9    was after I approached her about certain complaints on lack of

10   structure throughout the company and just very unscrupulous

11   regard for what we were trying to do in Finance.  So she asked

12   me to put together a policy and procedure and I had various --

13   I had a few specific complaints and at her behest she just

14   said, Hey, suck it up, it's -- any change you seek, put

15   together -- if you really want to impress the folks here,

16   then, you know, just put together a policy and procedures from

17   what you've learned.

18        And by that time I was doing some side reading on

19   audit and insurance at home and -- because that's where my

20   interest lied, and in this case on what I had gathered there

21   and from my experiences late in the year, this was December

22   2014, I had drafted a policy and procedure and it went through

23   a couple of iterations.

24   Q    Okay.  And how long did it take you to put the policy and

25   procedure together that Ms. Carnes asked you to put together?

1    A    So it took a couple of days, not the entire day each day,

2    but it wasn't -- I was very happy with it, but again, it was a

3    couple of days.  To me that was very much a one-off.  It

4    wasn't what my job was predicated on, so in the context of

5    nine months of working there, I worked on that for about 32

6    days.

7    Q    Okay.  Mr. Islam, were there other individuals at Shipcom

8    who were working in the same position that you were in?

9    A    No.

10   Q    And did you have the same job at Shipcom throughout your

11   employment there?

12   A    Correct.

13   Q    And did you have the same job duties the entire time you

14   worked for Shipcom?

15   A    for the most part up until the one-off policy and

16   procedure that I was encouraged to assemble.

17   Q    Okay.  What would you say your primary job duty for

18   Shipcom was?

19   A    Reducing the backlog of invoices and getting the payables

20   up to speed.

21   Q    Okay.  Did you supervise anyone at Shipcom?

22   A    No.

23   Q    All right.  And just generally speaking, what was your

24   work schedule like at Shipcom?

25   A    Well, I mean as I -- early on as I understood it, it

1     should have been 8:00 to 5:00 according to the application,

2     but quickly found out that that wasn't the case.  And I had to

3     come into work on weekends because to give me some perspective

4     I had to find stacks of invoices, hard copies that were

5     printed out that were neglected for all intents and purposes

6     and scan them and at the same time simultaneously be expected

7     to process invoices that were coming in on a daily basis.  So

8     it was an uphill battle from the outset.

9     Q     And did you ever complain to anyone at Shipcom about your

10    work schedule?

11    A     Yes.

12    Q     To whom did you complain?

13    A     The VP of Finance, Rene, a man in this room, Nakul

14    Goenka, and somebody else, I think he name was Erfan Chadbury

15    (phonetic).

16    Q     Okay.  And just what was -- in general what was the

17    nature of your complaint to those three individuals?

18    A     Attrition, atrophy, burnout, feeling misled as far as my

19    understanding of -- I mean I was very much looking forward to

20    learning as much as I could and coming and trying to help a

21    big problem.  But I just felt misled in terms of like I didn't

22    think that it would be like this where I would have to come in

23    on weekends.  And that's something I did on my own accord,

24    working on weekends.

25            But even on week days, just to get things into the

1    system and go backwards and continue to find even a months
2    progressed there were stacks of invoices that other folks had
3    in a different department that should not have been with them
4    that I had to go and ask about and retrieve and scan.  There
5    was just -- I had just complained that there was, from my
6    perspective a culture of lawlessness that was really hindering
7    and preventing me from doing my job to the best of my ability.
8    It was an encumbrance, so it was something that I complained
9    to them about, complained about stress, once again, attrition.
10   I mean this job, it was not -- like I thought it was giving me
11   a great insight into what lurks beneath in terms of accounts
12   payable because I ultimately wanted to get into internal audit
13   and file examination.
14          And you have to be acutely aware of -- on the AP so
15   much fraudulent activity can transpire there, so if I could
16   get a good understanding, so I got into that.  But, however, I
17   mean it was something that -- this isn't a role that would
18   be -- is a reflection of your mental horsepower, but there was
19   just so much volume.  And I even had -- this was something
20   that I called Nakul about.  I had a -- I don't mind telling
21   you that I had a panic attack and I don't know if this was
22   dehydration, but I was working until -- I mean there were some
23   nights I worked until like nine o'clock, past 9:00, 10:00.
24   But this one night it was only up until 8:00, but I came home
25   and I just collapsed.

1          And I talked with Nakul about it, and he asked me,

2     Well, did you talk to your manager, you should talk to her.

3     And then I just, you know, I complained to her and I was like,

4     You know, I should be getting, you know, some kind of

5     recognition or overtime, and she came back and said that,

6     You're a salaried employee and --

7     Q    When was that conversation, do you recall?

8     A    This was late in the year, late in 2014.

9     Q    Okay.

10    A    I don't recall when exactly.  But she, you know,

11    underlined it, her understanding was that it was black and

12    white, I was salary.  I had the understanding as well that my

13    client is salaried, exempt, et cetera.  And I wasn't in any

14    case.  There were folks across the company we're dealing with

15    the same thing, and we just have to rally together.

16         And she was just under tremendous -- she was just

17    under a lot of pressure because I think how she to -- kind of

18    being the finance person she had to -- you know, it was very

19    much like a startup atmosphere and she had to lead in a manner

20    that would facilitate like an automatic level of production

21    from everyone.  And to answer your question, it was late in

22    the year.

23    Q    And did you have any other conversations with Ms. Carnes

24    or anyone else about overtime?

25    A    So Ms. Carnes came to me and she said that she had a

1    discussion with somebody who sat next to her, I think he was

2    in Compliance, and they had a meeting and she told me that --

3            MR. NOTESTINE:  Your Honor, I think that's hearsay,

4    hearsay within hearsay, and unless he can identify that

5    person, it's not an admission by a party opponent.

6            THE WITNESS:  His name was Roger Barton.

7            MR. SINKULE:  And we believe that it's an admission

8    by a party opponent.

9            THE COURT:  Was Mr. Barton an employee of Shipcom?

10        (No audible response.)

11           THE COURT:  Mr. Barton is an employee of Shipcom?

12           MR. NOTESTINE:  I don't know.

13        (Pause in proceedings.)

14           MR. NOTESTINE:  He was a high level.

15           THE COURT:  All right.  I'll allow it.

16           THE WITNESS:  So she told me that he was also

17   wanting to believe that my role, alongside others, should, in

18   fact, be non-exempt.  And when she told me this, I was like,

19   So that means the door is open, I should be getting overtime.

20   And she's like, I don't know, it's still being discussed.  But

21   he was wanting to believe that given my duties and what I had

22   been doing, he even saw me a couple of times working late, and

23   he was like, Wow, man, you're still here.  You know, take it

24   easy, go home.

25           But so in my mind, you know, a light bulb went off

1  and like, Wow, maybe I can get some overtime.  But it

2  didn't -- the ball didn't roll that way and I was just very

3  frustrated so I thought -- I asked her, I mean I'm putting in

4  a Herculean effort, I should at least get a raise.  And then

5  that's when -- and then I had a few other complaints about

6  specific things, the structure where the whole reason I was

7  hired into Accounts Payable was to -- so that there would be

8  an audit, like a three-way match in place so Procurement would

9  be putting out the purchase orders, which delineates what the

10  company ordered.

11       MR. NOTESTINE:  I believe the witness is getting a

12  little far afield, I want to lodge an objection to the

13  narrative, make sure it's lodged.

14       MR. SINKULE:  Yeah, let's --

15       THE COURT:  Sustained.

16  BY MR. SINKULE:

17  Q     -- streamline things --

18  A     Okay.

19  Q     -- so we can be a little more efficient.  So let's -- if

20  you'll try to answer just what I ask you --

21  A     Okay.

22  Q     -- just so we can be as efficient as possible time-wise.

23  The conversation that you had with Ms. Carnes where she

24  indicated to you that Mr. Barton had indicated that he

25  believed you should be getting overtime, when was that

1    conversation?

2              MR. NOTESTINE:  I would object, it mischaracterizes

3    his testimony.

4              THE WITNESS:  I don't think it was late in the --

5              MR. NOTESTINE:  Wait, wait, wait.

6              THE COURT:  We need a ruling.  Repeat the question.

7    BY MR. SINKULE:

8    Q    Let me start the question and ask a question that might

9    be a little better.  Okay.  So the conversation that you had

10   with Ms. Carnes, the second conversation about her

11   conversation with Mr. Barton, when did that occur?

12   A    That was also late in the 2014.

13   Q    Okay.  How long after the first conversation you had with

14   Ms. Carnes about overtime?

15   A    It was not long, it wasn't more than a couple of weeks.

16   Q    Okay.  And you worked for Shipcom until when?

17   A    April 2015.

18   Q    Okay.  And you mentioned a bit ago, you testified a bit

19   ago that you were paid a salary.  Were you paid anything other

20   than a salary during your employment with Shipcom?

21   A    No.

22   Q    Okay.  So Shipcom never paid you overtime after you had

23   these conversations with Ms. Carnes?

24   A    No.

25   Q    All right.  Did -- you mentioned Mr. Goenka, having

1  conversations with him.  Setting aside those conversations did

2  Mr. Goenka ever observe you performing your duties?

3  A    We worked on one or two, I wouldn't say assignments but

4  he wanted to ask me for some clarification on an invoice

5  regarding -- I forget the nature of it but there was a vendor

6  who was very livid on not getting paid for the services that

7  they had professed to provide, and he was asking me to

8  ascertain and just determine whether or not they actually --

9  this contractor or subcontractor actually did the work, and in

10  my mind I think at the time I think I was wanting to believe

11  that from what I had seen in the invoices and the email

12  correspondence and everything that they had, but it was just I

13  think one or two assignments.  But other than that, we didn't

14  work routinely.

15  Q    Okay.  And then what about Reddy Cherukupally, did he

16  ever observe you performing your job duties?

17  A    No.

18  Q    Okay.  Mr. Islam, would you say that you exercised

19  discretion in performing your job duties for Shipcom?

20  A    No.

21  Q    Okay.  Right.  And --

22  A    Like I said, I didn't have that kind of latitude.

23  Q    All right.

24  A    There was a lot of coaching and, you know, Make sure you

25  do this, do that and convene the seniors.

1    Q    All right.  And would you say that you exercised

2    independent judgment in doing your job for Shipcom?

3    A    No.  There was some I would say minor judgment calls

4    being made when I'm looking at invoices, and making sure that,

5    you know, if we are getting over-charged, like just seeing if

6    we actually paid the vendor within the contractually agreed

7    upon net terms, and just factoring in weekends, et cetera and

8    just making calls on that.  But other than that, no.

9    Q    So what --

10   A    I don't think so.

11   Q     -- just I want to understand what -- you said you made

12   some judgment calls to see -- you mentioned about looking to

13   see whether Shipcom had been over-charged.  So what -- is

14   that -- did I understand you correctly?

15   A    Yes.

16   Q    Okay.

17   A    If there are -- if we have late fees.

18   Q    Okay.  So what was the judgment call that you made on

19   that?

20   A    Well, just making sure that -- I mean if those late fees

21   were warranted, if a -- if we did, in fact, pay within the net

22   terms, then they should rescind those late fees and --

23        MR. NOTESTINE:  Your Honor, I don't understand how

24   this is relevant, it's disparaging the company, it's

25   inadmissible under 403.  It's irrelevant and it's offered only

1      to disparage the company.

2              THE COURT:  Sustained.

3              MR. SINKULE:  All right.  Thank you.  I pass you as

4      a witness.

5                  CROSS-EXAMINATION OF ZAHID ISLAM

6      BY MR. NOTESTINE:

7      Q    Good afternoon, Mr. Islam.

8      A    Good afternoon.

9      Q    Good to see you again.  I'm going to ask you a few

10     questions.  And you got an offer letter from the company that

11     we've looked at already.  Correct?

12     A    Correct.

13     Q    And that offer letter is -- fortunately for the jury we

14     have some overlapping exhibits, some are the same documents --

15     or and the same documents are in both of our exhibit lists.

16              This is the letter you looked at previously.

17     Correct?

18     A    Correct.

19     Q    And this lists a whole bunch of duties, quite a bit more

20     than that other document we looked at, Exhibit 19, which we'll

21     look at in a minute, Plaintiff's Exhibit 19.  This is

22     Defendant's Exhibit 22 which is your offer letter.

23          (Defendant's Exhibit No. 22 identified.)

24     BY MR. NOTESTINE:

25     Q    And this clearly says you will be a Financial Analyst.

1    Right?

2    A    Yes.

3    Q    That's quite a few job duties, many more than we've

4    looked at in 19, and I'm going to show you 19, Plaintiff's 19.

5         (Pause in proceedings.)

6    BY MR. NOTESTINE:

7    Q    Which is this document, which this document -- you

8    remember this one we looked at?

9    A    Yes.

10   Q    We'll just scan a few duties.  And we're going to go over

11   some of these duties by the way in a few minutes, but you said

12   you never actually saw this while you were employed, this

13   document.  Right?

14   A    While I was employed, I don't believe so.

15   Q    The Accounts Payable Analyst.  Correct?

16   A    Yes.

17   Q    Yeah.  And do you have any knowledge about what the job

18   duties were for the person replaced you and whether these

19   might be that person's job duties, not your job duties?

20   A    Probably.

21   Q    Okay.

22   A    But those job duties are so aligned that --

23        MR. NOTESTINE:  Objection.  The objection is he's

24   already answered the question.

25        THE COURT:  Sustained.

1    BY MR. NOTESTINE:

2    Q    Now in your offer letter that we looked at the company

3    offered you, on the second page, a salary of $46,000.  Right?

4    A    Correct.

5    Q    And that was paid on a monthly basis, up here at the top

6    near the front, this $46,000.  And that's what you were paid

7    throughout your nine months of employment.  Right?

8    A    Yes.

9    Q    And the company always paid that, you understood that was

10   what you were being paid?

11   A    Yes.

12   Q    Paid your entire time.  Right?

13   A    Correct.

14   Q    And you only worked nine months for the company.  You

15   never got performance evaluations like we saw with Mr. Bethas

16   and Mr. Kehn, you never got one of those.  Right?

17   A    I asked for a mid-year one, I didn't get it, but --

18   Q    Do you know if the company's policy, do you know if it

19   was you had to work a year before you got one and you were

20   just asking for six months, or what?

21   A    I don't know if they had a policy, but I know I did ask

22   for one, but didn't receive one.

23   Q    Okay.  And when we looked at the application you filled

24   out, which was Plaintiff's Exhibit 17, just because -- I think

25   this is Plaintiff's Exhibit 17 I'm putting on the remote --

1    you said you put this in there, so it's salary desired,

2    46,000, date available, that's information that you add and

3    you put in there.  Right?

4    A    I mean I did put in the hours, I mean my handwriting is

5    there, but I do -- I could have as far as the position applied

6    for because that's the position that they told me to apply

7    for.

8    Q    And there's no discussion during your interview with the

9    company that you would be paid overtime.  Right?

10   A    No.

11   Q    And you actually got paid the salary that the company

12   offered you, 46,000, throughout your employment.  Right?

13   A    Well, they pro rated because I was there for nine months,

14   yes.

15   Q    And you never complained to anyone at the company while

16   you were employed about violations of the Fair Labor Standards

17   Act.  Right?

18   A    No, I didn't really knew it was -- as far as -- that's

19   asking fairly standard --

20   Q    In fact, you didn't even really know what the Fair Labors

21   Standards Act was while you were employed there.  Right?

22   A    I mean I had like a vague understanding of it, but I

23   didn't make any specific complaints along those lines.

24   Q    And your complaints really were that you were working too

25   hard and should get more hard, not that you should be paid

1    overtime for 40 hours -- after 40 hours.  Right?

2    A    Well, when the overtime discussion was brought up --

3    Q    Let me stop you there.  That overtime discussion about

4    whether you should be overtime was actually after Ms. Carnes

5    left the employment of the company.  Isn't that right?

6    A    That was the second time.

7    Q    Right.

8    A    There was a discussion we had while I was on the job.

9    Q    Well, and that was about -- that first discussion was the

10   first part where she said she thought it was under review but

11   the second one was after she had actually left the company.

12   A    Correct.

13   Q    Okay.

14        MR. NOTESTINE:  Your Honor, I would ask that that is

15   hearsay and should be struck, she was no longer an employee of

16   the company when she made that comment.  You should instruct

17   the jury not to consider that issue.

18        THE COURT:  Response?

19        MR. SINKULE:  I still think it's an admission by a

20   party opponent in terms of even the role she had at the

21   company, she was a high level person, equivalent to a CFO.

22   She was actually a vice president.

23        MR. NOTESTINE:  It's after she left.  She's no

24   longer an employee, it cannot be an admission of a party

25   opponent.

1          THE COURT:  I believe that after she's left the

2     company it's not an admission of a party opponent.

3          MR. SINKULE:  Okay.  And we'll -- well, and my

4     understanding was that -- I think this is different from the

5     testimony that Mr. Islam --

6          THE COURT:  I'll tell you what --

7          MR. SINKULE:   -- gave.

8          THE COURT:   -- you -- I'm going to let you all

9     clear this up with your questioning.  You can establish when

10    you think the conversation occurred and whether or not she was

11    an employee.  If you believe that's wrong, then you'll be able

12    to ask questions on --

13         MR. NOTESTINE:  I think he did, that's why I just

14    made the objection, Your Honor, because he just said that --

15    BY MR. NOTESTINE:

16    Q    She told you that, Ms. Carnes told you that, that second

17    part about being the classification after you -- after she had

18    actually left employment of the company.

19    A    She told me it was reclassified.

20         MR. SINKULE:  And I'll just say I think it's unclear

21    because earlier Mr. Islam testified that the first

22    conversation he had with her was when they were both still

23    employed, it was near the end of the year, and then the second

24    conversation he had with her was a couple of weeks later.

25    They were both still there at that time, so --

1          THE COURT:  All right.

2          MR. NOTESTINE:  Depositions.

3          THE COURT:  Here's the ruling.  Any hearsay from

4    Ms. Carnes while she's still with the company comes in as an

5    admission by a party opponent.  Things that she repeated to

6    him after leaving the company we'll have to look at whether

7    there's some other way to get it in other than the admission

8    rule.

9          MR. SINKULE:  Understood.

10   BY MR. NOTESTINE:

11   Q    I'm going to hand you your deposition just so we --

12   because we talked about this in your deposition, just so that

13   we can clarify what the timing of those conversations were.

14   I'm handing you a sealed copy -- pardon me, an unsealed copy

15   of your deposition.  Now you remember having your deposition

16   taken by me in the office of your counsel?

17   A    Yes.

18   Q    And in that deposition you promised to tell the truth at

19   that deposition?

20   A    Yes.

21   Q    And I'd like you to turn to Page 26 of that deposition.

22   And on Page 26, Line 6 I asked you, You didn't have those

23   discussions while you were employed, other than her saying

24   that her understanding was they were being reviewed.  Right?

25   A    And you said, Yes, it was just with her.  And then,

1     Question, But then afterwards she had a more definitive

2     discussion, she thought the company classified you wrong.

3     Yes, correct.  Okay.  At that point she was no longer with the

4     company.  Yeah, she left a month before I did.

5     A     Yes.

6     Q     So those conversations were after she had left the

7     company.  Correct?

8     A     As far as reclassifying, yes, it was after.

9          MR. NOTESTINE:  So I'd ask the Judge for an

10    instruction that the jury should not consider that statement

11    about whether he should be reclassified or not.

12          THE COURT:  Well, what I just understood, the

13    statement that he had been -- the position that he was in had

14    been reclassified it what she said after she left the company.

15    Is that correct?

16          MR. SINKULE:  That's correct.  There hadn't been any

17    questions about that from either Mr. Notestine or myself until

18    he read this from the transcript.

19          MR. NOTESTINE:  I guess I'm confused.  There's two

20    discussions.  The first was it was --

21          THE COURT:  Okay.  You know what, let's --

22          MR. NOTESTINE:  -- under review --

23          THE COURT:  -- move on with this examination.

24          MR. NOTESTINE:  Okay.

25          THE COURT:  We can take this up later after --

1  outside the presence of the jury.

2  BY MR. NOTESTINE:

3  Q    And at no point while you were employed did you actually

4  make a claim that you were misclassified under the FLSA and

5  entitled to overtime.  Right?

6  A    No.

7  Q    That's correct, you never said that.  Right?

8  A    Correct.

9  Q    Yeah.  Sorry.

10  A    Sorry.

11  Q    And you have two college degrees.  Right?

12  A    Yes.

13  Q    One in finance and one in real estate.  Those are two

14  degrees.  Right?  Not just two majors and one degree?

15  A    Correct.

16  Q    And I'm sure as a finance -- a person educated in

17  finance, you can understand the importance of having accurate

18  numbers in the Finance Department.  Right?

19  A    Correct, theoretical background -- or understanding.

20  Q    And it was very important for you to provide accurate

21  numbers on the files for Shipcom in your Finance Department,

22  it was important for you to do that.  Right?

23  A    That's correct, but I needed adequate training because I

24  hadn't had on-the-job exposure to that really.

25  Q    And you had several jobs before going to Shipcom.  Right?

ZAHID ISLAM - CROSS BY MR. NOTESTINE

1    A    I had one major job, I had one full-time job and then a

2    few contract positions.

3    Q    And you worked in the Department of Financial Services

4    for the State of Florida.  Right?

5    A    As a very entry-level staff auditor.

6    Q    And you were -- you did -- you were salaried, did not get

7    overtime in that job.  Right?

8    A    Yes, I was salary, I was making 32,700.

9    Q    And then you had a couple sort of part-time jobs, I think

10   you were maybe working for a temp company, and you worked --

11   you were placed in a couple of different companies and you got

12   hourly at those jobs.  Right?

13   A    Yes, one job they had nothing to do with my trajectory,

14   it was audit -- or file examination, it was, you know, oil and

15   gas insurance company, I was helping out claims adjusters, it

16   was more so customer service.  The contract ended.  They had

17   mentioned that they were going to open an audit position.  It

18   didn't transpire that way, so I left elsewhere.  And then

19   another company there was a lady who went on maternity leave

20   and it was just a clerical job that I had for a month.

21   Q    And you were just paid hourly at those two jobs.  Right?

22   A    Correct.

23   Q    And then you went to Universal America, an insurance

24   company in Houston.  Right?

25   A    Well, I went to Shipcom first for nine --

ZAHID ISLAM - CROSS BY MR. NOTESTINE                    271

1    Q    Okay.  I'm sorry.  Shipcom and then after Shipcom then

2    you went to Universal America, right, an insurance company.

3    Right?

4    A    Correct.

5    Q    And you were paid a salary at that job with no overtime.

6    Right?

7    A    Correct.

8    Q    And then you went to Office Depot in Florida and you were

9    an auditor there, sort of the kind of role you were looking to

10   get into.  Right?

11   A    Reasonably, yes.

12   Q    And you were salaried there you didn't get overtime there

13   either.  Right?

14   A    Correct.

15   Q    And the Shipcom job, when you got it at 46,000 was a

16   pretty sizable pay increase over these part-time jobs you had

17   before you went there.  Right?

18   A    About -- so 46,000, about like 4- or $5,000 more.

19   Q    Than the part-time jobs?

20   A    Well, in terms of I was getting paid hourly, but after

21   multiplying that by 40 it was roughly -- yeah, it was roughly

22   like 5,000, $6,000 more.

23   Q    And you interviewed with other people in Finance.  Right?

24   When you went for your work -- when you went -- when you were

25   interviewing for your job at Shipcom you worked at other --

1    interviewed with other people in Finance.  Right?

2    A    Correct.

3    Q    Sorry, bad question.  I apologize.  And you even

4    interviewed with the president of the company too.  Right?

5    A    Who, the CEO?

6    Q    Yeah.

7    A    Yes, and the VP of Finance was in the room.

8    Q    And all the people you interviewed with were high level

9    people with the company.  Right?

10   A    Correct.

11   Q    And in the Finance Department you got there things were

12   kind of a mess.  Right?  I think you already testified about

13   that.  Right?

14   A    Yes, because they didn't have an AP function.

15   Q    And your job was pretty much unique within the company

16   and no one really did anything like you.  Right?

17   A    Yes.

18   Q    Because a lot of work you did related to VA projects.

19   Isn't that right?

20   A    VA, well, yeah, I mean we were on the VA contract.

21   Q    Okay.  So most of the work you did, even though you were

22   in the Finance Department in Houston, related to VA work.

23   Right?

24   A    Correct.

25   Q    Okay.  The vendors were vendors for the VA project,

1    things like that.  Right?

2    A    Yes.

3    Q    And you said that before that your duties were pretty

4    consistent throughout your employment.  Right?

5    A    Correct.

6    Q    And you saw this position as a way to learn about the

7    payables process so you could use that information to get into

8    auditing.  Right?

9    A    Yes, and file examination.

10   Q    And you worked in an office, it was a desk job, not

11   anywhere out in the field.  Right?

12   A    Correct.

13   Q    And really before you got there basically nobody was

14   paying attention to payables.  Correct?

15   A    Yes.  I mean there was a backlog of invoices and I just

16   had to find a lot of these hard copy invoices and get them

17   into soft copies so that we can actually -- network with IT

18   does that with the vendor portal.  So I think I streamlined

19   the process.

20   Q    You felt it was part of your job to get the payable

21   process up to speed.  Right?

22   A    That's what it was predicated on, that was the crux of

23   it, to reduce the backlog and get the payables up to speed.

24   Q    And you had to build relationships with suppliers and

25   vendors to get them taken care of.  Right?

1    A    I mean we had -- there was no foundation of trust,

2    they -- again, they were being neglected, so really from the

3    first week I was getting a lot of livid calls, so.

4    Q    Part of your job was to restore relationships with those

5    vendors.  Right?

6    A    To mollify them, yes.

7    Q    And you were given them responsibility to correct this

8    problem.  Right?

9    A    With the guidance of the seniors, with Tim, at the time

10   Rebecca, they were telling me -- Nancy as well, they would

11   tell --

12           MR. NOTESTINE:  Objection, Your Honor, those are not

13   employees of the company, I object to any statements about

14   what they were telling him.  That's hearsay.  They were

15   contractors, not employees.

16           MR. SINKULE:  At least one of those employees, and

17   this was an employee, Nancy was, Mr. Islam also reported to

18   them.  So he's talking about the guidance they provided him.

19           THE COURT:  Overruled.

20   BY MR. NOTESTINE:

21   Q    I think my question was, you were building relationships

22   with the suppliers and vendors.  Right?

23   A    Correct.

24   Q    And lots of the vendors had never been paid and they were

25   livid and that was part of your job to fix those problems that

1    you just mentioned there.  Right?

2    A    Right.

3    Q    And you thought the work was very important work.  Right?

4    A    Of course.

5    Q    These vendors, if they weren't paid, they were important

6    to the project and that would cause problems on the project.

7    A    Of course.  But also to make sure --

8            MR. NOTESTINE:  Objection.  Objection.

9            THE WITNESS:   -- that they were legitimate --

10           MR. NOTESTINE:  I think he answered the question, I

11   object to the non-responsive part of that answer, Your Honor.

12           THE COURT:  Sustained.

13   BY MR. NOTESTINE:

14   Q    Ms. Carnes, your supervisor, only gave you a few pointers

15   on your job, and it was your job to handle the problem pretty

16   much on your own.  Right?

17   A    No, I had weekly guidance from her.

18   Q    Do you remember saying something different in your

19   deposition?

20   A    No.

21   Q    Okay.  You actually had your deposition done by video, do

22   you remember that?

23   A    Correct.

24   Q    And I'd like to show on Page 44 and 45 video clip 1 of

25   your deposition on that issue.

1              THE COURT:  Are we -- hold on.  Are we just doing

2       page and line?  The question, I will allow -- it would be a

3       lot better if you just have the written deposition, but I --

4       we're not going to do a long video clip just --

5              MR. NOTESTINE:  Well, it's -- yeah, it's pretty

6       short.  It's --

7              THE COURT:  Is it the question that he just

8       answered?

9              MR. NOTESTINE:  He -- yeah, he said, No, he did not.

10      My question was, Your supervisor only gave you a few pointers

11      on this and it was your job to handle the problem pretty much

12      on your own.  Right?  He said, That's not right.  And I'm

13      quoting from Page 45, Line 10 to Page 46, Line 1.  If you'd

14      rather, Judge, I can point him to the deposition.

15             THE COURT:  I think that would be better.

16             MR. NOTESTINE:  Okay.

17      BY MR. NOTESTINE:

18      Q    Could you turn to Page 45 in your deposition.  Are you on

19      Page 45 of your deposition?

20      A    Yes.

21      Q    Do you see there on Line 10 where it says, I assume that

22      this was something important because vendors were important to

23      the contract to be performed.  Right?  Do you see that?

24      A    Yes.

25      Q    And you said, Sure, I remember we were trying to change

1       the optics of the company, and then I asked, Was this

2       something Ms. Carnes helped you with or was this something you

3       mostly did yourself.  And you said, and I'm going to read the

4       answer,

5               "Well, she gave me some pointers briefly, like she

6               told me there's one reason she wanted me to do the

7               work was because she liked that I was cordial and I

8               could speak with people calmly, and she just said,

9               This is going to be one of your roles, if you could

10              help me and build relationships with suppliers, that

11              would be like a huge victory for the company.  So

12              she just gave me some minor brief pointers but from

13              there it was my responsibility to do that because it

14              was sort of like a startup atmosphere where people

15              were juggling a myriad of roles so everyone was

16              busy."

17              Isn't that -- wasn't that your answer at the time?

18      A     Yes, and it was weekly.

19      Q     You really didn't get much of any training from the

20      company when you went to work and you had a finance degree and

21      were expected just to sort of run with it from there.  Right?

22      A     I didn't know anything about accounts payable.  I got

23      tremendous coaching from the leads that were there.  If I were

24      to run with things, then there would be have been chaos.  I

25      did not -- I didn't have hands-on experience with accounts

1    payable, that was not the expectation.

2    Q    Yeah, let's look on Page 8 of your deposition.  And on

3    Page 8 of your deposition I'm asking, You had a financial

4    background, Line 9, You had a financial background but you

5    didn't have -- know what was -- an accounts payable person did

6    you?  And your answer was, I mean I had a high level

7    understanding but not so much.  I mean I just, from what I

8    learned in accounting of course but no high on-the-job

9    experience.  And then I asked you, So you basically learned it

10   on your own as you went along.  Yeah.  Your answer was what,

11   could you read your answer there?

12   A    It was learning on the fly.

13   Q    Yes, yeah, like really learning on the fly.  That was our

14   answer when I asked you at your deposition.  Right?

15   A    Yes, but still getting guidance, especially when I was

16   making mistakes, so.

17   Q    And you got guidance on your job early on from the

18   contractors you worked with, but later in 2014 and into 2015

19   you felt you were able to make judgment calls and had an

20   adequate amount of independence.  Right?

21   A    Minor judgment calls and some independence in terms of

22   just making sure that we were paying per the contractually

23   agreed upon terms.

24   Q    Let's turn to Page 116 of your deposition.  At the very

25   bottom of 116 on Line 23 I asked you, Did you feel like you

1    had a fair amount of independence.  And you asked me, What do

2    you mean by that.  I said, I mean, you know, were you able to

3    make decisions on your own.  And you answered, Well, I mean at

4    some point I think like early I mean I was just getting a lot

5    of guidance, but a lot of that was just judgment calls and --.

6    And so I asked you, So you had to make your judgment calls.

7    Your answer is, Yeah, I would say like late in the year and

8    early into 2015.

9           And then I asked,

10        "Were you able to resolve problems on your own or

11        did you have to always go to somebody else to get

12        your problems resolved?

13        "Well, early on I mean because I didn't know

14        anything about the position, it was just a setting

15        where I was asked some question and, you know, it

16        was the first time they had had that role so it was

17        kind of a evolving position.  So there really wasn't

18        any expectations, they just needed someone to --

19        something to be filled and someone to be the kind

20        of, you know, gathering, just somebody doing that

21        kind of work.  But I thought I had, you know,

22        adequate independence."

23           Isn't that what your statement was?

24   A    Yes, I did say that I had some independence.

25   Q    So I want to go through a few of your duties.  Your

1    lawyer went through some duties on Exhibit -- Plaintiff's

2    Exhibit 19, which was for the position of the person that

3    replaced you.  But let's look at what your position --

4              MR. SINKULE:  Objection --

5              MR. NOTESTINE:   -- was --

6              MR. SINKULE:   -- that mischaracterizes the

7    witness's testimony.  He did not say that that -- those were

8    the job duties of the person who replaced him definitively.

9              MR. NOTESTINE:  But he did.

10             MR. SINKULE:  He said some --

11             THE COURT:  I'll sustain the objection.  I believe

12   what he said is it could be that those were the job duties of

13   the person that replaced him.

14             MR. NOTESTINE:  Okay.

15   BY MR. NOTESTINE:

16   Q   And I showed this before, this is Defendant's Exhibit 22,

17   and your offer letter actually had quite a few job duties

18   actually listed in your offer.  Right?  It was a little bit

19   different from some of the others, I don't know why that was.

20   But you actually had quite a few listed.  Right?

21   A   As I did tell you, if you recall, at deposition, a lot of

22   this was redundant and it was under Accounts Payable.

23   Q   And you also had -- you have a -- actually did a LinkedIn

24   page like some of the other Plaintiffs in this case that we've

25   looked at.  Do you remember doing a LinkedIn page where you

1       summarized your work at Shipcom?

2       A     Sure.

3       Q     And this is the first page of that, and I apologize, it's

4       a little hard to see.  And this is you, Zahid Islam.  Right?

5       A     Yes.

6       Q     Internal Audit at Office Depot.  So this was after you

7       had left and while you were working at Office Depot.  Right?

8       A     About three years after.

9       Q     It's actually printed as of December 15, 2017.

10      A     Two years, two and a half years.

11      Q     This is Defendant's Exhibit 23.

12            (Defendant's Exhibit No. 23 identified.)

13      BY MR. NOTESTINE:

14      Q     And it lists on the second page, or at least what printed

15      off as the second page, your job duties.  And the ones you

16      list in the LinkedIn page that you wrote was your position.

17      A     The position that was designated to me in the offer

18      letter, Financial Analyst.

19      Q     Okay.  And we're going to talk a little bit about what

20      these roles were that you performed.  And the first one was

21      talk about here is, On finance team to assess a new ERP

22      accounting system, Deltek.  And we've talked about that

23      already, it's a software system that the VA was using.  Right?

24      A     Right, and that's really something everyone was doing, it

25      was the ERP software that the company was using and I was on

1    the finance team and we were trying to figure it out.

2    Q    You understood that you needed to upgrade the accounting

3    software that you were using, and which was Deltek.  Right?

4    A    Upgrade the software?

5    Q    Yeah.

6    A    I did not upgrade any software.  I mean that was the

7    established -- that's was the VA's preferred ERP software,

8    Deltek, so we were working with that, we were trying to figure

9    out what was the most efficient way to work with it.  I didn't

10   upgrade anything.

11   Q    Well, I'm not saying you upgraded it yourself, but you

12   understood that the software needed to be upgraded.  Right?

13   A    Yes, because it couldn't catch duplicate the payments

14   alongside other important things.

15   Q    And you also say here that you were integral to startup

16   operations by developing payables process incorporating AP

17   best practices and much-needed separation of duties.  And

18   that's what you listed as one of the things you did there.

19   Right?

20   A    Yes.

21   Q    And you also indicate that you analyzed 250-plus

22   transactions monthly, reconciled vendor statements for

23   accuracy for peer analysis of accounts, and corresponded with

24   175 suppliers to address and resolve their individual needs.

25   Right?

1     A    Right.  At that time that was assisting, so.

2     Q    Well, that's not what you say in your LinkedIn page.  You

3     said you were resolving their needs.  Right?

4     A    Resolve -- now you're talking about suppliers, I was

5     referring to the vendor statements.  I was helping, assisting

6     along those lines.

7     Q    I'm not sure I understand what you're saying.  It says --

8     A    The second line goes on --

9     Q     -- and correspond with 175 suppliers to address and

10    resolve their individual needs.

11    A    Well, that's correct, I was referring to something else,

12    but never mind.

13    Q    And, in fact, you had sent an email to your -- Shuba, who

14    took over for Ms. Carnes, right, about I believe this issue,

15    wasn't it?

16    A    Regarding?

17    Q    Well, that's one of the things you said to her about what

18    you had done.  Right?  Remember that?

19    A    As far as fierce?

20    Q    Yeah, for example here I'm looking at Defendant's

21    Exhibit 86, which is March 13, 2015 memo.

22         (Defendant's Exhibit No. 86 identified.)

23    BY MR. NOTESTINE:

24    Q    See that?  It's from you to Shuba.

25    A    I think she was known as Shuba.

1    Q    Yeah, this is Shuba, the person that took over for

2    Ms. Carnes.  Right?

3    A    Yes.

4    Q    And among this you were telling her what your

5    responsibilities were pertaining to your loan of financing,

6    and you said you were the Financial Analyst in Accounts

7    Payable.  Right?

8    A    Correct.

9    Q    And we've talked about ERP, we've talked about routine AP

10   procedures, we're going to talk about some of these.  Number 7

11   was you correspond with 70-plus suppliers to address and

12   resolve their individual needs.  Right?

13             MR. SINKULE:  Objection, mis-states the document.

14             MR. NOTESTINE:  Correspond with 200-plus suppliers

15   to address and resolve -- did I read that wrong?

16             MR. SINKULE:  You said 70-plus.

17             MR. NOTESTINE:  Okay.  It's 200-plus.  I'm sorry.

18             THE WITNESS:  Yes.

19   BY MR. NOTESTINE:

20   Q    This is what you were telling your supervisor you were

21   doing.  Right?

22   A    Yeah, but she understood I was skimming items.

23             MR. NOTESTINE:  Your Honor, I object, speculation.

24   He hasn't stated how --

25             THE WITNESS:  It's in the deposition --

1          THE COURT:  Sustained.

2     BY MR. NOTESTINE:

3     Q    Number 8, research and resolve rejected invoice, escalate

4     extraordinary issues to upper management.

5     A    Yes, of course.

6     Q    That's what you're telling Shuba.  Right?

7     A    (No audible response.)

8     Q    Not every issue.  Right?  Just extraordinary ones.

9     Right?

10    A    To upper management, yes.  The leads were not upper

11    management.

12    Q    Weren't even employees actually.  Right?

13    A    I didn't hear that.

14    Q    They weren't even employees, were they?

15    A    They were 1099 contractors.

16    Q    Okay.  Going back to your LinkedIn profile, you say you

17    helped establish, the next bullet point, routine and auditable

18    AP process within the company that meets FAR regulations.

19    Right?

20    A    Yes.

21    Q    And FAR is a federal regulation that related to the VA.

22    Right?

23    A    Federal Acquisition Regulations.

24    Q    Then it says you developed automated three-way matching

25    of invoice and expedited approvals of payments.  And this was

1    separated duties between Accounts Payable, Procurement,

2    Logistics, which was -- I have a hard time actually reading --

3    three-way matching of invoices, expedited approvals and

4    payments, right, is what your LinkedIn profile said.  Right?

5    A    Yes, that's what my Accounts Payable position was

6    predicated on.

7    Q    And this included the process and the AP policies and

8    procedures that you wrote.  Right?

9    A    That, all of that and -- but again, that was a one-off.

10   Q    And you say here that you established a vendor portal to

11   ensure documentation is collected and invoices paid.

12   A    That's something that collectively as a unit we worked

13   with IT because we didn't have the ability to establish a

14   vendor portal, but we ditched that idea, so interdependently

15   correctively as a unit we did do that.

16   Q    And it looks like to me -- I'm going to show you what's

17   been marked as Defendant's Exhibit 84.

18        (Defendant's Exhibit No. 84 identified.)

19   BY MR. NOTESTINE:

20   Q    This is something that you're -- an email you're sending

21   to Ms. Carnes.  It says, Attached -- on this email is a Word

22   document, it's intended to delineate our Accounting/Finance

23   Department's work flow process pre-vendor portal.  Is that on

24   this issue that we're talking about, establishing a vendor

25   portal along with IT I guess?

1    A    Yes.

2    Q    And this is what's attached, it's a document that goes

3    over a variety -- it's a little hard to read, I don't want to

4    go over this in great detail.

5    A    It's Tim and Brandy's names.

6    Q    Yeah.  So Zahid is providing a whole lot of information

7    on this about what needs to be done and kind of doing a check

8    list of things that need to be -- or need to be addressed for

9    this vendor portal.  Right?

10   A    Yes, it's Zahid by the way.

11   Q    Zahid.  I'm sorry.  And Ms. Carnes responded to your

12   email, do you remember responding to her back and forth about

13   this?

14   A    No, I don't.  I don't remember -- I mean I remember email

15   and response, but I can't tell you the details.

16   Q    But she sent you and email Friday, October 3, 2014, she

17   said, Please fill in Others columns and let us all edit as

18   needed, it has to be written process and procedures are very

19   thorough steps.  So there was probably some going back and

20   forth.  And in this document there's a -- it's a little bit

21   hard to read but it looks like there's a picture of a

22   whiteboard where you must have been in a meeting with the

23   VP -- the finance people where you're talking about this

24   vendor portal and kind of thinking of ideas.  Right?

25   A    I remember this.  We had this meeting in Rene's room, Tim

1    and -- Tim was also right there, and we were just pretty
2    much -- we wanted to put things in writing so we went to the
3    whiteboard.
4    Q    Okay.  And so she selected a picture of it and sent it
5    around, and then there's some follow up to this email about
6    all these different issues on the vendor portal they were
7    suggesting.  And then -- so this is what we kind of looked at
8    before and then you filled in some other items.  Right?
9    A    Yes.
10   Q    Now there's --
11   A    At their request.
12   Q     -- Tim and Brandy and Rene, at least whenever this draft
13   was.  It didn't add too much besides what you were putting in
14   there.  Right?
15   A    I mean that was the unfinished draft, from there I
16   believe they had to fill it in.
17   Q    Okay.  And you had already provided your information for
18   that.  Right?
19   A    Correct.
20   Q    And so there was a fair amount of brainstorming going on
21   with this vendor portal on how to deal with things.  Right?
22   A    Yes.
23   Q    And then it says on your LinkedIn profile that you --
24   down to this next one here where it says, Wrote AP policies
25   and procedures.  Right?

1    A    Yes, at Brandy's request.

2    Q    And that was something that the company did not have

3    before you did those.  Right?

4    A    Correct.

5    Q    And you put the first company accounts payable policies

6    and procedures.  Right?

7    A    I drafted them, I don't know if they implemented them.

8    Q    Okay.  And that was something that was important for the

9    company.  Right?

10   A    I believe so.

11   Q    And Ms. Carnes encouraged you to put together the

12   policies and procedures because you complained that there was

13   not enough structure for your job.  Right?

14   A    Yes, I mean there were people prior to the AP function

15   being built in, there were people collecting the cash,

16   recording the transactions, writing the checks.  So we had

17   segregation of duties.  She wanted me to put that down in

18   writing.

19   Q    Okay.  And here is an email that you sent Ms. Carnes, the

20   Vice President of Finance, or CFO, whatever she was, and you

21   are -- it has, Attachment to Accounts Payable PMP document.

22   Right?

23   A    Yes.

24   Q    So this is something -- your draft of what you had

25   prepared.  Right?

1    A    That's what I said earlier, I drafted it.

2    Q    Okay.  And I'm not going to go over great detail, but

3    this is something you wrote.  Right?  It's a multi-page

4    policies and procedures document about segregation of duties,

5    who was supposed to do what, how AP files are supposed to be

6    set up, how voucher processing steps were supposed to be

7    handled, voucher processing steps for PO invoices,

8    communication with suppliers, and concluding responsibilities.

9    Right?

10   A    Could you go back to the first page?

11   Q    The very first page?

12   A    Yes.

13   Q    The email or --

14   A    No.

15   Q    The document.

16   A    Yes --

17   Q    By the way, if you want to look at the document, it's in

18   that notebook there.  It's -- the big notebook.  I'm actually

19   going to show you.  It's easier to look at the document

20   instead of looking at the overhead.

21          But anyway, this is something you -- I'm not going

22   to get into an great detail, but this is something you drafted

23   for the company.  Right?

24   A    Yes.  But I think it's worth pointing out that I refer to

25   the position as an AP Clerk, and the duties delineate that of

1     an AP clerk.

2             MR. NOTESTINE:  Your Honor, I move that the Court

3     strike that last section about the duties of the AP Clerk,

4     that's not the question I asked him.

5             THE COURT:  Sustained.

6     BY MR. NOTESTINE:

7     Q    You had sent these policies and procedures to HR to show

8     the important work that you were doing for the company.

9     Right?

10    A    Yes.

11    Q    I'm showing you what's been marked as Defendant's Exhibit

12    28.

13        (Defendant's Exhibit No. 28 identified.)

14    BY MR. NOTESTINE:

15    Q    Have you seen this document before?

16    A    Yes, at the deposition.

17    Q    And it's attaching the same, pretty much the same

18    document we just looked at.  Right?

19    A    Correct.

20    Q    And you were sending this on April 3, 2015.  This is

21    pretty shortly before you left the company.  Right?

22    A    Yes.

23    Q    This is after Ms. Carnes left and when you had now gotten

24    a new supervisor.  Right?

25    A    Correct.

1    Q    When you say here, I have just sent this to Shuba, along

2    with Melissa and Tim -- Shuba was the new supervisor along

3    with Melissa and Tim, the contractors.  Right?

4    A    Yes.

5    Q    But I wanted you to have this for your reference.  I

6    wrote the AP policies and procedures in December.  It

7    highlights my thought process of the position to the best of

8    my ability.  While they may inadvertently slip up here or

9    there, I want to understand.  I've been docile in giving my

10   full efforts and so I started working through weekends.  I

11   look forward to guidance on making the process work be

12   efficient and look forward to our team incorporating new ideas

13   and working together as a team.  Hopefully we close on a

14   positive note.  Right?

15   A    Yes.

16   Q    There's just a few other duties that I just want to

17   mention on this and then we'll be done.  I actually have a

18   hard time seeing this.  It actually indicates here you provide

19   assistance with various account analysis and reconciliations,

20   but I think you said that that was mostly being done by the

21   contractors.  Right?

22   A    Where is this?

23   Q    After, Wrote AP policies and procedures I'm now saying,

24   Provide assistance with various account analysis or

25   reconciliation.  Right?

1     A     Yes, I assisted them whenever they needed me.

2     Q     That was their major responsibility, you just helped out.

3     A     Yes.

4     Q     Then you said, Help accounting personnel with closes of

5     the ledger on a monthly basis.  Again, that was their

6     responsibility, you were just helping them out.  Right?

7     A     My work as AP correlated with that, so we informed them

8     on the nuances of AP directly related to that for them to be

9     able to close out the ledger.  They needed a fix on what I was

10    doing, so we had active communication.

11    Q     You worked interdependently with Procurement, Logistics

12    and Supply Chain team members.  We talked about that already,

13    is that that whiteboard thing, or is that something -- no,

14    that was the portal.

15    A     No, I know you asked me this at the deposition, but

16    interdependently just means working like as a team player,

17    like working with different departments because as we -- as

18    the Finance team we established the three-way matching, we had

19    made the -- or Ray made the determination that Logistics has

20    to do the receiving, so I had to communicate that to them.

21    Q     So you worked with a couple of other departments sort of

22    as a Finance Department representative to help work out deals,

23    issues.  Right?

24    A     Yes, just like a carrier pigeon.

25    Q     Let me ask that again, you work with these other

1    departments as the Finance representative to work out issues

2    with them.  Isn't that right?

3    A    Not as a Finance representative, strictly as the Accounts

4    Payable function and underlying why I'm not doing the

5    receiving and why they should be doing it.  So when I

6    interdependently communicate it to them, or with them rather,

7    what happened was there were folks in Logistics who didn't

8    want to do the receiving, and I had to communicate to them why

9    AP can't do it and why Procurement can't do it, and why they

10   need to be confirming what was in the packing slips and

11   just --

12   Q    So you were working out problems with them.  Right?

13   A    Yes, communication.

14   Q    And finally, and I think you talked about this in your

15   direct, you worked to improve vendor relations and restore

16   supplier confidence, right?

17   Q    Yes, as a result of getting the payables up to speed.

18   A    And the vendors told you they were happy that you were

19   getting the payables up to speed.  Right?

20   A    Yes.

21   Q    And you were helping with vendors because those vendors

22   were mostly on the project with the VA Hospital.  Right?

23   A    Yes.

24         MR. NOTESTINE:  I pass the witness, Your Honor.

25         THE COURT:  Redirect, Mr. Sinkule?

1    MR. SINKULE:  Yes, Your Honor.

2            REDIRECT EXAMINATION OF ZAHID ISLAM

3    BY MR. SINKULE:

4    Q    All right.  Mr. Islam, Mr. Notestine asked you some

5    questions about other jobs that you have held, both before

6    Shipcom and after Shipcom.  Do you recall those questions?

7    A    Yes.

8    Q    Okay.  In terms of the jobs that you have held both prior

9    to working for  Shipcom and after working for Shipcom, have

10   any of those jobs been jobs in which you performed the same

11   duties that you performed when you worked for Shipcom?

12   A    No, as a compliance auditor with the State of Florida,

13   the only thing that the same was that I was getting guidance

14   from the auditors, but the realm of audit is very different

15   from accounts payable, than what I had been doing.  And like I

16   said, I hadn't had previous exposure to that.

17   Q    Okay.

18           THE COURT:  Mr. Sinkule, just a quick question.  The

19   jury would like to take a quick break, but I don't know how

20   long you're going to be on redirect.  Do you have several

21   questions?

22           MR. SINKULE:  Yeah, I've got some more so it may

23   be --

24           THE COURT:  Okay.

25           MR. SINKULE:   -- a good time to break.

1           THE COURT:  Let's take a quick break.

2           THE CLERK:  All rise.

3       (Jury exits courtroom at 3:54:28 p.m.)

4       (Recess taken from 3:54 p.m. to 4:03 p.m.)

5           THE COURT:  All right.  The jury is ready?  We need

6    to wait for the -- oh, here we go.

7           UNIDENTIFIED SPEAKER:  Judge, do you know what time

8    you'd like to start tomorrow?

9           THE COURT:  The jurors are asking?

10          UNIDENTIFIED SPEAKER:  The jury is downstairs --

11          THE COURT:  Let me find out if they're going to --

12   I think -- Counsel, if we started at 8:30 or 9:00 tomorrow --

13   well, so here's my only concern.  We have a juror, Number --

14   she's Panel Member Number 5, who's going on vacation next

15   week, so she needs to be finished by Friday.  I think we

16   should just bite the bullet and start at 8:00 if they want to

17   start at 8:00.

18          UNIDENTIFIED SPEAKER:  Fine with me.

19          THE COURT:  All right.

20          MR. SINKULE:  That's -- yeah, that's fine with us.

21          THE COURT:  All right.  Okay.

22          THE MARSHAL:  All rise for the jury.

23      (Jury enters the courtroom at 4:04 p.m.)

24          THE COURT:  Be seated, please.

25          Ladies and gentlemen of the jury, we, in talking

1     about the schedule, we may be able to release you a little bit

2     early today.  The lawyers and I will stay and do work

3     regarding the charge.  We will have the case closed, both the

4     Plaintiff and Defendant by tomorrow will finish with their

5     cases and we'll have closing arguments tomorrow and you will

6     receive the case for deliberations.

7              Are you all still fine with starting at 8:00 a.m.

8     tomorrow morning?

9          (No audible response.)

10             THE COURT:  All right.  We will begin again at 8:00

11    a.m. tomorrow morning, and we will -- you know, you'll be able

12    to work as late as you want to deliberating tomorrow, and

13    you'll deliberate until the -- until you reach a decision.  So

14    in terms of housekeeping issues, you'll probably leave a

15    little before 5:00 today and we'll start at 8:00 a.m.

16    tomorrow.

17             All right.  Please proceed, Mr. Sinkule.

18             MR. SINKULE:  Thank you.

19             REDIRECT EXAMINATION OF ZAHID ISLAM (RESUMED)

20    BY MR. SINKULE:

21    Q    All right.  Mr. Islam, there's been some testimony from

22    you today about your title, your job title at Shipcom.  What

23    did you say, what would you represent to people if you were

24    out at a cocktail party and someone said, Hey, what's your job

25    or what is your title, what would you have said?

ZAHID ISLAM - REDIRECT BY MR. SINKULE                    298

1    A    The title is Financial Analyst.

2    Q    Okay.  And so what is your understanding in general of

3    what the title Financial Analyst means,  not in your role

4    necessarily at Shipcom, but just generally speaking?

5    A    Just budgeting, forecasting, extrapolating the

6    performance of the company.  Very different from the AP

7    function.

8    Q    Okay.  And so is that what you were doing for Shipcom,

9    were you doing in the traditional sense the job of a Financial

10   Analyst?

11   A    No.

12   Q    Okay.  I'm going to show you -- let's see, let's look at

13   Defendant's Exhibit Number 23.  This is the LinkedIn profile.

14        (Pause in proceedings.)

15   BY MR. SINKULE:

16   Q    This is very faint.  Okay.  A little bit better.  All

17   right.  So let's look at the second bullet point.  You see

18   this here, it says, Integral to startup operations by

19   developing payables process incorporating AP best practices

20   and much needed separation of duties.  Did I read that

21   correctly?

22   A    Correct.

23   Q    Okay.  And that's some information that you provided on

24   your LinkedIn profile.  Correct?

25   A    Yes.

1    Q    And is that something you did at Shipcom?

2    A    Yes.

3    Q    Okay.  And how would you -- well, how did you develop the

4    payables process at Shipcom?

5    A    Well, it was just by the position being open that really

6    opened the door for the automated -- for the three-way

7    matching, and as far as developing the payables process, just

8    getting things scanned in, having soft copies and having them

9    so that another company can have a clear idea of the cash flow

10   in it, and to me developing the payables process was just

11   doing things scrupulously and getting them into the system so

12   they're available electronically.

13   Q    Was there a payables process at Shipcom prior to you

14   joining the company?

15   A    There was but it was being -- it was not scrupulous, it

16   was being carried out by a person who shouldn't have been

17   doing the payables.

18   Q    What do you mean when you say wasn't scrupulous?

19   A    There was collusion.

20   Q    Okay.  And so what did you do in the role that when you

21   say, I did the job scrupulously, what do you mean by that?

22   A    Well, just I mean I was performing the function of

23   Accounts Payable and I was not doing, obviously not

24   Procurement, I was not doing receiving.  There were times that

25   people were -- the other departments wanted the AP function to

1    be doing the receiving function of the three-way process, but

2    I had to -- obviously we deliberated, I convened with the

3    leads and then I would explain to them that there's no way the

4    AP function can be doing the receiving because that would be

5    just a blatant violation of doing things scrupulously.

6              MR. NOTESTINE:  Your Honor, I object to this line of

7    questioning.  Again, it's not relevant to the issue and it's

8    disparaging to the company.

9              MR. SINKULE:  It's relevant --

10             MR. NOTESTINE:  Rule 403 I'm arguing it's

11   inappropriate.

12             THE COURT:  Response?

13             MR. SINKULE:  Well, this is information that

14   Mr. Notestine previously asked about and I'd like to redirect

15   my client to answer the -- just so we can explain what it was

16   that he meant by that.

17             THE COURT:  Overruled.

18   BY MR. SINKULE:

19   Q    And I think you finished answering my question.  Is that

20   right?

21   A    Yes.

22   Q    Okay.  Let's look at the fourth bullet point, Help

23   establish routine, do you see that, in auditable AP process

24   within the company that meets FAR regulations.  Do you see

25   that?

1    A    Yes.

2    Q    And Mr. Notestine asked you about that.  Correct?

3    A    Correct.

4    Q    So what's the reference here, what routine and auditable

5    AP process did you establish, or were you referencing here?

6    A    Well, previously there wasn't really a paper trail or not

7    a trial because some of the invoices were manual hard copies

8    and just by me scanning them and scraping them over and have

9    them available electronically, and entered into Deltek made it

10   auditable because previously there were stacks of invoices

11   lying around in cabinets and there was no paper trail.

12   Q    So this says you established the AP process.  Was there

13   an AP process in place prior to you joining the company?

14   A    I don't believe so.  That's why they brought me in,

15   that's the position they needed to fill.

16   Q    And did you do that on your own?

17   A    No, I was getting guidance once again by the leads who

18   were there, first Rebecca, Tim and the Accounting Manager that

19   they brought in full-time and my boss, Rene.

20   Q    All right.  Let's look at another exhibit.  Let's look at

21   Defendant's Exhibit 83.

22        (Defendant's Exhibit No. 83 identified.)

23   BY MR. SINKULE:

24   Q    Mr. Islam, do you recall Mr. Notestine asking you some

25   questions about this document?

1   A    Yes.

2   Q    And this is the email that you sent to Rene, Ms. Carnes,

3   and you reference in this  that you had -- you're happy to

4   inform her that you had -- I have the AP policies and

5   procedures drafted, reviewed by Irvana (phonetic) and then you

6   attach those to the email.  Correct?

7   A    Correct.

8   Q    Okay.  And then attached to the email is the document,

9   Accounts Payable Policies and Procedures.  Correct?

10  A    Correct.

11  Q    And you testified about this I think on direct that this

12  was something you had put together near the end of the year.

13  Is that correct?  Near the end of your first year there, 2014.

14  Right?

15  A    Yes.

16  Q    And, in fact, that's what this email stated, end of the

17  year, 12/15/2014.  Is that --

18  A    Yes.

19  Q     -- correct?  Okay.  And tell us again, how long did it

20  take you to compile this information that's contained in

21  Defendant's Exhibit Number 83?

22  A    Just a couple of days and at this point I had a much

23  better understanding obviously, several months into the AP

24  function, and what others were doing, and alongside just a lot

25  of reading, a lot of reading that I was doing on the side.

1  Q    Okay.  And so of the nine months you worked approximately

2  nine months you worked for Shipcom, you spent a couple of days

3  on this.  Correct?

4  A    Correct.

5  Q    Any other policies and procedures that you put together

6  on behalf of the company during your nine months of employment

7  with Shipcom?

8  A    No.

9  Q    All right.  Let's look at Exhibit Number 28, Defendant's

10  Exhibit Number 28.  Okay.  Mr. Notestine asked you about this

11  email.  Do you recall that?

12  A    Correct.  Yes.

13  Q    And this is an email that you sent to Malek.  Is that

14  what guys referred to him as?

15  A    Yes, and we also invited MK.

16  Q    MK.  Okay.  And so this was sent in April, April 3, 2015.

17  Correct?

18  A    Correct.

19  Q    And to this you attached -- look at the next page -- a

20  copy of the same Accounts Payable Policies and Procedures that

21  you had previously circulated back at the end of 2014.

22  Correct?

23  A    Correct.

24  Q    And why did you send this email to MK?

25  A    Well, because we just had my former boss, she left, she

1    departed the company, and new management was in so I just

2    wanted to make it exceedingly clear to him -- we had talked

3    previously in person, but I just wanted in writing that just

4    beyond, you know, my duties.  I didn't -- I was adding value

5    so I just wanted that to be known.

6    Q    Okay.  All right.  Thank you.

7              MR. SINKULE:  I pass the witness.

8              MR. NOTESTINE:  I have no further questions, Your

9    Honor.

10             THE COURT:  All right.  You may be excused,

11   Mr. Islam.

12       (Witness steps down.)

13             THE COURT:  All right.  Ladies and gentlemen of the

14   jury, we are going to break for the day and release you at

15   this point and we will pick up tomorrow at 8:00 a.m.

16             THE MARSHAL:  All rise for the jury.

17       (Jury exits courtroom at 4:15 p.m.)

18       (Outside the presence of the jury.)

19             THE COURT:  All right.  If the parties want to be

20   excused, and corporate reps, they don't have to stay for the

21   charge conference --

22             MR. NOTESTINE:  Yeah, we're --

23             THE COURT:   -- if they don't want to.

24             MR. NOTESTINE:   -- going to let our guys go.

25             THE COURT:  Okay.

1           MR. NOTESTINE:  And then we need about -- just

2    10 minutes for Mr. Sinkule and I to kind of go over a couple

3    of things.

4           THE COURT:  That's fine.  Well, we'll pick up after

5    4:30.

6           MR. NOTESTINE:  Great, Your Honor.  Thank you.

7           THE COURT:  All right.  Thank you.

8        (Recess taken from 4:16 p.m. to 4:35 p.m.)

9        (Outside the presence of the jury.)

10          UNIDENTIFIED:  Judge, Jenni Olson.  I'm the ER.

11          THE COURT:  All right.  Thank you for being here.

12          UNIDENTIFIED:  You're very welcome.

13          THE COURT:  Try not to be too long.

14       So the 2016 version is the most current version.

15          MR. NOTESTINE:  I couldn't remember what year, but I

16    knew it was after 2014.

17          THE COURT:  But there aren't any changes from

18    what -- we just talked to the librarian, Elizabeth.

19          MR. NOTESTINE:  Yeah, so on the (indiscernible)

20    defense, has Defendant proved that it exercised reasonable

21    care to promptly correct any harassment of Plaintiff because

22    of his age.  That's --

23          THE COURT:  Yeah, but that's not the same standard

24    as what we're doing here.

25          MR. NOTESTINE:  Well that's --

1        THE COURT:  For the good faith -- I mean --

2        MR. NOTESTINE:  Yeah, well that's something where

3   the Defendant has a burden of proof.  It's a different issue.

4   It's not --

5        THE COURT:  Right.

6        MR. NOTESTINE:  But that's just how it's termed.  We

7   basically have the same language, it's just we have -- well, I

8   shouldn't be arguing this with you without (indiscernible).

9        THE COURT:  Yeah, well we'll get everybody in here

10  and get going.

11       MR. SLOBIN:  Hello, Your Honor.  I'm sorry.

12       THE COURT:  That's okay.

13       MR. SLOBIN:  Something looks different in here.

14       THE COURT:  So we were -- sorry?

15       We were talking about whether there is a newer

16  version of the pattern jury charge.  I don't believe -- we

17  just called the librarian and we were told that the 2016 --

18  that it is the same as the 2014 charge updated through 2016,

19  is what I believe Elizabeth just communicated with the

20  librarian.

21       MR. NOTESTINE:  Okay.

22       THE COURT:  Does that sound --

23       MR. SLOBIN:  Yeah, I just -- I mean, I just was

24  looking it up during the break.  So that's what I was kind of

25  working off of.

1          MR. NOTESTINE:  But we have hardly any --

2          THE COURT:  2014.

3          MR. SLOBIN:  I need to look at the date on them.

4          THE COURT:  Yeah, I don't --

5          MR. SLOBIN:  Whatever is on the Fifth Circuit list.

6          THE COURT:  Right.  I believe that is --

7          MR. NOTESTINE:  Well also, they've updated the 2014

8    on the website through 2016.

9          THE COURT:  Correct.

10         MR. SLOBIN:  I see what you're saying.

11         THE COURT:  Correct.

12         MR. NOTESTINE:  I got it.

13         THE COURT:  We are bringing down copies of the

14   charges we have at this point in time.

15         MR. SLOBIN:  Okay.

16         THE COURT:  But we can go ahead and start talking, I

17   guess, before Elizabeth brings us the copies of the charge.

18         MR. NOTESTINE:  We hardly have any dispute, Your

19   Honor.  I mean --

20         THE COURT:  You guys are okay without water at this

21   point, right?

22         MR. NOTESTINE:  Yeah, I'm fine.

23         THE COURT:  Okay.  Are you okay?

24         UNIDENTIFIED:  Yeah.

25         THE COURT:  Yeah, we're fine.

1           So here's one issue that I wanted to bring up.

2     We're getting an advisory opinion from the jury on the good

3     faith question.  I'm assuming that by the close of the case

4     tomorrow, all parties will have submitted whatever evidence

5     they want to have considered on the good faith defense.

6                 MR. SLOBIN:  Yes.

7                 MR. NOTESTINE:  I think that's right, Your Honor.

8                 THE COURT:  All right.  Because if we're going to

9     get the advisory opinion, I want that opinion to be based on

10    all of the evidence that's going to be -- meaning, I don't

11    want to consider any other evidence or hold any other portion

12    of the trial beyond what the jury has.

13                MR. NOTESTINE:  It was really Mr. Goenka's testimony

14    that -- he's the only one that is going to --

15                MR. SLOBIN:  Before we started the trial, we were

16    talking about, like, that little mini part -- we're going to

17    have all of our stuff out, I think you're going to have all of

18    your stuff out, and therefore we'll be done when everyone's

19    done.

20                MR. NOTESTINE:  Yeah.  And I think that there's

21    anything else.  Mr. Cherukupally may have --

22                THE COURT:  Well I'm not telling you what to put on

23    in your case.  I'm just telling you, I'm not going to take any

24    other -- since we're getting an advisory opinion from the

25    jury, I'm not going to take any additional evidence after we

1    submit that to the jury.

2              MR. NOTESTINE:  And we don't have any other

3    evidence.

4              THE COURT:  All right.  Okay.  So that was one

5    issue.

6              The other issue that I had was the proposed charge,

7    and I guess it's a lot easier to talk about this once we get

8    copies in everybody's hands.  But there's a burden of proof

9    instruction and there's an FLSA instruction.  I think it's on

10   page -- of the proposed charge that you all included in the

11   final pretrial order.  It's instruction number 12, the Fair

12   Labor Standards Act, and that includes the issue that we

13   discussed today with respect to whether we're going to say if

14   the Defendant has satisfied you by a preponderance of the

15   evidence that the Plaintiff's primary duties were exempt

16   administrative duties, then your verdict should be for the

17   Defendant.

18             MR. NOTESTINE:  And that's similar to the

19   affirmative defense on the (indiscernible) defense in the

20   discrimination cases.

21             THE COURT:  So I believe that that is the way that

22   we should submit it because it is part of the --

23             MR. SLOBIN:  Your Honor, my preference is that we

24   offer both of them.  I think it's the same conclusion, but I

25   think it's very clear for the jury as to what they're asked to

1     do.  And if you read them both in conjunction, you can really

2     not answer one one way and one the other, you're going to

3     answer them the same.

4          THE COURT:  So in the pattern jury charge, what does

5     the Fair Labor Standards Act instruction include?  Does it

6     just stop prior to that?  So just stop at the paragraph --

7          MR. NOTESTINE:  Yeah.  There's nothing -- I mean, it

8     -- yeah, it stops at -- is this a pattern jury charge?  In

9     example 12, is that from the pattern jury charge?

10         Yeah, I don't --

11         THE CLERK:  What page is it on?

12         THE COURT:  The question is, the instruction on the

13    Fair Labor Standards Act, is that contained in the pattern

14    jury charge?  Or is this just created from the statute?

15         THE CLERK:  No, this is just the law from the

16    statute.

17         MR. NOTESTINE:  Yeah, I don't think there is a

18    pattern instruction.

19         THE COURT:  Okay.  There is no pattern

20    instruction --

21         MR. NOTESTINE:  I don't think there is, Your Honor.

22         THE CLERK:  No.

23         THE COURT:  All right.

24         MR. NOTESTINE:  So I mean, we've agreed to the first

25    part.  It's just that --

1          THE COURT:  So you're agreed -- the parties are

2    agreed upon everything.  So let's look at -- do you all have a

3    copy of what the Court has given you, correct?

4          MR. NOTESTINE:  Yeah.

5          THE COURT:  So we're on page 9 of the current draft,

6    specific instructions, we have Fair Labor Standards Act.  The

7    parties are in agreement with everything on that page up to

8    what is currently the last paragraph that begins, "If the

9    Defendant has proved by a preponderance of the evidence that

10   the Plaintiff's primary duties were exempt administrative

11   duties, then your verdict should be for the Defendant."

12         And the Plaintiff is now suggesting, or has been

13   suggesting, that we should also include the paragraph that

14   says, "If the Defendant has not satisfied you by a

15   preponderance of the evidence, that the Plaintiff's primary

16   duties were exempt administrative duties, then your verdict

17   should be for the Plaintiffs."

18         MR. SLOBIN:  Yeah, Your Honor.  For clarity's sake,

19   I think the words are exactly the same, it's just for clarity

20   and for just making it very easy for the jury not to be

21   confused as to why they were given the last couple of days.

22         THE COURT:  Mr. Notestine, do you have any objection

23   to including --

24         MR. NOTESTINE:  Yeah, I object.  I think it's

25   redundant and unnecessary.  Just looking at the pattern jury

1      charge on employment claims and seeing if they include both.

2      I'm pretty sure they don't, Your Honor.

3              I'm just looking at the employment charge for

4      hostile work environment.

5              MR. SLOBIN:  Your Honor, I don't see the potential

6      for harm in adding both.  I can see that, you know,

7      potentially there could be confusion by just having the one.

8          (Pause in the proceedings.)

9              THE COURT:  Can you cite me authority for submitting

10     it both ways?  Like other pattern charges that --

11             MR. SLOBIN:  I'm sure if I had some time, Your

12     Honor, I could probably find something.  Not off the top of my

13     head.

14             THE CLERK:  The charge for Title 7 is on 129.

15             MR. SLOBIN:  What was that?

16             THE CLERK:  I said the charge for Title 7 is on 129.

17             MR. NOTESTINE:  I was looking at the

18     (indiscernible).

19             THE CLERK:  Okay.

20             THE COURT:  How did they submit it in the pattern

21     charge for a Title 7 claim?

22             THE CLERK:  It says:  Plaintiff claims that he or

23     she would not have been specified adverse employment action

24     but for protective trade, or Defendant's average employment

25     action of Plaintiff was motivated by Plaintiff's name -- by

1     Plaintiff protecting trade."  So it's either/or.

2             THE COURT:  Can you bring that?

3             THE CLERK:  Yeah.

4             MR. NOTESTINE:  Yeah, it says if you find Plaintiff

5     was sexually harassed because of her sex, then you must find

6     for Plaintiff unless Defendant proves by a preponderance of

7     the evidence that -- and then it goes into the (indiscernible)

8     defense.  That's about as close as I see --

9             THE COURT:  Where is that?

10            MR. NOTESTINE:  That's on 133.  What if it has it --

11            THE COURT:  I don't think it's error to submit both

12    of them.

13            Well that's not submitting -- oh, will they submit

14    it that way?

15            THE CLERK:  No, I think it's --

16            THE COURT:  Either or.

17            THE CLERK:  Yeah.  They're different.  I think it's

18    depending on what type of case it is.

19            THE COURT:  I'd rather -- is there a burden of proof

20    because this is more closely tied to the burden of proof issue

21    than anything else?  You know, the burden shifting issue.

22            Do we have any -- is there any guidance from --

23            MR. SLOBIN:  Should we maybe looking at an FMLA

24    questions?  That's going to be -- because they're consistent

25    with --

1          MR. NOTESTINE:  I don't think there's much on the

2     FMLA is the problem.

3          MR. SLOBIN:  Your Honor, again, I just think that

4     there's -- you're not going to get any confusion by having

5     both of them there.  They're basically worded the same.  It's

6     just giving it a very clear directive to the jury.

7          MR. NOTESTINE:  Your Honor, I don't know really that

8     we have something directly telling us what to do here.

9          (Pause in the proceedings.)

10          THE COURT:  All right.

11          So Defendants object to having it submitted with

12     both of these paragraphs.

13          MR. NOTESTINE:  Yes, we object Your Honor.

14          THE COURT:  All right.

15          Are there any other differences among the parties

16     with respect to the charge?

17          MR. SLOBIN:  I have some other potential additions,

18     Your Honor.  Maybe if I can just hold this over herer?

19          THE COURT:  Well --

20          MR. NOTESTINE:  I mean, you put in our proposal on a

21     good faith defense for the Defendants -- the advisory issue.

22     That's ours.  We obviously don't object to that, Your Honor.

23          THE COURT:  So there's a question on a good faith

24     defense.

25          MR. SLOBIN:  Your Honor, there's two things I'd like

1          to potentially add to number 12.  That's (indiscernible) the

2          best fit.  Can I go over them with you?

3                    THE COURT:  Hold on just a second.  Two things you

4          want to add to instruction number 12?

5                    MR. SLOBIN:  Correct, Your Honor.

6                    THE COURT:  All right.  Let's hear those.

7                    MR. SLOBIN:  One, it's --

8                    THE COURT:  Let's talk with respect to the copy that

9          we are working with -- the charge that we are working with.

10                    MR. SLOBIN:  I'm sorry.

11                    THE COURT:  That would be on page 9.  Starting on

12          page 9, that's the Fair Labor Standards Act instruction is

13          what you're referring to when you say instruction 12, correct?

14                    MR. SLOBIN:  That's correct, Your Honor.

15                    And I would propose possibly inserting it on page 10

16          above the issue that we were just dealing with.  It's from a

17          Supreme Court case, Your Honor.  The words are, "Employers may

18          not, either prospectively or retrospectively," -- I'm sorry.

19          "Employees may not, either prospectively or retrospectively,

20          waive their FLSA rights, to minimum wages, overtime, or

21          liquidated damages."  And the case is

22          D.A. Shulte, Incorporated vs. Gangi, G-A-N-G-I, 328 U.S. 108

23          on page 114 (1946).

24                    MR. NOTESTINE:  But that's talking about --

25                    THE COURT:  Is that a jury charge?

1          MR. NOTESTINE:  No.

2          MR. SLOBIN:  It's not, Your Honor.  But they've made

3     a lot of argument that by accepting their offer letter that

4     has a salary, that therefore, they can waive it essentially

5     and not be entitled to overtime.  That's what I heard.

6          THE COURT:  I haven't heard any evidence of a

7     waiver.

8          MR. NOTESTINE:  I haven't heard (indiscernible).

9          MR. SLOBIN:  What I would say it's argument from

10    Mr. MacDowall when he was asking those questions of the

11    trainers for sure, Your Honor, saying, that's an offer and

12    acceptance, but --

13         THE COURT:  Okay.  You can submit your requested

14    instruction and the authority for it, but I'm not inclined to

15    add that.

16         MR. SLOBIN:  Okay.  I will offer it and submit it.

17    I'll write it up between them --

18         THE COURT:  Okay.

19         MR. SLOBIN:  -- for the fourth quarter.

20         THE COURT:  Okay.

21         MR. SLOBIN:  Okay.

22         THE COURT:  Probably what you should do is file it

23    as an amended proposed charge.  Just include it.  You know,

24    attach it, say you really want it included, and file it as an

25    amended proposed jury charge.

1          MR. SLOBIN:  Okay.

2          And Your Honor, one other -- I don't know how you're

3     going to rule on this, but I'd like to put it out there.

4          THE COURT:  Sure.

5          MR. SLOBIN:  Same spot, essentially.  Also a

6     Plaintiff's past employment experiences and method of being

7     compensated cannot be used to justify the Defendant's method

8     of compensating Plaintiffs during their employment of

9     Defendant.

10          There seem to be -- I have no authority for that,

11     Your Honor.  I'm trying to get a case sent to me from the

12     office.  It seemed like they tried to make an argument for

13     sure that because you are compensated one way at your former

14     employer that that also means that you can be compensated at

15     your current employer or at Shipcom.

16          Your Honor, it's such a -- to me, a bizarre legal

17     theory that that's just not how it works.  But I don't wan

18     there to be any confusion by the jury to think that, well if

19     they worked somewhere else and they were paid the salary that

20     that means that when they go to Shipcom, it's okay to be paid

21     on that.

22          MR. NOTESTINE:  Your Honor, I think we addressed it.

23     It's evidence.  I mean, whether the jury believes it or not, I

24     don't think the construction -- I mean, they put on evidence

25     from Mr. Islam that those duties at those other jobs were

1     different.  So the jury can make a decision about whether it's

2     relevant or not, and I don't think we need an instruction on

3     it.

4             It's not a waiver.  We'd have to go into all of the

5     elements of a waiver, Your Honor.  I think that would kind of

6     complicate it.

7             THE COURT:  Well what I -- the instruction I'm going

8     to give them is the instruction that you all agree to in the

9     proposed charge.  You, again, include your additional request.

10    You know, file it so that you protect your record.  But the

11    FLSA describes how the exemption is to be decided, and

12    that's -- you know, that's how we're going to submit it to the

13    jury -- whichever three elements that are in the statute.

14           And we also have instructions in here which come

15    from the regulations regarding directly related to, discretion

16    and independent judgment, and I think we have primary duty in

17    here, correct?

18           MR. SLOBIN:  Yes, Your Honor.

19           THE COURT:  So those are the -- that's the guidance

20    we have from the statute itself and the regulations that

21    interpret the statute, so that's what we're going to stick

22    with for the charge.  There's certainly nothing stopping you

23    from arguing the facts and that that evidence, you know, is

24    not part of what is considered in the instructions.

25           I don't think -- yeah.  Unless you show me a case

1    where it was an error to fail to submit that instruction to

2    the jury, I don't think we're going to add it.

3              MR. SLOBIN:  Yeah, I don't think we're going to find

4    one.

5              MR. NOTESTINE:  (Indiscernible).

6              THE COURT:  Anything else that you want in the

7    charge that is not in the --

8              MR. SLOBIN:  Yes, Your Honor.

9              On page 11, the paragraph at the top that starts

10   with "An employee."

11             THE COURT:  Yes.

12             MR. SLOBIN:  So this is from the 29 CFR, but it's

13   missing a couple of words and I'd like to insert those words.

14             THE COURT:  Okay.

15             MR. SLOBIN:  Specifically, if you'll pick it up at

16   "thus, for example, employees acting as advisors or

17   consultants to their employers, clients, or customers."

18   Here's what missing, "(as tax experts or financial

19   consultants, for example)," and that's exactly from 29 CFR

20   Section 541.201(c).  And I'd like to have that included

21   because that's what the CFR says.

22             THE COURT:  As tax experts or financial

23   consultants --

24             MR. SLOBIN:  Comma, for example.

25             MR. NOTESTINE:  Which those aren't really relevant

1       to the case, Your Honor, and it's probably why we left it out.

2               MR. SLOBIN:  Your Honor, there's plenty of examples

3       throughout the charge of things that aren't exactly relevant

4       to the case.

5               THE COURT:  I agree.  And we're using the

6       regulations and the statute as guidance for the jury on how to

7       decide whether the exemption or whether the duties fall within

8       the administrative exemption, so I will agree to include the

9       language directly from the CFR.

10              MR. SLOBIN:  Thank you, Your Honor.

11              In the next section, under "discretion and

12      independent judgment," there's, I believe, a sentence missing.

13      Give me one second to pull it up.

14              One moment, Your Honor.

15         (Pause in the proceedings.)

16              Yes, Your Honor.  Here's directly from the CFR in

17      the comments.  I'm sorry.

18              MR. SINKULE:  Look, it's not from the comments.

19              MR. SLOBIN:  No.  Okay.  You're right.  It's right

20      in the CFR.  Your Honor, there's a sentence missing that

21      should go right before, "In general."  The sentence is --

22              MR. NOTESTINE:  Is this from 541.202?

23              MR. SLOBIN:  Correct.

24              MR. SINKULE:  Yes.

25              THE COURT:  Elizabeth, do you have that pulled up?

1    THE CLERK:  I'm not connected to the internet right

2    now.

3    MR. SLOBIN:  I'm on Judge Milloy's internet.  I hope

4    that's okay.

5    Do you want me to read the sentence, or are you

6    looking it up, Your Honor?

7    THE COURT:  I'm trying to pull it myself.  I'm going

8    to need for you to give me the cite once I get connected to

9    the internet.

10    (Pause in the proceedings.)

11    MR. NOTESTINE:  I've got it here, Your Honor.

12    MR. SLOBIN:  I can just bring it to you, Your Honor,

13    if you want.

14    THE COURT:  Okay.  Sure.

15    To qualify for the administrative exemption.

16    MR. SLOBIN:  Yeah, that's missing from the charge.

17    MR. NOTESTINE:  What sentence is missing?

18    THE COURT:  "To qualify for the administrative

19    exemption, an employee's primary duty must include the

20    exercise of discretion and independent judgment with respect

21    to matters of significance."

22    MR. NOTESTINE:  That's in the primary duty, though,

23    isn't it?

24    Yeah, that's the first -- to qualify for the --

25    which primarily must be --

1          THE COURT:  Hold on.

2          MR. NOTESTINE:  It's in the primary duty

3    instruction.  Well it must be performance of exempt work.  The

4    term primary duty means a principal one.

5          It's a similar statement.  It's not exactly the

6    same.  So I think we moved the primary duty to the primary

7    duty instruction.

8          THE COURT:  So we do have under primary duty, to

9    qualify for the administrative exemption, an employee's

10   primary duty must be the performance of exempt work.

11         Let's be consistent.  Let's go with the language

12   exactly as it appears in the CFR.  So we'll insert the missing

13   sentence, and then when we get to the primary duty

14   definition -- you want to pull that up and make sure we have

15   that?

16         MR. SLOBIN:  Yes.

17         MR. NOTESTINE:  That's from a different CFR.

18         THE COURT:  So Ms. Humphrey, do you see what we're

19   doing?

20         THE CLERK:  I don't have internet, so you're going

21   to have to show me what you're doing.

22         MR. SLOBIN:  Here, I'll bring it to you.

23         THE CLERK:  Yeah.

24         THE COURT:  And just go ahead and type it right into

25   the charge right now.

1          MR. SLOBIN:  Thank you, Your Honor.

2          THE COURT:  Yes.

3          Now is the instruction on primary duty as it comes

4     out of the CFR?

5          MR. SLOBIN:  Your Honor, do you know what the CFR

6     number is for that?

7          THE COURT:  29 CFR 541.700.

8          MR. NOTESTINE:  541.700.

9          Your Honor, it starts out, directly -- here it is.

10    It starts out --- I haven't gone through the entire

11    regulation.

12         (Off the record.)

13         THE COURT:  Okay.

14         We leave primary duty as is as far as I can tell.

15    Do you agree?

16         MR. SLOBIN:  Yes, Your Honor.

17         THE COURT:  The instruction that we have currently

18    for primary duty which begins on page 14 is going to remain as

19    is.

20         MR. SLOBIN:  Yes, Your Honor.  It looks the same to

21    me.

22         THE COURT:  So the changes that we are making so far

23    is we are adding the missing sentence from 29 CFR 541.202 on

24    page 11 as the first sentence under discretion in independent

25    judgment, correct?  Mr. Notestine, do you agree?

1          MR. NOTESTINE:  Yeah.  I have no problem with that,

2     Your Honor.

3          THE COURT:  And, Mr. Slobin, that is correct?

4          MR. SLOBIN:  Yes, Your Honor.  That is correct, Your

5     Honor.

6          THE COURT:  All right.

7          I've overruled the other two requested instructions

8     that Plaintiffs have made.  Is there anything else?

9          MR. SINKULE:  There was the addition of those few

10    words as well in the one section.  The words in parenthesis,

11    the example.

12         THE COURT:  Yes.

13         MR. SINKULE:  I forget what section that was.

14         THE COURT:  That was --

15         MR. NOTESTINE:  I guess I object to that.

16         THE COURT:  That's also on page 11, the last line of

17    the section.

18         MR. SLOBIN:  Your Honor, I'm just reading over the

19    good faith.

20         THE COURT:  Okay.

21       (Off the record.)

22         MR. SLOBIN:  Hey, Kerry?

23         MR. NOTESTINE:  Yes.

24         MR. SLOBIN:  Did this good faith instruction come

25    from somewhere, or is it just --

1          MR. NOTESTINE:  Mr. MacDowall can tell you, but I

2     believe the first sentence comes directly from the statute.

3     Then the reasonable belief to the second sentence came from

4     where?

5          MR. MacDowall:  I believe that came from the Eighth

6     Circuit case that's cited in the footnote --

7          MR. NOTESTINE:  *Tyson Foods.  Guyton vs. Tyson*

8     *Foods*.  I thought that's where the third sentence came from.

9          THE COURT:  Which page is that instruction on?

10         MR. SLOBIN:  15.

11         MR. NOTESTINE:  Third sentence came from that.  I

12    think I looked at this, Your Honor, and I know the first

13    sentence comes directly out of the statute.

14         (Off the record)

15         MR. NOTESTINE:  The Eighth Circuit case apparently

16    said, Judge, that they gave a limiting instruction that had to

17    include the third sentence.  That's the *Tyson Foods* case.

18         THE COURT:  And the third sentence being --

19         MR. NOTESTINE:  A finding that Shipcom was acting in

20    good faith and reasonable act or omission was in violation may

21    only be used to decide issues presented by this defense.

22         THE COURT:  Right.

23         MR. NOTESTINE:  It's kind of what you said once to

24    the jury I think that -- I think you said it.

25         Good faith just -- I don't know if you ever said the

1    audit leads to good faith, but could only be considered for

2    that issue.  Did you ever say that to the jury?

3         THE COURT:  No.  Because the issue -- because I

4    don't think there's a basis for a limiting instruction on the

5    evidence since I have held that Rule 407 doesn't exclude the

6    evidence.  I think the limiting instruction would apply if it

7    were being admitted for a limited purpose as under Rule 407.

8         MR. SLOBIN:  Your Honor, I have some thoughts on

9    things I'd like to add to that good faith instruction.

10         THE COURT:  Okay.

11         MR. SLOBIN:  And I haven't drafted that

12    specifically, but I'd like to put in some words that good

13    faith is not delays in reclassification because I think that's

14    the issue for the jury, really, as to how long it took the

15    company once they even looked at this issue.  You know, it was

16    over a year, and I don't think --

17         THE COURT:  I think that the case law is going to

18    say and this instruction says the act or omission giving rise

19    to such action.  So that would be reclassification.

20         MR. SLOBIN:  What about adding even such act or

21    omission including delays?

22         MR. NOTESTINE:  Your Honor, I think that's

23    commenting on the evidence.  I mean, unless he's got a very

24    specific cite for that, I --

25         THE COURT:  Yeah.  I mean, my understanding of the

1    law and my understanding of this instruction is that you're

2    looking at the act or omission that gave rise to the action

3    which would be initial reclassification.  So --

4           MR. SLOBIN:  Yeah, I know.  But the argument that

5    they're making, if I understand it correctly, is we acted in

6    good faith and that's what all that testimony is.  We hired

7    Nitin Sud (phonetic), and we did this, and we did this.  These

8    are all the things that we did in good faith.  Okay.

9           It's not arguing about what we initially did.  All

10   of the testimony from the first witness was, look at all the

11   stuff that we did in good faith once we looked at this issue.

12          THE COURT:  You know what?  I don't think that

13   that's what the law is, and I don't think that that's what

14   this instruction says, either.  Plaintiffs may recover

15   liquidated damages unless the employer shows to a satisfaction

16   of the Court that the act or omission giving rise to such

17   action.  The act or omission giving rise to the action is the

18   initial classification.  So that has to be in good faith and

19   it had reasonable grounds for believing that its act or

20   omission was not a violation of the FLSA.

21          I think that they can argue -- you know, both sides

22   can argue the evidence.  Well I'm going to put this back on

23   you all.  I believe that the law is that you look at the time

24   of the original classification.  I'll charge you all with

25   finding tonight any case law that says otherwise.

1           MR. SLOBIN:  I appreciate that, Your Honor.  I'll
2     look tonight.
3           MR. NOTESTINE:  First sentence is right out of the
4     statute, Your Honor, so there can't be a dispute about that.
5           THE COURT:  Yeah, I mean --
6           MR. SLOBIN:  I don't have any problem with the first
7     sentence.  But let me -- I'll look.  If I find something, I'll
8     let you know, and if not --
9           THE COURT:  Okay.
10          MR. SLOBIN:  -- it will be what it is.
11          THE COURT:  The thing that I'm concerned we may not
12    properly have in this defense is the burden.
13          MR. SLOBIN:  Yes, I agree with you.
14          MR. NOTESTINE:  Unless the employer shows to the
15    satisfaction of the Court.  That --
16          THE COURT:  And I'm wondering if we should take --
17    because this is an advisory opinion for the jury -- whether we
18    should take out "to the satisfaction of the Court."  Maybe
19    just take out the words "to the satisfaction of the Court."
20          MR. NOTESTINE:  Yeah, that seems unlikely to be
21    appropriate to present to a jury, especially since we've got a
22    lawyer on the jury.  Isn't that something that the Court
23    should decide?
24          THE COURT:  Right.
25          I think we need a sentence regarding the burden just

1    like we have in what was formerly instruction 12.

2         MR. NOTESTINE:  I'm fine with putting something

3    similar to what we added to 12 in there, Your Honor.

4         THE COURT:  Something like the Defendant must prove

5    by a preponderance of the evidence --

6         MR. NOTESTINE:  That it acted in good faith.

7         THE COURT:  Or maybe it should say -- maybe what we

8    should do is say -- I think that if we combine it with the

9    fact that the defense only applies to liquidated damages,

10   that's the appropriate way to go.  So we --

11        MR. NOTESTINE:  That's kind of what this says.  It

12   was not a violation and it won't be used to decide issues

13   presented by this defense as to liquidated damages.  That's

14   what that --

15        THE CLERK:  I think I might have changed that on the

16   last sentence, are entitled to liquidate.  And the only reason

17   (indiscernible).  I'm not sure if that's what you had in the

18   initial instruction.

19        MR. NOTESTINE:  And then we have a finding that

20   should come up in good faith and then have reasonable grounds

21   for believing its act or omission is not a violation may only

22   be used to decide issues presented by this defense.

23        THE CLERK:  Yeah.

24        MR. NOTESTINE:  You've changed it.

25        THE CLERK:  I changed that to, may only be used to

1     determine whether Plaintiffs are entitled to mitigated

2     damages.

3          THE COURT:  So what I would like to do, and I would

4     like for the parties to agree on the language.  I think that

5     this instruction needs to specify that the good faith defense

6     is an affirmative defense to an award of liquidated damages

7     and that the Defendant has the burden of demonstrating that it

8     acted in good faith.

9          So let's look at that last paragraph.  A finding

10    that Shipcom Wireless acted in good faith and that it had

11    reasonable -- and I guess we could just insert a sentence in

12    front of that last sentence on the page that says --

13         THE CLERK:  What if you just, instead of "to the

14    satisfaction of the Court," took that out and said, "the

15    employer shows by a preponderance of the evidence that"?

16         MR. NOTESTINE:  Yeah, that sounds pretty good,

17    actually.

18         MR. SLOBIN:  I like what the Judge said previously.

19         THE COURT:  You like the second sentence?

20         MR. SLOBIN:  No, I liked good faith is an

21    affirmative defense and Defendant has the burden of

22    demonstrating that.

23         THE COURT:  Ultimately, this is an advisory issue.

24    I do want to get it right as much as possible.

25         MR. SLOBIN:  Your Honor, I've never done an advisory

1    like this.  Do we let them know it's an advisory, or?  No?

2              MR. NOTESTINE:  No.

3              THE COURT:  No.

4              MR. SLOBIN:  Okay.

5              THE COURT:  Not that I know of.

6              MR. NOTESTINE:  You know, frankly, in the Title 7

7    case, that case really had an advisory.  That's really -- in

8    fact, I think that's really something the Court's supposed to

9    decide because it's definitely (indiscernible).  It's just not

10   always done by a jury.  They never say anything about it being

11   advisory.

12             MR. SLOBIN:  Yeah.

13             MR. NOTESTINE:  I think the Court -- unless the

14   Plaintiff shows by a preponderance of the evidence that the

15   act or omission (indiscernible), I mean, I think the clerk's

16   idea is -- takes out the satisfaction of the Court and shows

17   by a preponderance of the evidence that the act or omission.

18        (Pause in the proceedings.)

19             THE COURT:  Yeah.  I would rather see how it's been

20   submitted as an advisory --

21             MR. NOTESTINE:  I don't know that we've got a copy

22   of the case, but they actually gave an advisory opinion in

23   this *Guyton vs. Tyson Foods* case holding that the jury

24   instruction of good faith was not error when the limiting

25   instruction that it could only be used to decide the issue

1    presented by the good faith defense was had.  That's at the

2    bottom of our --

3              I don't think we have the copies of those cases,

4    Your Honor, where I can show it.

5              THE COURT:  I had a bunch of them.  It was the

6    *Guyton vs.* --

7              MR. NOTESTINE:  Yeah, there's three cases where they

8    apparently gave advisory --

9              THE COURT:  Oh, here we go.  I have the *Guyton* case

10   right here.  At least some parts of it.  Yeah, for some

11   reason, I don't have -- I must have left other pages --

12             MR. NOTESTINE:  In state court, it's pretty common

13   to give a good faith when you do punitive damages.  That's

14   sort of a standard part of the pattern jury charge in state

15   court.  And I think that's why clear and convincing standard,

16   all that kind of stuff, you know.  It's not a Title 7 claim.

17             THE COURT:  I don't see if this was -- I don't have

18   the full case here in front of me, but I don't see that they

19   submitted this to the --

20             MR. NOTESTINE:  It's referring to page 762.  Do you

21   have page 762?

22             MR. SLOBIN:  Your Honor, what's the cite?

23             THE COURT:  Yes, I do have page 762.

24             MR. NOTESTINE:  767 F.3d 754, citing to page 762.

25             THE CLERK:  (Indiscernible).

1          (Pause in the proceedings.)

2          THE COURT:  It just says the jury found that Tyson

3     acted in good faith under 29 U.S.C. 259(a).  Plaintiffs

4     believe the trial court should have decided the good faith

5     question as a matter of law.  Jury's other findings render any

6     error harmless.  According to Plaintiffs, allowing the jury to

7     hear evidence on Tyson's good faith defense prejudiced their

8     other claims.  The jury was instructed on *Reich* and *Alvarez* as

9     part of the good faith claim, but were told this could only be

10    used by you to decide the issues presented by the good faith

11    defense.

12          MR. NOTESTINE:  Yeah, that's where this last

13    sentence comes from.

14          THE COURT:  A jury is presumed to follow its

15    instructions.

16          So what are the instructions on *Reich* and *Alvarez*?

17          MR. NOTESTINE:  It has the questions to the jury.

18          THE COURT:  Yeah, I don't have that page.

19          MR. NOTESTINE:  Did the Plaintiffs -- but it's the

20    questions.  Did the Plaintiffs prove their FLSA and Iowa

21    claims on a class-wide basis were pre-shift and post-shift

22    donning and doffing in this case because it was work within

23    the meaning of the FLSA, it is integral and indispensable to a

24    principal activity, such that it starts and ends, and the

25    answer to both questions is no, then do not answer any more

1  questions and sign the verdict form.

2          THE COURT:  So on page 760, they talk about the

3  *Reich* case and the *Alvarez* case, and those are cases regarding

4  walking time to and from the production floor after donning

5  special safety gear.

6          MR. NOTESTINE:  Integral and indispensable principal

7  activities.

8          THE COURT:  All right.  I don't think that this case

9  is really going to help us.

10          MR. NOTESTINE:  Going to help us.

11          THE COURT:  No.

12          So let's go back to our statute, look at the

13  language of the statute on liquidated damages and good faith,

14  and I want to see --

15          THE CLERK:  What about (indiscernible)?

16          MR. NOTESTINE:  206, I believe, or was it 260.

17          MR. SLOBIN:  Is it 260 (indiscernible)?

18          MR. NOTESTINE:  Yeah, maybe it was 260.

19  29 U.S.C. --

20          MR. SINKULE:  Well it starts at 200 or 201.

21          MR. NOTESTINE:  Liquidated damages right at the end.

22  Yeah, liquidated damages.

23          THE CLERK:  That's 260.

24          What did you want to know, Judge?

25          THE COURT:  I want to know exactly what's in the

1     statute regarding the --

2           MR. NOTESTINE:  Here's the liquidated damages

3     section.  It's 29 U.S.C. 260.  As I said, it's our first

4     sentence, Your Honor.

5           (Pause in the proceedings.)

6           THE COURT:  All right.  This is what I tend to think

7     we should do, but I'm willing to listen to argument.

8           Keep the first sentence as it is.  The FLSA provides

9     that Plaintiffs may recover liquidated damages unless the

10    employer shows that the act or omission giving rise to such

11    action was in good faith and that, let's say that Defendant

12    had reasonable grounds for believing that its act or omission

13    was not a violation of the FLSA.

14          Then, I think we should say, a finding that Shipcom

15    Wireless, Inc. -- we should take the sentence that is right

16    now a separate paragraph and move it up so it would say a

17    finding that Shipcom acted in good faith and that it had

18    reasonable grounds -- blah, blah, blah -- may only be used to

19    determine whether Plaintiffs are entitled to liquidated

20    damages.

21          Then I think we should insert the sentence that

22    says, Shipcom Wireless bears the burden of proving good faith

23    by a preponderance of the evidence.  And a reasonable belief

24    may be found where the employer engaged in the acts proven to

25    be violations of the FLSA but did so under mistake although

1     reasonable belief.

2              MR. NOTESTINE:  I think I'm okay with that, Your

3     Honor.

4              MR. SLOBIN:  I am, too, Your Honor.

5              MR. NOTESTINE:  Yeah.

6              THE COURT:  Okay.  Now if I can just repeat it.

7              THE CLERK:  Do you want me to read back to you what

8     I have?

9              THE COURT:  Did you type all that as I was talking?

10             THE CLERK:  (No audible response.)

11             THE COURT:  Yes.  Great.

12             THE CLERK:  FLSA provides that Plaintiffs may

13    recover liquidated damages unless the employer shows that the

14    act or omission giving rise to such action was in good faith

15    and that Defendant had reasonable grounds for believing that

16    its acts or omission was not a violation of the FLSA.

17             A finding that Shipcom Wireless, Inc., acted in good

18    faith and that it had reasonable grounds for believing that

19    its act or omission was not a violation of the FLSA may only

20    be used to determine whether Plaintiffs are entitled to

21    liquidated damages.

22             Shipcom Wireless bears the burden of proving good

23    faith by a preponderance of the evidence.  A reasonable belief

24    may be found where the employer engaged in the acts proven to

25    be violations of the FLSA but did so under mistake although

1     reasonable belief -- under a mistake and although reasonable

2     belief that its acts were in conformity with the law.

3            THE COURT:  Yeah.  The only thing I would say is

4     maybe we should say good faith defense because --

5            THE CLERK:  Good faith defense by a preponderance?

6            THE COURT:  Yeah.  Well, the only thing I'm

7     concerned about is the first sentence talks about good faith

8     and reasonable grounds and then the last sentence talks about

9     a reasonable belief.  Maybe we just sort of -- maybe in the

10    first sentence, where we say FLSA provides that Plaintiffs may

11    recover liquidated damages, blah, blah, blah, blah, blah.

12    Instead of period, we say coma, this is called the good faith

13    defense or something like that.  Or this is known as the good

14    faith defense.  We're just defining it.

15           MR. SLOBIN:  Yeah, I'm happy with that.

16           THE COURT:  Are you okay with that, Mr. Notestine?

17           MR. NOTESTINE:  Yeah.

18           THE COURT:  So the first sentence that Ms. Humphrey

19    just read after the word FLSA, we will say, this is known as

20    the good faith defense.

21           MR. NOTESTINE:  So you'd say the FLSA provides that

22    the Plaintiff may recover liquidated damages unless the

23    employer shows the section supported the act.  It says, "shows

24    that the act omission gave rise to the good faith and had

25    reasonable grounds for believing that its (indiscernible)

1     violation."  This is the good faith defense.  Is that what

2     you're saying?

3              THE COURT:  Yes.

4              MR. NOTESTINE:  Yeah, I'm okay with that.

5              THE COURT:  Okay.  Then I think we're set.

6              THE CLERK:  Take out known as, this is the good

7     faith.

8              MR. NOTESTINE:  I don't think you're taking out

9     anything, just adding --

10             THE COURT:  No, this is known as the good faith

11    defense, yeah.

12             And then I guess we could make the remainder a

13    second paragraph just so that the jury understands we're

14    expanding on the good faith defense.  Okay.

15             MR. NOTESTINE:  Whoops.

16             THE COURT:  Here you go.

17             MR. NOTESTINE:  My law firm would be upset that I

18    gave my phone to a Judge.

19             THE COURT:  Oh, I didn't look at it.

20             MR. NOTESTINE:  All the different wild emails we

21    get.

22             THE COURT:  All right.  Anything else?

23             MR. SLOBIN:  Can we get a print out of that?

24             THE COURT:  Yes.

25             And look over it closely, and if there are any --

1          MR. NOTESTINE:  We'll just have a short formal
2     charge conference first thing in the morning, and then just
3     make our objections and submit it.
4          I'm going to object, obviously, to the defense
5     because of the -- I have to figure out exactly how I'm going
6     to object to it.
7          THE COURT:  Yeah, I don't know how you're going to
8     object to that because --
9          MR. SLOBIN:  I think you objected to one of your own
10    questions today.
11         MR. NOTESTINE:  Did I sustain myself?
12         MR. SLOBIN:  You were asking (indiscernible) a
13    question, and he responded, and you objected to his response,
14    and I was like --
15         THE COURT:  I noticed that too.
16         MR. NOTESTINE:  I meant to object to his response,
17    I'm sure.
18         THE COURT:  So unless there's a major error --
19    unless it's something other than just making your formal
20    objections that you've already given me, we'll do the formal
21    charge conference --
22         MR. NOTESTINE:  My objection should take two
23    minutes.
24         THE COURT:  Okay.
25         All right.  So I think we can probably just do it

1    first thing in the morning before we bring the jury in the

2    box.

3            MR. NOTESTINE:  And we're keeping the questions the

4    same, right?

5            THE COURT:  Yes.

6            Yeah.  The questions look good to me.

7            MR. NOTESTINE:  Very good.

8            MR. SLOBIN:  Kerry?

9            MR. NOTESTINE:  Yes.

10           MR. SLOBIN:  Is your witness, do you know, and you

11   don't have to answer me, but are you expecting a long time for

12   the witness, or a short time?  I'm just trying to figure out

13   timing for --

14           MR. NOTESTINE:  I think we have some -- I mean,

15   obviously, we have some things to address.  I mean, he's not

16   going to be half an hour or anything like that.

17           THE COURT:  So we have one Plaintiff and one defense

18   witness, perhaps two.

19           MR. NOTESTINE:  And I don't think we're going to go

20   over.  It's very unlikely.  We talked about it at lunchtime,

21   and kind of decided --

22           THE COURT:  I don't think we'll have any

23   difficulty -- assuming we don't have any difficulty closing

24   the evidence before lunch.  Obviously, the sooner we get the

25   case to the jury, the better.

1        MR. NOTESTINE:  And you said the jury questions are
2    (indiscernible).

3        THE CLERK:  (Indiscernible) jury questions
4    (indiscernible).

5        THE COURT:  I think we at least should be able to --
6    I mean, I guess, worst case scenario, if we get the evidence
7    closed before lunch but not sufficiently before lunch to have
8    both sides give their closing arguments, how do you want to
9    address that?

10        MR. SLOBIN:  My honest preference is that we eat
11    honestly before -- if we're going to --

12        THE COURT:  Just break early, eat --

13        MR. SLOBIN:  Just break early, eat --

14        MR. NOTESTINE:  Come back --

15        MR. SLOBIN:  -- do the closing.  But we'll just play
16    it by ear.

17        MR. NOTESTINE:  (Indiscernible).

18        We shouldn't spend time on something that may not be
19    an issue.

20        MR. SLOBIN:  Yeah, if we're cranking tomorrow
21    morning, I think we'll be fine.

22        THE COURT:  All right.

23        MR. NOTESTINE:  Okay.  Thank you, Your Honor.

24        THE COURT:  We'll see you all in the morning.  Thank
25    you.

342

1          MR. SLOBIN:  Thank Your Honor.

2          THE COURT:  Thank you.

3       (Discussion off the record.)

4          THE COURT:  Oh, Counsel, we did not address the

5  exhibits.  So we have, quote/unquote, "pre-admitted all

6  exhibits."  I don't think you have referred to all of them.

7  Are you still going to want to send everything back to the

8  jury, everything that was admitted?  Do you want to send it

9  back to the jury?

10         MR. NOTESTINE:  Well, we're going to take out the

11  ones that relate to the damages.

12         MR. SINKULE:  Yeah, We've taken those out.

13         THE COURT:  Right -- which we already have on

14  Record.  But yeah, you're going to -- is that the only thing

15  you're going to pull and not send back with the jury?

16         MR. NOTESTINE:  I think we pretty much referred to

17  everything else.

18         MR. SLOBIN:  I've not been keeping (indiscernible).

19         MR. NOTESTINE:  Well, I mean, once Mr. Abraham

20  testifies, I think we're --

21         THE COURT:  Okay.  Well I just want to make sure

22  because at some point, Ms. Jantowski is going to get you all

23  to sign a document stating that all of these exhibits have

24  been admitted and are going back with the jury.

25         MR. SLOBIN:  We'll look tonight and let you know

1    first thing in the morning.

2              THE COURT:  Great.  Thank you, very much, gentlemen.

3              MR. NOTESTINE:  Thank you.

4              MR. SLOBIN:  Thank you.

5              MR. NOTESTINE:  We'll want to take -- we're going to

6    bring another notebook and take out -- we're going to take the

7    statements back and then we'll take out the damages ones that

8    are on that list, put them in a separate notebook just for --

9              THE COURT:  And you did already pull out 7 and 24?

10              MR. NOTESTINE:  We already -- I just pulled that

11    out.

12              THE COURT:  All right.

13              See you all in the morning.  Thank you, very much.

14         (Proceedings adjourned at 5:35 p.m.)

15                        *  *  *  *  *

16         *I certify that the foregoing is a correct transcript*

17    *to the best of my ability produced from the electronic sound*

18    *recording of the proceedings in the above-entitled matter, and*

19    *this is an accurate a transcript, as best as is possible, due*

20    *to conditions of the recording.*

21         */S./   MARY D. HENRY*

22    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

23    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

24    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

25    *JTT TRANSCRIPT #59147   DATE FILED:  SEPTEMBER 1, 2018*